## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE CROTTY

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        v.

JOHN BABIKIAN,

        Defendant.

Civil Action No.

14 CV 1740

Filed *Ex Parte*

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF, FOR PREJUDGMENT WRITS OF ATTACHMENT AND GARNISHMENT, AND FOR AN ORDER TO SHOW CAUSE ON A PRELIMINARY INJUNCTION**

Dated:  March 13, 2014

Michael J. Roessner, #MR4195

Matthew P. Cohen (pro hac pending)

SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549-4030
Tel: (202) 551-7276 (Cohen)

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    STATEMENT OF FACTS ..................................................................................... 4

       a.  Babikian's Connection to and Control of the Instrumentalities of the Fraud ............... 4

       b.  The Touts of America West Stock on February 23, 2012 ............................................ 7

       c.  Babikian's Position in America West and his Preparation for the Touts ..................... 8

       d.  Babikian Immediately Sells his America West Stock Following the Touts ................. 9

       e.  There is a Risk of Imminent Disposition of Certain of Babikian's Assets ................. 10

III.   ARGUMENT ...................................................................................................... 12

       a.  Authority and Legal Standards Governing the Equitable Relief Sought by the
           Commission .................................................................................................... 12

       b.  The Court Should Order an Asset Freeze to Facilitate the Preservation of Assets and
           the Just Administration of the Case ................................................................. 14

               i.     Babikian used Instrumentalities of Interstate Commerce .......................... 15

               ii.    Babikian Engaged in Fraudulent Conduct ................................................. 16

               iii.   Babikian Acted with Scienter ................................................................ 19

               iv.    Under the Circumstances Described Herein, an Asset Freeze
                      is Warranted .......................................................................................... 20

       c.  To Further Preserve the Status Quo, the Court Should Order a Conduct-Specific
           Temporary Restraining Order and Preliminary Injunction .......................................... 20

       d.  The Court Should Order an Accounting ................................................................ 22

       e.  The Court Should Order Expedited Discovery and Prohibit the Destruction of
           Documents ...................................................................................................... 23

       f.  Pursuant to the Federal Debt Collection Procedures Act, the Court Should Issue Writs
           of Garnishment and Attachment to Apply to Assets in Anticipation of a Civil Penalty
           in Favor of the Commission ............................................................................. 24

|      | i.  | The Commission's Claim for Penalties is a "Debt" under the FDCPA .... | 24 |

| | ii. | The Commission has met the Conditions for Prejudgment Writs of Garnishment and Attachment Under the FDCPA ..................................... | 25 |

| g. | | The Court Should Order Alternative Service of Process............................................. | 27 |

| IV. | | CONCLUSION ......................................................................................... | 28 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        v.

JOHN BABIKIAN,

        Defendant.

Civil Action No.

Filed *Ex Parte*

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN
SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING
ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF, FOR
PREJUDGMENT WRITS OF ATTACHMENT AND GARNISHMENT, AND FOR AN
ORDER TO SHOW CAUSE ON A PRELIMINARY INJUNCTION**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully

submits this memorandum of law in support of its *Ex Parte* Application for a Temporary

Restraining Order Freezing Assets and Granting Other Relief, for Prejudgment Writs of

Attachment and Garnishment, and for an Order to Show Cause on a Preliminary Injunction (the

"Application"). The Commission seeks this immediate and *ex parte* relief to prevent the

imminent transfer of ill-gotten gains to a foreign jurisdiction, and to otherwise protect assets that

are under the direct and indirect control of Defendant John Babikian ("Babikian"), in order to

preserve the Commission's ability to recover a civil penalty for Babikian's fraud.

## I.    PRELIMINARY STATEMENT

This is an application for emergency relief in a case involving a type of securities fraud

known as "scalping". A defendant unlawfully "scalps" securities by recommending or touting a

security to others, without disclosing that he intends to sell his shares of the very security that he

is recommending that others purchase.  After recommending the security to others, the defendant

sells his shares after a rise in market price following the tout.

The touts in this case began at approximately 2:30 p.m. (Eastern) on Thursday, February

23, 2012, when two internet websites caused a mass email blast to be widely disseminated to

approximately 700,000 email addresses over the Internet.  This email blast recommended that

investors purchase the stock of America West Resources Inc. (OTC:  AWSR) ("America West"),

a Nevada corporation.  The email touts identified Centro Azteca, S.A. as the putative owner and

operator of the touting websites.  However, strong circumstantial evidence suggests that Centro

Azteca, S.A. ("Centro Azteca") is an alter ego for Defendant John Babikian, and that Babikian

was behind the email touts.  The touts, however, neither disclosed Babikian's role in the AWSR

purchase recommendation nor the fact that Babikian himself held over 1.4 million shares of

AWSR stock, which he had positioned to be sold promptly upon dissemination of the touts.

The day before the touts, AWSR shares closed at $0.29 with only 5,659 shares trading.

In the ninety minutes following publication of the touts on February 23, 2012,  trading of AWSR

stock exploded.  AWSR share price hit an all-time high of $1.80, before closing at $1.29.

During this window of artificially inflated trading volume and pricing,  Babikian sold all or

substantially all of his position in AWSR, realizing proceeds in excess of $1.9 million.  By

engaging in this conduct, Babikian violated the antifraud provisions of the Exchange Act and the

Securities Act.  In its Application, the Commission respectfully requests that the Court order

Babikian to disgorge his ill-gotten gains and assess a money penalty against him.

Therein lies the emergency that necessitates the Commission's Application.  Although

Babikian, a Canadian citizen whose whereabouts are presently unknown, uses a web of alter-ego

front companies and offshore bank accounts to hide his assets, the Commission is aware of two of Babikian's U.S.-based assets that are at immediate risk of expatriation. The first is Babikian's fractional interest in a jet aircraft, which Babikian held through one of his alter ego front companies. On March 5, 2014, Babikian sold his interest in the aircraft to a U.S.-based third party, and Babikian is currently pressing the third party to wire the proceeds of that transaction – approximately $2.5 million – to an account in Dubai, United Arab Emirates in the name of another suspected Babikian alter ego corporate entity. Absent a court order freezing Babikian's assets, the third party intends to oblige Babikian's request and wire the funds by the close of business March 13, 2014. Second, the Commission has identified real property in California in the name of another Babikian front company that recently was listed for sale at approximately $2.6 million. A mainstream internet real estate website presently lists the property under "sale pending" status. An emergency asset freeze therefore is necessary to prevent Babikian from diverting the proceeds of the home sale or any other property to one of his numerous offshore accounts. To the extent the value of assets frozen pursuant to the Court's order exceeds the total value of the Commission's disgorgement remedy, the Commission seeks prejudgment writs of garnishment and attachment to apply to those assets under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 *et seq.*, in anticipation of a civil penalty that the Commission will seek against Babikan upon judgment in this case.

## II.    STATEMENT OF FACTS[1]

Babikian's fraudulent scheme centers around email newsletters disseminated on February 23, 2012 from two internet websites, Awesomepennystocks.com ("APS") and Pennystockuniverse.com ("PSU"), which purported to recommend purchases of a microcap or "penny" stock.   In virtually identical disclaimers, these email newsletters stated that a company called Centro Azteca owned and operated the APS and PSU websites.   The newsletters, however, did not disclose that Centro Azteca was one of Babikan's many alter egos.   In fact, as set forth below, Babikan was behind the email "touts" from APS and PSU, and he did not disclose to the email recipients that he was selling his shares in a company that he recommended they buy.

### a.   Babikian's Connection to and Control of the Instrumentalities of the Fraud

Strong circumstantial evidence establishes that Babikian exercised, or at least shared, control over the APS and PSU websites and Centro Azteca, and that Babikian accessed the email distribution service used to distribute the fraudulent touts moments before their dissemination.

First, Babikian *created* the offending APS and PSU sites.   These sites were created on November 5, 2009 through an internet domain registration company, with an account in the name of "johnjackinc" and an email address of crazypennystocks@gmail.com. (McFall Decl. ¶¶ 13 and Ex. 1.)   Babikian's role, however, in creating the APS and PSU websites is established by the following:

- Records from Google that show the user of the crazypennystocks@gmail.com email address carries a secondary email address of johnjackinc@gmail.com, and that the contact name for this secondary email address is John Babikian of Montreal, Canada. (McFall Decl. ¶¶ 15, 16 and Exs. 2, 3.)

---

[1] The evidence supporting this emergency application is set forth in the Declaration of Andrew R. McFall executed on or about March 12, 2014 ("McFall Decl.") and the attached Exhibits 1-64, which are true copies of documents obtained by the Commission staff during the course of the Commission staff's investigation of the defendant that led to this action.

- Records from the internet domain registration company that show the account "johnjackinc" is associated with a credit card in the name of John Babikian with the last four digits 1872. (McFall Decl. ¶ 13 and Ex. 1.)

Second, the circumstantial evidence establishes that Babikian– through a separate account in the name of Centro Azteca–*maintained* the offending websites by renewing the APS and PSU domain names in 2010 (for one year) and again 2011 (for two years, including the time of the "touts" that are the subject of this Application).  (McFall Decl. ¶¶ 18, 19 and Ex. 4.)  The evidence tying Babikian to these renewals includes:

- Records from the same internet domain registration company that show that payment for the 2011 renewals came from a Paypal account in the name of "John Babikian" and associated with the email address mapleboyone@gmail.com. (McFall Decl. ¶ 19 and Ex. 4.)

- Records from Google that show the secondary email address provided by the user of mapleboyone@gmail.com is johnjackinc@gmail.com – the same email address described above with contact name of John Babikian. (McFall Decl. ¶ 20 and Ex. 2.)

Third, the circumstantial evidence shows that Babikian – again, through an account in the name of his Centro Azteca alter ego – paid an email service provider substantial fees for a number of mass email disseminations from the APS website.  Specifically, over approximately eight months before the February 23, 2012 touts, Babikian's alter ego Centro Azteca paid more than $106,000 in the form of monthly charges and distribution fees to a mass email service called iContact, and in turn iContact distributed over 470 sets of email newsletters on behalf of the APS website.  (McFall Decl. ¶ 22)  Records provided by the parent company for iContact show that Centro Azteca paid for this service with an American Express credit card in the name of John

Babikian.  (*Id.*)  Google records list this same American Express credit card in connection with

the mapleboyone@gmail.com email address described above.  (McFall Decl. ¶¶ 20 and Ex. 2.) [2]

Fourth, Internet Protocol (IP) [3] address logs produced by iContact's parent company for

the Centro Azteca account at iContact, and by Babikian's personal brokerage account, reinforce

that Centro Azteca was Babikian's alter ego during the time period that included the fraudulent

touts.  Specifically, the logs show the following:

- The same IP address (76.94.134.16) accessed the Centro Azteca account at iContact and Babikian's personal brokerage account between January 14, 2012 and May 2, 2012.  (McFall Decl. ¶¶ 23, 25 and Ex. 6.)[4]

- A separate IP address (184.163.111.93) accessed both the Centro Azteca account at iContact and Babikian's personal brokerage on the same day, May 20, 2012; Internet service provider records show that this IP address was assigned to John Babikian, 1300 Rue Alain-Grandbois, Apt.701, Montreal, Quebec on May 20, 2012. (McFall Decl. ¶¶ 24, 26 and Exs. 6, 52.)

Finally, and of greatest significance, IP records connect Babikian to Centro Azteca's

email distribution service *within moments of the fraudulent tout*.  On February 23, 2012, IP

address 76.94.134.16 accessed Centro Azteca's account at iContact at approximately 2:21 p.m.,

---

[2] Babikian's credit card did not pay for the fraudulent touts on February 23, 2012.  Although records produced by the parent company for iContact show that those touts were paid by a credit card associated with an individual named Robert Kalfayan (McFall Decl. ¶ 22), the record suggests that Babikian uses Kalfayan – or at least a credit card in Kalfayan's name – to assist in some of the touting activity.  For example, credit cards in both men's names paid for email distributions from an older iContact account that distributed APS emails, and those account records list the same mailing address for both men.  (McFall Decl. ¶¶ 37, 38.)

[3] Internet Protocol is a method through which computers communicate over the Internet.  Each computer as a unique identifier (i.e., an IP Address) that distinguishes it from other computers. Computers leave a "fingerprint" on the Internet on what are called "IP Logs," which capture the date and time at which a specific computer accessed a specific location on the Internet.

[4] The Centro Azteca account was accessed repeatedly between these dates.  Babikian accessed his personal brokerage account from the same IP address on February 28 and March 29, 2012, which were the only times Babikian accessed his brokerage account during this period.

and that access continued until at least 2:35 p.m. (McFall Decl. ¶ 34) This access covered the time of the PSU tout and was the last to access the Centro Azteca account at iContact before the fraudulent PSU and APS touts. Thus, the mass email distribution service responsible for the fraudulent touts was accessed moments before the touts from an IP address that also can be shown to have accessed Babikian's personal brokerage account. This is strong circumstantial proof that Babikian was directly responsible for the fraudulent touts.

### b. The Touts of America West Stock on February 23, 2012

On February 23, 2012, at 2:32 p.m., PSU issued a mass email with the subject, "Brand new pick coming March 1!" (McFall Decl. ¶ 27 and Ex. 56.) The body of the email began with the following in large color type: "Today's pick is: AWSR". (Id.) The email then described a coal mining company that was producing coal in Utah, albeit in a manner that suggested that the coal mining company would be the subject of a stock promotion campaign on March 1. (*Id.*) Several minutes later, at approximately 2:48 p.m., APS disseminated a nearly identical mass e-mail. (McFall Decl. ¶ 28 and Ex. 8.) The account records for the Centro Azteca account at iContact show that these email distributions went to a total of more than 700,000 email addresses on February 23, 2012 (McFall Decl. ¶ 33)

America West Resources, Inc. was a coal mining company with operations in Utah whose ticker symbol was AWSR and whose shares were quoted on the OTC Link operated by OTC Markets Group, Inc. (formerly known as the Pink Sheets). (McFall Decl. ¶ 29 and Ex. 9.) Prior to the issuance of these email touts, AWSR's stock was both low-priced and thinly traded. AWSR's trading volume over the prior year averaged, in round numbers, only 15,400 shares per day, with barely 7,000 shares traded in the entire week leading up to February 23. Its closing price on February 22, 2012, the day prior to the touts' dissemination, was $0.29. On February

23, 2012, in the time period before the issuance of the first tout at 2:32 p.m. (Eastern), there were *no trades whatsoever* in America West stock. But immediately following dissemination of the touts on February 23, 2012—in the less than ninety minutes of trading that remained that day— more than 7.8 million shares of America West were traded. This was more than double the total volume the stock had traded during the whole of the prior year. During those ninety minutes, America West's share price hit an all-time high of $1.80 before closing at $1.29. (McFall Decl. ¶ 32.)

The PSU and APS touts of America West each contained a disclaimer, which stated in part that the issuing newsletter's website (Pennystockuniverse.com or Awesomepennystocks.com, respectively), "is owned and operated by Centro Azteca S.A.", and further, that "[the respective issuing newsletter's website], its operators, owners, employees and affiliates may have interests or positions in equity securities of the companies profiled on this website, some or all of which may have been acquired prior to the dissemination of this report, and may increase or decrease these positions at any time." (McFall Decl. ¶¶ 30-31 and Exs. 8, 56.) The touts did not disclose, however, that one of the individuals behind the touts, Babikian, in fact already did have a substantial position in America West, consisting of at least 1,466,667 shares, as described more fully below. Nor did the touts disclose that Babikian had already caused those shares to be poised for immediate sale. And the touts did not disclose that Babikian intended to sell as many of those shares as he could on the same day the touts were disseminated.

### c. Babikian's Position in America West and his Preparation for the Touts

Between November 2010 and April 2011, Babikian amassed approximately 1,466,667 restricted shares of America West stock in his own name. (McFall Decl. ¶¶ 39-42 and Exs. 10-

19, 39, 40.)[5] Babikian deposited his shares into a brokerage account in his name at John Thomas Financial, in New York,NY.  (McFall Decl. ¶¶ 43-44 and Exs. 20-21.)

Brokerage account records establish that, beginning in August 2011, Babikian began to take steps to sell his America West stock.  First, Babikian had the "restricted" legend removed from 966,667 of his America West shares and then had the shares transferred to Brown Brothers Harriman in New York, NY, as custodian for Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG ("Frankfurter Bank").  (McFall Decl. ¶¶ 46-48 and Exs. 22-31.)  In November 2011, Babikian had the restricted legend removed from the remaining 500,000 restricted America West shares.  (McFall Decl. ¶ 49 and Ex. 32-34.)  Babikian then repeated the same steps and transferred these shares to Brown Brothers Harriman as a custodian for Frankfurther Bank.  (McFall Decl. ¶¶ 49-50 and Exs. 31-35.)  Records from Brown Brothers show that Brown Brothers deposited Babikian's shares into an account in the name of Six Sis AG, the Swiss securities depository.  Accordingly, by January 20, 2012—a little more than one month before the February 23, 2012 touts—Babikian had rendered his America West shares transferrable and positioned to be sold.

### d. Babikian Immediately Sells his America West Stock Following the Touts

As stated above, the touts on February 23, 2012 were first disseminated at approximately 2:32 p.m.  In the approximately 90 minutes that remained in that trading day, Frankfurter Bank sold a total of 1,601,548 shares in return for gross proceeds of $2,217,269.  (McFall Decl. ¶¶ 51-

---

[5] The term "restricted stock" in this context, means stock that is acquired from an issuer in an unregistered offering.  When a company issues shares in transactions exempt from registration, such as private placements, the transfer agent will place a "restricted" stamp on the stock certificates (or electronic counterparts) indicating that the stock may not be publicly sold. Documents produced to the Commission indicate that Babikian obtained restricted stock directly from America West via a promissory note and a private placement. (McFall Decl. ¶¶ 40-42 and Exs. 10-19, 39, 40.)

52 and Exs. 31, 36-38.)  The account records establish that, at a minimum, 1,383,655 of these shares sold on February 23, 2012 were Babikian's and came from Babikian's position of 1,466,667 shares described above.  (Id.)  Absent the touts Babikian could not have sold more than a few thousand shares at approximately $0.29 per share – the price at which American West stock closed on February 22, 2012.

### e.  There is a Risk of Imminent Disposition of Certain of Babikian's Assets

There is an acute need for an immediate asset freeze.

***Proceeds from NetJets. Inc.***  The Commission has learned that, in the past year, Babikian purchased a 6.25% interest in a Bombardier, Inc. Global 500 airplane from NetJets, Inc. ("NetJets"), a business that sells fractional ownership of private business airplanes.[6]  (McFall Decl. ¶ 62 and Exs. 46, 55, and 62.)   Babikian effectuated this purchase through an alter ego front company called the Vertical International Relief Fund ("VIRF"), and Babikian signed the purchase contract with NetJets as VIRF's "chief asset manager".  (McFall Decl. ¶ 63 and Exs. 46-47.)  Pursuant to the agreement, all notices "Addressed to Owner" were to be sent to the attention of "Mr. John Babikian" of VIRF.  (Id.)  Furthermore, flight records provided by NetJets establish that Babikian was the primary user of the aircraft that is the subject of the fractional purchase agreement.  (Id.)

In early March 2014, NetJets executed a repurchase agreement with VIRF (through Babikian), pursuant to which Babikian sold fractional interest in the Bombadier aircraft back to NetJets for approximately $2.5 million, an amount less than market value. (McFall Decl. ¶ 64.) Pursuant to that repurchase agreement, NetJets is obligated to remit the purchase price of

---

[6]  These fractional ownership interests are analogous to timeshare arrangements.  Through fractional ownership, NetJets' clients can purchase and own partial interests in specific airplanes. These clients are then entitled to utilize those planes for a certain number of hours each year.

approximately $2.5 million to Babikian.  (Id.)  A NetJets representative has advised the Commission staff that Babikian has requested NetJets wire the sale proceeds to an account at a financial institution in the United Arab Emirates.  (Id.)  Since the sale, Babikian has repeatedly contacted NetJets to inquire about the status of the wire transfer.  (Id.)  NetJets has advised the Commission staff that, absent a court-ordered asset freeze, it will wire the money per Babikian's instructions by the close of business on Thursday, March 13, 2014, which in turn will frustrate the Commission's efforts to recover disgorgement, prejudgment interest, and a civil penalty for Babikian's fraudulent scheme outlined above.  (McFall Decl. ¶ 65.)

    ***Proceeds from the Sale of Real Estate in the United States.***  The Commission's investigation has also identified real property in California and Oregon that Babikian owns through two alter-ego front companies, Middlebay Trade Ltd. ("Middlebay") and Oriwa Villas Ltd. (McFall Decl. ¶ 66-72 and Exs. 44-45, 48,49-53, 54, 45, and 60.)  With respect to one of these properties, 642 N. Laurel Avenue, Los Angeles, California (the "N. Laurel Ave. property"), real property records show that Babikian purchased the N. Laurel Ave. property on December 1, 2010, and that he transferred it to Middlebay in a "nominal" cash transaction approximately seven months later.  (McFall Decl. ¶¶ 66-72 and Exs. 44-45, 47, 49-53, 60.)[7]  Emergency relief in the form of an asset freeze is necessary because it appears from a mainstream real estate internet site that Babikian is on the verge of selling the N. Laurel Ave. property, although a precise closing date is not known.  As of March 9, 2014, the internet website Redfin.com showed

---

[7]    The Commission's investigation has yielded substantial additional evidence that Middlebay is one of Babikian's alter egos.  (McFall Decl. ¶¶ 66-68 and Exs. 44-45, 49, 53, and 60.)  By way of example only, before executing the purchase of the Bombadier aircraft from NetJets described above, Babikian leased a Gulfstream IV from NetJets through a company called "Middle Bay Trade, Ltd.," and signed the lease documents as the company's "President".  (McFall Decl. ¶ 56 and Ex. 51, 60.)

that the N. Laurel Ave. property was listed for sale at a price of $2,595,000, with a sale of the property "pending". (McFall Decl. ¶ 69 and Ex. 54.) Based upon Babikian's pattern of conduct, there is a real and present risk that, if the sale of the N. Laurel Ave. property is consummated, Babikian will divert the proceeds to an offshore account and/or a front company, which will significantly frustrate the Commission's efforts to recover disgorgement, prejudgment interest, and a civil penalty for Babikian's fraudulent scheme outlined above. (McFall Decl. ¶ 70.)

## III.   ARGUMENT

Broadly speaking, the Commission seeks two forms of relief. First, the Commission seeks equitable relief including, among other things, (a) an order freezing Babikian's assets to preserve the Commission's ability to recover disgorgement and prejudgment interest, (b) an order enjoining him from engaging further in scalping-type conduct that violates the federal securities laws, (c) an accounting of Babikian's assets, and (d) an order expediting discovery and prohibiting the destruction of documents. Second, to the extent that the Commission is able to freeze assets whose value exceeds the anticipated disgorgement of Babikian's ill-gotten gains (approximately $1.9 million), the Commission seeks prejudgment writs of garnishment and attachment to apply to those assets, in anticipation of a civil penalty that will be levied against Babikian. This request is made pursuant to the Federal Debt Procedures Collection Act, 28 U.S.C. §§ 3001, 3101, discussed in Section III.f., below.

### a.   Authority and Legal Standards Governing The Equitable Relief Sought by the Commission

The instant Application seeks equitable relief. "Section 22(a) of the Securities Act of 1933 and Section 27 of the Exchange Act of 1934 'confer general equity powers upon the district courts' that are 'invoked by a showing of a securities law violation.'" *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d

Cir.1972) (citing 15 U.S.C. §§ 77v(a), 78aa)). "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances," *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir.1984), "including the impoundment of assets," *SEC v. American Bd. of Trade, Inc.* 830 F.2d 431, 438 (2d Cir. 1987).

      With respect to injunctive relief, Section 21(d) of the Exchange Act provides:

> Whenever it shall appear to the Commission that any person is engaged, or is about to engage in acts or practices constituting a violation of any provision of this title, the rules or regulations thereunder, . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.[8]

15 U.S.C. § 78u(d).  Section 20(b) of the Securities Act employs nearly identical language.  *See* 15 U.S.C. § 77t(b).  Because the SEC is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party.  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  Thus, "the standards of public interest, not the requirements of private litigation measure the propriety and need for injunctive relief."  *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944).  In particular, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities laws violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition."  *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).

      The standard for an asset freeze is not as high as the usual standard for a preliminary injunction; rather, the SEC is required to show either a likelihood of success on the merits or that "an inference can be drawn" that the defendant violated federal securities law.  *Smith*, 653 F.3d

---

[8] Section 20(b) of the Securities Act of 1933 [15 U.S.C. § 77t(b)] ("Securities Act") similarly confers such authority to the Commission in connection with violations of that Act.

at 128 (2d Cir. 2011) (citing *SEC v. Byers*, No. 08 Civ. 7104(DC), 2009 WL 33434, at *3 (S.D.N.Y. Jan. 07, 2009)). The decision to freeze assets, or to modify an asset freeze, is committed to the district court's discretion. *See Smith*, 653 F.3d at 127. Asset freeze orders are less burdensome on defendants than other types of injunctive relief; for that reason, the required showing of success on the merits (or a permissible inference) is lower, especially if the freeze order is limited in duration. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (citing *SEC v. Levine*, 881 F.2d 1165, 1177 (2d Cir.1989)). In *Unifund*, the Second Circuit made clear that an asset freeze may be ordered even where the Commission has not presented sufficient evidence to obtain the "traditional" preliminary injunction against continuing statutory violations. 910 F.2d at 1041 (reasoning that an asset freeze could be imposed with a lesser showing because "the freeze order does not place [defendants] at risk of contempt in all future securities transactions. It simply assures that any funds that may become due can be collected."); *see also SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (purpose of asset freeze is to "preserve status quo by preventing dissipation and diversion of assets").

**b. The Court Should Order an Asset Freeze to Facilitate the Preservation of Assets and the Just Administration of the Case.**

The Commission has alleged in its Complaint violations of the antifraud provisions of the Securities Act and the Exchange Act. As explained above, when there are concerns that a defendant might dissipate assets, a court need only find *some basis* for inferring a violation of federal securities laws in order to impose a freeze order. That standard is plainly met here. Indeed, as set forth below, there is *a substantial likelihood* that the Commission will succeed in establishing each of these violations.

Section 17(a) of the Securities Act prohibits any person, in the offer or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud;

(2) obtaining money or property by means of any untrue statement of material fact or any

omission to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; or (3) engaging in any

transaction, practice or course of business which operates or would operate as a fraud or deceit

upon the purchaser. *See* 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5

thereunder prohibit essentially the same conduct, if committed in connection with the purchase

or sale of any security.[9]

To prevail in a civil enforcement action alleging violations of these antifraud statutes, the

Commission must show that a defendant: (i) by the use of the mails or an instrumentality of

interstate commerce; (ii) made false and misleading statements or omissions of material fact or

otherwise employed any device, scheme, or artifice to defraud or engaged in any transaction,

practice or course of business which operates as a fraud or deceit; (iii) in connection with the

offer, purchase or sale of securities; and (iv) acted with the requisite intent or scienter. *Aaron v.*

*SEC*, 446 U.S. 680, 697 (1980). *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d

Cir. 1969); *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992), *aff'd*, 997 F.2d 287 (7th Cir.

1993). The proof of each of these violations is abundant.

### i. Babikian used instrumentalities of interstate commerce

To begin, Babikian used multiple means or instrumentalities of interstate commerce in

connection with his conduct: Babikian's scheme was the widespread dissemination of fraudulent

"touts" via email on the internet, and there is ample evidence that Babikian managed aspects of

the fraud remotely, via internet connections. Indeed, much of the circumstantial evidence that

---

[9]The Supreme Court has recognized that the antifraud provisions of the Securities Act and the
Exchange Act prohibit much of the same conduct. *See U.S. v. Naftalin*, 441 U.S. 768, 778
(1979).

Babikian exerted control over the APS and PSU websites, their putative "owner," Centro Azteca, and the fraudulent touts themselves, is in the form of internet domain registration records, email account records, IP access records, payment records, and the like – all strong evidence that Babikian therefore plainly used the instrumentalities of interstate commerce in connection with this fraud. *See, e.g., Heyman v. Heyman*, 356 F. Supp. 958, 969 (S.D.N.Y. 1973) (all that is necessary for jurisdiction is some means of "interstate commerce," such as a mailing, a phone call, or a trip, "used in some phase of the transaction, which need not be the part in which the fraud occurs"); *Richter v. Achs*, 962 F. Supp. 31, 33 (S.D.N.Y. 1997) ("[I]f a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity, the jurisdictional element is satisfied.").

### ii.   Babikian Engaged in Fraudulent Conduct

There is substantial proof of the fraudulent nature of Babikian's scalping activity, that is, the degree to which his conduct entailed false and misleading omissions of material fact and otherwise constituted a scheme to defraud.

Courts have long recognized the practice whereby the owner of shares of security recommends that security for investment and then immediately sells it at a profit upon the rise in market price which follows the recommendation, as a fraud or deceit for purposes of establishing violations of the Securities Act and the Exchange Act. *See, e.g., SEC v. Abellan*, 674 F. Supp.2d 1213, 1219 (W.D. Wash. 2009) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963)); *see also SEC v. Eisenberg*, 773 F. Supp. 662, 723 (D.N.J. 1991) (alleged undisclosed "'scalping' schemes" state a claim under "Section 10b and Rule 10b-5"); *SEC v. Blavin*, 557 F. Supp. 1304, 1311 (E.D. Mich. 1983) ("The protection of the securities laws would be shallow indeed if such 'scalping' schemes were permitted.  Courts have uniformly held that

such schemes violate the securities [laws] and that a failure to disclose such a 'scalping' scheme is a material omission prohibited by § 10(b).").

Though he committed it through a patchwork of fictitious email addresses and alter-ego front companies, Babikian's was a classic scalping scheme that violated the antifraud provisions of the securities laws. Babikian established and maintained, over a nearly three-year period, the APS and PSU websites from which the fraudulent touts were disseminated. Through an account in the name of his Centro Azteca alter ego, Babikian paid an email service provider substantial fees for a number of mass email disseminations from the APS website. Meanwhile, Babikian methodically accumulated stock in America West, and, in the months before the fraudulent touts, Babikian rendered his America West stock transferrable and positioned the stock to be sold through a Swiss bank's omnibus account. Then, on February 23, 2012, at approximately 2:21 p.m., IP records support a strong inference that Babikian accessed Centro Azteca's account with the mass email distribution service responsible for the fraudulent touts. Within minutes, APS and PSU – entities purportedly owned by Centro Azteca – "touted" America West stock using the same mass email distribution service. These touts did not disclose that Centro Azteca was, in fact, Babikian; that Babikian, in fact, already did have a substantial position in America West; that Babikian had already caused those shares to be poised for immediate sale; or that Babikian intended to sell as many of those shares as he could, into the rise in stock price and volume increases caused by his touts on that very same day.

A statement or omission is material if a reasonable investor would view its disclosure as significantly altering the "total mix of information" made available. *See TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Judged against this standard, Babikian's omissions plainly were material, particularly where Babikian's email touts strongly recommended that

investors buy the very same stock he intended to sell.  Indeed, courts have not had difficulty in

finding materiality on analogous facts.  *See, e.g., SEC v. Reynolds*, 3-08-CV-0384-B, 2008 WL

3850550, at *6 (N.D. Tex. Aug. 19, 2008) ("[T]he SEC's allegation that Defendants failed to

disclose their true intention to 'pump and dump' the stock alone could be a material omission.");

*SEC v. Corp. Relations Group*, 6:99-CV-1222, 2003 WL 25570113 (M.D. Fla. Mar, 28, 2003)

(the fact that defendants "were selling their stock at the same time they were encouraging their

readers to buy would clearly be material to reasonable investors"); *SEC v. Huttoe*, 96-CV-2543,

1998 WL 34078092 (D.D.C. Sept. 14, 1998) ("[T]he fraud lies not in [the] practice of selling

stocks contrary to [the newsletter's] recommendations, but in the failure to disclose that practice

to potential investors and readers. The practice reflects on the objectiveness of the investment

advice and is therefore material.").

> The February 23, 2012 touts did contain a general "DISCLAIMER" that stated:

> > [the respective issuing newsletter's website], its operators,
> > owners, employees and affiliates *may* have interests or
> > positions in equity securities of the companies profiled on
> > this website, some or all of which *may* have been acquired
> > prior to the dissemination of this report, and may increase
> > or decrease these positions at any time.

(McFall Decl. ¶ 30 Ex. 56.)  (emphasis added).  Far from curing Babikian's fraudulent omission,

however, this boilerplate language was itself a material misstatement.  *See, e.g., Blavin*, 760 F.2d

at 711 ("In this factual context, a disclaimer that the investment advisor 'may' trade in

recommended securities for its own account is itself a material misstatement."); *see also SEC v.*

*Recycle Tech, Inc.*, No. 12-21656-CIV-JAL, at 13-14 (S.D. Fla. Sept. 26, 2013) (slip op.) (in

scalping case, holding that complaint adequately pled material misrepresentations or omissions

despite a general disclosure that defendant "may sell part or all" of its shares in the stock)[10]; *SEC v. Gane*, No. 03-61553, 2005 WL 90154, at *1 (S.D. Fla. 2005) (noting the court's previous Summary Judgment Order held that defendants' "written statements that they 'may' buy or sell Dicom stock did not provide adequate disclosure to investors").[11]

### iii. Babikian Acted with Scienter

Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).[12]  Scienter includes conduct evidencing an intent to mislead, as well as conduct demonstrating a reckless disregard for misleading statements. *See Ernst & Ernst*, 425 U.S. at 701-02.

This is not a case of recklessness, but one of knowing, deliberate, active, and intentional misconduct.  Among other things, Babikian's extensive efforts to establish and renew the registrations for the APS and PSU under the ostensible ownership of an alter-ego front company, Centro Azteca, his purchases and maneuvering of America West stock, and his sale of that stock on February 23, 2012, following the "touts", constitute strong circumstantial evidence as to his conscious behavior and motive.  These facts and the others catalogued above more than support an inference that, in effectuating a lucrative "scalp", Babikian acted with scienter. *See, e.g.,*

---

[10] *Recycle Tech* is unpublished and not available on Westlaw.  The Commission will have a printed copy available for the Court at the time of the Application in this matter.

[11] For the conduct to be assailable under the antifraud provisions, it must also be done "in connection with" the offer, purchase or sale of securities.  This requirement is satisfied if the fraud "touches" upon a securities transaction. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971).  This element is readily satisfied here: Babikian purchased America West shares, positioned them for sale, manipulated other investors to purchase the same stock and unnaturally drive up its price, and then Babikian sold the shares.  These transactions "in connection with" the offer, purchase or sale of securities constitute the essence of Babikian's fraud.

[12] There is no scienter requirement for violations of Sections 17(a)(2) or 17(a)(3). *See Aaron v. SEC*, 446 U.S. 680, 697 (1980).

*Corp. Relations Group*, 2003 WL 25570113, at *9 ("The Defendants' scalping practice—the acquisition of stock, followed by touting of that stock in an effort to drive up the price, followed by a sale of that stock at a substantial profit—shows an intent to manipulate the market in a manner proscribed by the securities laws.").

> iv.  **Under the Circumstances Described Herein, an Asset Freeze is Warranted.**

Having established the legal and evidentiary basis for a freeze order, the Commission believes that a freeze of Babikian's assets is essential to prevent the imminent transfer of ill-gotten gains to a foreign jurisdiction.  As set forth above, Babikian, a Canadian citizen whose whereabouts are presently unknown, utilizes a web of alter-ego front companies and online accounts to transact business and hide assets.  There is a substantial danger that Babikian is likely to remove assets beyond the jurisdiction of this Court or that he may dissipate or conceal funds in an attempt to shield those assets from the Commission unless those assets are frozen. Indeed, at present, Babikian is actively seeking to have NetJets wire $2.5 million — Babikian's proceeds from the sale of the  NetJets interest—to a bank account in the United Arab Emirates. (McFall Decl. ¶ 64.)  Similarly, there is a real risk that, absent the immediate relief requested herein, Babikian will consummate the sale of the N. Laurel Ave. property in California and then divert the proceeds to the same or another offshore account.  A freeze will merely preserve the status quo, pending the Court's adjudication of the Commission's Complaint.

> c.  **To Further Preserve the Status Quo, the Court Should Order a Conduct-Specific Temporary Restraining Order and Preliminary Injunction**

In addition to the equitable relief of an asset freeze, the Commission also seeks an order that temporarily restrains and permanently enjoins Babikian from "scalping" conduct of the sort

at issue in this case.[13] In determining whether to grant such relief, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. *See Cavanagh*, 155 F.3d at 135-36. Among the factors to be considered in assessing the likelihood that a defendant will repeat his wrongdoing are the character of the violation, the degree of scienter involved, whether the infraction was an "isolated occurrence", and whether a defendant has acknowledged the wrongfulness of his conduct and given sufficient assurances that it will not be repeated. *See id.* at 135; *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978).

Application of these considerations strongly counsels in favor of the narrowly-tailored relief the Commission seeks. Far from an impulsive act, Babikian's fraud described herein was the product of a complex and well-planned scheme. Domain registration records show that Babikian – through an alter-ego front company – established and maintained the APS and PSU websites. Those websites recommended, or "touted", penny stocks, and the Commission's investigation has revealed that the websites operated in this manner for some time before the fraudulent touts at issue here. As set forth above, in the 8 months preceeding the February 23, 2012 touts, Babikian paid more than $106,000 in monthly charges and distribution fees to a mass email service, thereby causing the distribution of *over 470* sets of email newsletters on behalf of the APS website. (McFall Decl. ¶ 22.)

Moreover, the scalping conduct in question constituted an egregious securities fraud. The touts at issue triggered immediate and dramatic increases both to America West's share price and to its trading volume—increases which Babikian immediately exploited by selling over 1.3

---

[13] Specifically, the Commission proposes that the Court order Babikian and any entity that he controls or with which he is affiliated, including but not limited to APS, PSU and Centro Azteca, directly or indirectly, be temporarily restrained and enjoined from recommending the purchase of any U.S. publicly traded or quoted stock, without simultaneously disclosing any and all plans or intentions to sell all or part of said holdings, within 14 days of the recommendation.

million shares of America West at an artificially inflated price. This conduct permits a strong inference of scienter, *see Corp. Relations Group*, 2003 WL 25570113, at *9, which counsels in favor of injunctive relief. More generally, the factual record in this case depicts a defendant who is more than adept at using anonymous email accounts, a number of deceptive alter-ego front companies, internet domain name registration systems, mass email distribution services, and any number of far-flung financial institutions to transact business and conceal assets. These background circumstances, when considered in the context of Babikian's scalping fraud, significantly enhance the potential that Babikian will continue his conduct unless restrained and enjoined. A temporary restraining order and preliminary injunction therefore are warranted to preserve the status quo pending the adjudication of the merits of the Commission's Complaint.

### d. The Court Should Order An Accounting

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and of a defendant's current financial resources. *See, e.g.,. Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105; *SEC v. Lybrand*, No. 00 Civ. 1387(SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992). Evidence in this case indicates that Babikian has held assets as varied as fractional interests in airlines, to real property, through a number of alter-ego front companies, and that Babikian has recently requested that a third party (NetJets) transfer approximately $2.5 million to an offshore account. An accounting is therefore necessary to determine the extent of the fraud, the full amount of unjust enrichment, and the assets available for potential disgorgement.

### e. The Court Should Order Expedited Discovery and Prohibit the Destruction of Documents.

The Court should order expedited discovery to allow the Commission to supplement its motion for a preliminary injunction. Expedited discovery will allow the Commission to present a more complete evidentiary record to the Court, and focus the issues that must be decided on by the Court at a hearing on the preliminary injunction motion. Expedited discovery will also assist the Commission in locating additional assets and effectuating any order entered by the Court freezing the defendant's assets. Likewise, the Court should enter an order prohibiting the defendant, or any of his alter egos, agents, or front companies, from destroying and altering documents to preserve as much of the evidence as possible.

### f. Pursuant to the Federal Debt Collection Procedures Act, the Court Should Issue Writs of Garnishment and Attachment to Apply to Assets in Anticipation of a Civil Penalty in Favor of the Commission

The Federal Debt Collection Procedures Act ("FDCPA") provides the exclusive civil procedures for the United States[14] to obtain, before judgment on a claim for a civil penalty, a remedy in connection with such claim. 28 U.S.C. § 3001 et seq. In the instant case, the Commission is aware that Babikian has approximately $5.1 million in U.S.-based assets that would be potentially subject to the Court's equitable freeze order.[15] Because the estimated value of the Commission's disgorgement remedy —that is, Babikian's ill-gotten gains, plus prejudgment interest —is likely *less* than the total value of Babikian's assets subject to a freeze order, the Commission seeks prejudgment writs of garnishment and attachment to apply to those

---

[14] The "United States" includes, inter alia, "an agency, department, commission, board, or other entity of the United States[.]" 28 U.S.C. § 3002(15)(B).

[15] As described above, these assets are the proceeds from the NetJets fractional share (approximately $2.5 million) and the proceeds from the sale of the N. Laurel Ave. property (approximately $2.6 million).

assets under the FDCPA in anticipation of a civil penalty that the Commission will seek against

Babikan upon judgment in this case.

### i.  The Commission's Claim for Penalties is a "Debt" under the FDCPA

Section 3002(3)(B) of the FDCPA Act explicitly includes "penalty" within the definition

of the term "debt," as follows:

> [A]n amount that is owing to the United States on account of a fee, duty,
> lease, rent, service, sale of real or personal property, overpayment, fine,
> assessment, *penalty*, restitution, damages, interest, tax, bail bond
> forfeiture, reimbursement, recovery of a cost incurred by the United
> States, or other source of indebtedness to the United States, but that is not
> owing under the terms of a contract originally entered into by only persons
> other than the United States.

28 U.S.C. § 3002(3)(B) (emphasis added).  The penalties sought against Babikian, which the

Commission seeks to recover in the associated civil action filed herewith, therefore constitute a

"debt" as defined in Section 3002(3)(B) of the Act.

It does not matter that Babikian's liability for the Commission's claim has not yet been

adjudicated.  The FDCPA provides the exclusive procedure of the government to "(1) recover a

judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in

connection with such claim." 28 U.S.C. § 3001(a).  Under the plain language of the statute, the

FDCPA supplies a remedy to the United States *before* judgment is entered on a debt.  *See Board*

*of Governors v. Pharaon*, 169 F.3d 110, 114 (2nd Cir. 1999) (observing that "Congress clearly

intended to authorize the use of [the FDCPA's prejudgment remedies] prior to a formal

determination that such amount must be paid to the United States by a certain date"); *see also*

*United States v. Teeven,* 862 F. Supp. 1200, 1214 (D. Del. 1992) (finding probable validity of

claim on a debt where debt had yet to be adjudicated).  Therefore, the penalty sought in this

action is "a claim for a debt," and the FDCPA applies.

### ii. The Commission has met the Conditions for Prejudgment Writs of Garnishment and Attachment Under the FDCPA

The FDCPA sets forth the procedures and requirements applicable to all prejudgment remedies. First, the Commission must show that it has "reasonable cause" to believe the debtor (Babikian) is selling its assets and that there is "probable validity" to the Commission's claim for a debt and right to prejudgment remedy. 28 U.S.C. § 3101(b). Second, the Commission must show "the probable validity" of "the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). Once these requirements are met, the FDCPA provides that the court shall issue all process sufficient to put into effect the prejudgment remedy sought. 28 U.S.C. § 3101(e).[16] In addition, in order to obtain the writs of attachment and garnishment sought herein, the Commission must also satisfy the requirements of Sections 3102 (Attachment), and 3104 (Garnishment).[17]

With respect to the first requirement, Section 3101(b) requires the government to show "reasonable cause to believe" that the debtor:

> (B) has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying or defrauding the United States; [or]

> (C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying or

---

[16] Although the debtor may request a prompt hearing on the prejudgment writ to contest limited aspects of the writ, the court need not wait for the requested hearing to issue the writ. *See* 28 U.S.C. § 3101(d).

[17] The prejudgment remedy of attachment under Section 3102 entitles the Commission to attach property in which the debtor has a substantial non-exempt interest. 28 U.S.C. § 3102(a). The prejudgment remedy of garnishment under Section 3104 entitles the Commission to garnish property in which the debtor has a substantial non-exempt interest and which is in the possession, custody or control of a person other than the debtor, in order to satisfy a claim for a debt. 28 U.S.C. § 3104(a). To qualify for these prejudgment remedies, in addition to the requirements cited above, the value of the garnished property may not exceed the amount of the debt claimed, including costs and interest. 28 U.S.C. § 3104(c).

defrauding the United States . . . .

The Commission can make this showing.  As set forth above, there is evidence that Babikian is

seeking to imminently move approximately $2.5 million out of the United States and into a bank

account in the United Arab Emirates held by a company called Elementos, LTD.  (McFall Decl.

¶ 64.)  Babikian also appears poised to sell the N. Laurel Ave. property and may receive

approximately $2.6 million in additional funds.  (McFall Decl. ¶¶ 66-70.)  Based on his past

conduct, it is likely Babikian will transfer this money to a front company and/or out of the United

States related to the pending sale of a home he owns in Los Angeles.  Once those funds are

moved abroad, they will be difficult, if not impossible, to repatriate to the United States to satisfy

judgments obtained for violations of the federal securities laws.  These transactions therefore will

have the effect of hindering, delaying or defrauding the Commission, and the requested writs will

help preserve the status quo so that funds will be available to satisfy a judgment for a civil

money penalty, should one be entered by this Court.[18]

The second requirement under the FDCPA is that the Commission set forth facts

supporting the "probable validity of a claim on a debt."  28 U.S.C. § 3101(c).  The inquiry here is

whether "the Government has complied with the terms of the statute," thereby demonstrating the

probable validity of the debt.  *Teeven*, 862 F.Supp. at 1217.  The facts set forth above and

supported by the McFall Declaration establish the right of the Commission to recover what is

---

[18] Courts routinely issue prejudgment writs in similar circumstances.  *See, e.g., United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 884 (M.D. Fla. 2007) (issuing prejudgment remedies under the FDCPA in a penalty case); *N.L.R.B. v. Shane Steel Processing, Inc.*, No. 07-x-50335, 2007 WL 1608009 at *2 (E.D. Mich. May 16, 2007) (granting prejudgment writ under FDCPA to prevent debtor from selling real estate in a manner detrimental to the government's collection of its debt); *Teeven*, 862 F. Supp. at 1226 (D. Del. 1992) (granting prejudgment remedies to prevent the defendants from potentially wreaking "havoc to the Government's efforts to collect [its debt]").

sought in the Complaint, namely appropriate civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act. This FDCPA requirement therefore is satisfied.

To obtain the prejudgment writs of attachment and garnishment, the final step under FDCPA is for the Commission to satisfy the requirements of Sections 3102 (Attachment), and 3104 (Garnishment). Garnishment is appropriate because defendant has money currently held by a third party. Specifically, the Commission requests garnishment of Babikian's funds held by NetJets, Inc. in which defendant has a substantial nonexempt interest.[19] Likewise, Attachment is also appropriate because the requirements of 28 U.S.C. §§ 3101, 3102(b) are satisfied, and Babikian has a substantial nonexempt interest in the real property identified above and in the attached declaration.

In conclusion, the Commission has complied with all procedural requirements of the FDCPA. Upon the Court's entry of the proposed writs, the Commission will serve copies of the writs on Babikian at all of his known email addresses, and will serve NetJets by email and regular mail. Id.

### g. The Court Should Order Alternative Service of Process

Babikian is a citizen of Canada, and his present whereabouts are unknown. (McFall Decl. ¶¶ 8, 11.) Through its investigation to date, however, the Commission has identified the following four internet email accounts used by Babikian:

> crazypennystocks@gmail.com
> johnjackinc@gmail.com
> mapleboyone@gmail.com
> singaporepop@gmail.com

---

[19] A substantial nonexempt interest property defined by certain sections of the Bankruptcy Code not at issue here, or state or local laws also not at issue here. The judgment debtor bears the burden of proving that he is entitled to the exemption. *See* 28 § 3014(b)(2).

Although the Commission will, if necessary, attempt to effect service by other means permitted under Fed. R. Civ. 4, service by electronic mail will maximize the possibility that the Defendant will receive prompt actual notice of these documents.  Accordingly, the Commission respectfully requests that this Court authorize service of any Order issued by the Court in connection with this Application, as well as the papers on which the Order was granted, upon the Defendant by email to the three above-listed addresses.

## IV.   CONCLUSION

For all the foregoing reasons, and those set forth in the accompanying declarations and exhibits there, the Commission respectfully requests that the Court issue the Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief in the form of the order submitted with this motion.


Dated:  March 12, 2014                           Respectfully Submitted,


                                                 Michael J. Roessner
                                                 Assistant Chief Litigation Counsel


                                                 Matthew P. Cohen (pro hac pending)
                                                 Assistant Chief Litigation Counsel

                                                 Attorneys for Plaintiff
                                                 United States Securities and Exchange Commission
                                                 100 F Street, N.E., Mail Stop 5985
                                                 Washington, D.C. 20549
                                                 Tel:  (202) 551-7276 (Cohen)
                                                 Fax:  (703) 813-9366 (Cohen)
                                                 Email:  cohenma@sec.gov (Cohen)