**CANADA**
**PROVINCE OF QUEBEC**
**DISTRICT OF** *MONTREAL*

No. *500-12-319480-137*

*G*

S U P E R I O R    C O U R T
<u>(FAMILY DIVISION)</u>

Alima Beg,

            Plaintiff

vs.

John Babikian,

            Defendant-Babikian

and

9264-5076 Québec Inc., a company duly incorporated, having its place of business at 1102 Moody Boulevard, suite 204, in the city and district of Terrebonne, province of Québec, J6W 3K9

and

9224-1249 Québec Inc., a company duly incorporated, having its place of business at 1300 Alain-Grandbois Street, #701, in the city and district of Montréal, province of Québec, H4N 0A2

and

Tidal East Global Relief Fund Inc., a non-profit corporation duly incorporated, having its place of business at 2001 University Street, suite 1700, in the city and district of Montréal, province of Québec, H3A 2A6

and

Vertical International Relief Fund, a non profit corporation duly incorporated, having its place of business at 109 17th Street West, in the city of Cheyenne, Wyoming, United States of America, 82001

and

Middlebay Trade Ltd., a company duly incorporated having its place of business at 642 N. Laurel Avenue, in the city of Los Angeles, California, United States of

and

John Jack Ventures Ltd., a company duly incorporated having its place of business at 12914 The Reef Atlantis, One Casino Drive P.O. Box N-4777, in the city of Nassau, Bahamas

and

Montblue Commerce, a company duly incorporated in Panama, having its place of business at 12914 The Reef, Atlantis, in the city of Nassau, Bahamas

and

Kenora Overseas, a company duly incorporated, having its place of business at 12914 The Reef Atlantis, in the city of Nassau, Bahamas

and

One Berger Circle, a company duly incorporated in Guatemala, having its place of business at 5a Avenida S-55 Zona 14, in the city of Guatemala City, Guatemala, 1014

and

Arrow Import & Export Corporation, a company duly incorporated in the British Virgin Islands, having its place of business at P.O. Box 3321 Road Town, Tortola, British Virgin Islands

and

Antica Ventures Ltd., a company duly incorporated in Belize

and

Mediasky Holdings Ltd., a company duly incorporated in Belize

and

Monolith Ventures Ltd., a company duly incorporated in the Seychelles Islands

and

Aurora Intour Ltd., a company duly
incorporated in Seychelles Islands,

and

Intelligent Alliance Corp., a company duly
incorporated in Seychelles Islands

and

Liner Investments Ltd., a company duly
incorporated in Seychelles Islands

and

Normandia Capital Corporation, a
company duly incorporated in Panama

and

Nottingham Group, a company duly
incorporated in Panama,

and

Fellow Trading Ltd., a company duly
incorporated,

and

Oriwa Villas Ltd., a company duly
incorporated,

                                    Co-Defendants

---

### MOTION FOR MAREVA INJUNCTION
### AND SEALING ORDER

**TO ONE OF THE JUDGES OF THE SUPERIOR COURT, FAMILY DIVISION,
SITTING IN AND FOR THE JUDICIAL DISTRICT OF MONTREAL, YOUR
PLAINTIFF RESPECTFULLY REPRESENTS:**

#### INTRODUCTION

1.         Plaintiff has instituted a motion in divorce against the Defendants seeking,
*inter alia*, a condemnation against Defendant-Babikian for spousal support in the amount
of $ 43,000 per month; interim provision for costs in the amount of $ 500,000; partition
of the value of the family patrimony and the matrimonial regime of partnership of
acquests, these condemnations sought being in the sum of approximately $ 50,000,000;

the whole, as appears from the Court record;

2.        Defendant-Babikian, who is only twenty-six years old, runs a business by which he acquires, directly and indirectly, large stakes in penny stocks, then "promoting" these penny stocks through multiple websites, thereby causing the price of these stocks to run up, so that he can "dump" the stocks with enormous profits;

3.        Defendant-Babikian has been able to accumulate assets of at least one hundred million dollars, which he holds in the names of various *alter ego* corporate entities, which are located in multiple countries, all over the world;

4.        Defendant-Babikian has been able to amass his wealth using only the Internet, without the need for a "bricks and mortar" office, without staff or employees, and without any type of conventional infrastructure. In fact, he runs his business entirely from specially encrypted Blackberry smartphones, which he uses for a few days or weeks before destroying and replacing them. Defendant-Babikian smashes his Blackberry smartphones into small pieces that are disseminated in different garbage bins so that it is absolutely impossible for anyone to reconstitute the devices and have access to the information they once contained;

5.        Very little information can be found concerning the individuals and the corporate entities behind the website www.awesomepennystocks.com and its many sister websites, and Defendant-Babikian's name in particular cannot be linked to these sites through the web;

6.        Defendant-Babikian seeks to conceal his identity at all costs, to avoid paying income taxes on the tens of millions of dollars he has earned through his business of stock promotion on the Internet, and to avoid having to share the assets he has acquired with Plaintiff, who is married to him in the regime of partnership of acquests;

7.        With the astronomical profits that he has been able to generate "promoting" penny stocks, Defendant-Babikian has invested in real estate, in shares of real companies and in stocks, but he has been doing so using *alter ego* corporate entities, of which he is the sole directing mind, often situated in tax haven countries, and his latest strategy is to use companies set up as "charities". Here is the list of *alter ego* corporate entities that Plaintiff has been able to trace so far:

        (a) Plaintiff is suing the following corporate entities because they are holding Defendant-Babikian's assets in fraud of her rights, or they have been created in order to hold his property on his behalf:

        • **Middlebay Trade Ltd.** is incorporated in the Seychelles, and holds for Defendant-Babikian the secondary residence of the parties located at 642 N. Laurel Avenue, Los Angeles, as appears from **Exhibit P-8**;

        • **Oriwa Villas Ltd.** holds for Defendant-Babikian his property located at 1401 Londonderry Pl., Los Angeles, California, but its address is at 642 N. Laurel Avenue, Los Angeles as appears from **Exhibits P-10A and P-10B**. Moreover, the funds to purchase the property came from Arrow Import & Export Corporation and Microtech Ventures Limited, as appears from the Buyer's Final Settlement Statement from Granite Escrow Services dated August 08 2012, produced herewith as **Exhibit P-16**;

        • **Arrow Import & Export Corporation** is incorporated in the British Virgin Islands and holds for Defendant-Babikian bank accounts at Hong Kong HSBC. To the

best of Plaintiff's knowledge, these are Defendant's principal accounts. The debit and credit cards that Defendant-Babikian would use the most frequently for his day-to-day expenses were the ones from HSBC Hong Kong. Defendant also had a security device from HSBC Hong Kong enabling him to make wire transfers that he also carried with him all the time. Defendant-Babikian is the sole shareholder and director of this company, as appears from the copy of the share transfer certificate and the Consent to act as a Director/Shareholder, all dated February 16 2011, produced herewith as **Exhibit P-17**;

• **John Jack Ventures Ltd.** is incorporated in the Bahamas and holds for Defendant-Babikian seven condos located at The Reef Atlantis, in Nassau, Bahamas (Defendant-Babikian's names are «John Jack»), as appears from statement of account of the Reef Atlantis, dated June 20 2013, produced herewith as **Exhibit P-18**;

• **9264-5076 Québec Inc.**, holds three lots located at Le Domaine des Berges, Laval, Quebec, that Defendant-Babikian acquired to build a new family residence, as appears from **Exhibit P-9** and is further explained at paragraphs 46 to 51 herein;

• **9224-1249 Québec Inc. [Bargainoo Est et Etablissement Bargainoo]**, a company that is related to the domain **www.bargainoo.com**, created and operated by Defendant-Babikian, as appears from the CIDREQ for this company, produced herewith as **Exhibit P-19**;

• **Vertical International Relief Fund**: Defendant-Babikian flies around the world in a private Gulfstream jet, having an account with NetJets, in the name of this "charitable organization", as appears from NetJets Invoices produced herewith as **Exhibit P-20**;

• **Tidal East Global Relief Fund** holds shares of Energy Telecom for Defendant-Babikian;

• **Antica Ventures Ltd.** holds for Defendant-Babikian a bank account at the Belize Bank International Limited, in Belize and shares in the company Wow Brands. Plaintiff produces herewith an instruction sheet to reload his VISA prepaid Card, indicating that his account is in the name of Antica Ventures, as **Exhibit P-21**;

• **Kenora Overseas** holds for Defendant-Babikian shares in the company RGMS Media Beeyoo;

• **Monolith Ventures Ltd.** holds for Defendant-Babikian shares in the company YS Catering LLC / The Fresh Diet;

◦ **Normandia Capital Corp.** holds for Defendant-Babikian shares in the companies CBS Food, T-Grip and Skora and some shares in Energy Telecom;

• **Fellow Trading Ltd.** holds for Defendant-Babikian shares in the company Ayala Herbal Water;

• **Nottingham Group** holds for Defendant-Babikian shares in the companies Robofusion Inc. /Puffin Innovations Inc. et Shamrock;

• **Montblue Commerce** holds for Defendant-Babikian shares in the company Copa Di Vino;



• **One Berger Circle Holdings** was used by Defendant-Babikian to funnel money in order to build the family residence located at 445 des Anémones, Laval, Quebec;

• **Mediasky Holdings Ltd.** is a company recently incorporated in Belize;

• **Liner Investments Ltd.**, is a company recently incorporated in Seychelles Island;

• **Intelligent Alliance Corp.**, is a company recently incorporated in Seychelles Island;

• **Aurora Intour Ltd.**, is a company recently incorporated in Seychelles Island;

(b) Other entities have acted as *alter ego* companies but have been dissolved:

• **Microtech Ventures Limited** held bank accounts for Defendant-Babikian;

• **7238843 Canada Inc.**, a company in which Defendant-Babikian was the principal shareholder and director;

• **9173-8153 Québec Inc., [JB Marketing]**: Defendant was the primary shareholder, director and president of this company, which is now bankrupt;

• **9195-5948 Québec Inc.,**: Defendant was the primary shareholder, director and president of this company, which is now bankrupt;

(c) As far as **9248-3247 Québec Inc.** is concerned, it holds the condominium located at 1300 Alain-Grandbois #702, Montréal, Québec, previously owned by Defendant-Babikian. The principal shareholder is Alexandre Salameh but Plaintiff suspects that he is acting as a "prête-nom" for Defendant-Babikian since the latter was planning to invest in real estate with Mr. Salameh;

8.        Approximately a year ago, Defendant-Babikian decided to give up Canadian residency and go live in Monaco and he has applied for citizenship in several countries, and in the European Community. He is now a citizen of Canada, Lebanon, Nevis, Guatemala and he is hoping to become a citizen of other countries in the near future. He holds a diplomatic passport from Guatemala, which is produced herewith as appears **Exhibit P-22**, even though he is not a diplomat. If he is not stopped soon, it will become impossible to control his movements. As it is, he travels on private jets, via NetJets (in an account registered in the name of a "charity"!), where security can be more lax in terms of travel documents;

9.        Defendant-Babikian has companies, or is forming companies, in the Bahamas, the Seychelles, St. Kitts and Nevis, Panama, Hong Kong, British Virgin Islands, Belize, amongst others, and he is in the process of founding a bank in Guatemala, so that he will be able to conduct banking transactions with impunity, and not face expulsion by legitimate banks that do not want to handle his large and unexplained transactions;

11.       Defendant-Babikian told Plaintiff that the Royal Bank of Canada, HSBC in Switzerland and the Bank of Montreal did not want to keep him as a client. Plaintiff recently discovered the letters the Bank of Montreal wrote to him expelling him, which



are produced herewith as **Exhibit P-23**. The undersigned attorneys obtained the Defence filed by the Bank of Montreal telling the rest of the story, as appears from **Exhibit P-13**;

12.        Plaintiff has witnessed Defendant-Babikian handling cash transactions for very large sums of money. For example, in her presence, in her parents' home, they counted out three million Canadian dollars in cash which he then paid to Construction D'Astous, a construction contractor, in Quebec, Canada, to build the family residence;

13.        The Minister of Revenue of Quebec [MRQ] was alerted by the possibility that Defendant-Babikian was under-reporting his income, through its project: «indice de richesse», a lifestyle audit. Defendant declared a total gross income of only $ 504,536 in 2010 but bought in Canada three extremely expensive automobiles during the year: a BMW X6 M, a Bentley Continental 2010 and a Lamborghini Gallardo 560 Spider 2010. In 2010, he also bought in Canada one condominium for $ 370,000 and a piece of land for $ 677,250, the whole without indebting himself for any of these purchases;

14.        During the period that the MRQ was auditing Defendant-Babikian and his four companies in Quebec, he had two of his companies declare bankruptcy, based on debts that appear to be fictitious:

(a) Defendant-Babikian declared in his bankruptcy documents that 9173-8153 Québec Inc. had debts of $ 550,000 including a debt of $ 300,000 to a law firm located in Texas, Uya Madu Attorneys, where Leonnel Iruke was practising. The other $ 250,000 debt was to a California company, Nick Thomas Ltd. Plaintiff does not believe for a minute that Defendant's company actually owed these debts as the documents indicate, considering that both Leonnel Iruke and Nick Thomas are personal friends of Defendant-Babikian;

(b) The bankruptcy documents for 9195-5948 Quebec Inc. show a debt of $ 175,000 to a company located in Florida, First Spectacle Corp. Plaintiff also does not believe for a minute that Defendant's company actually owed this debt;

15.        On April 19 2013, the MRQ obtained a judgment for $ 4,642,978 against Defendant-Babikian and instituted proceedings to collect this sum, as appears from **Exhibit P-4** and the *Ex parte* motion to obtain authorization to take immediate recovery measures, for permission to execute prior to expiration of delays and other measures, produced herewith as **Exhibit P-24**;

16.        The same day, the MRQ attempted a seizure of the moveable effects located at 445 Des Anémones, Quebec, but the parties were not in the country and nobody was named as guardian of the goods. This writ of seizure was also never served on Defendant-Babikian;

17.        Shortly thereafter, the MRQ registered legal hypothecs on all the assets registered in Quebec in the name of Defendant-Babikian, which are the principal residence of the parties, and three cars: a BMW X6 M, a Bentley Continental 2010 and a Bugatti Veyron which is worth two million dollars, as appears from the extract of the Registry of real and personal rights of moveables produced herewith as **Exhibit P-25**;

18.        At that time, the Bugatti Veyron was physically in Monaco, where Defendant-Babikian had had it shipped a few months before;

19.        However, Defendant-Babikian shipped the Bugatti Veyron back to Montreal for the Grand Prix weekend in June 2013 and sent it back to Monaco once the event was

over, without consideration for the fact that he was putting his second most valuable asset known to the MRQ outside of its reach;

20.         Plaintiff finds herself in the following precarious situation:

• she abandoned her studies, at Defendant-Babikian's request, in order to make a home for the family in the different cities where the couple have resided: Montreal, Los Angeles, Laval, Monaco and the Bahamas;
• She has no income of her own;
• she resides in the family residence that Defendant-Babikian bought under his name only and which is subject to a legal hypotec from the MRQ exceeding the value of the immoveable;
• She co-owns the two cars that are still in Quebec but they are subject to a legal hypothec from the MRQ as well;
• Defendant-Babikian is indebted towards Plaintiff for tens of millions of dollars for the partition of the value of the family patrimony and the partnership of acquests but will have completed organizing his worldwide financial empire in such a manner that Plaintiff will never be able to recover her claim;
• Defendant-Babikian has relocated to Monaco where he has moved all his personal belongings that used to be kept in the family residence, and he has obtained citizenship from Guatemala and Nevis;
• Defendant-Babikian has systematically placed the assets he acquires and the revenues he earns in the names of nominees and alter ego companies to defeat Plaintiff's legitimate claims for alimentary support, partnership of acquests and family patrimony;
• Defendant-Babikian is planning to dispose of his assets that are known from Plaintiff, or to encumber them with fictitious loans, as he has already done with the cars registered in Quebec;

## PLAINTIFF'S CLEAR RIGHTS

21.         Plaintiff has a clear right to spousal support, provision for costs and partition of the value of the family patrimony and of the partnership of acquests;

22.         (a) Plaintiff does not have full knowledge of Defendant-Babikian's assets, nor is she in a position to identify all the acquests, without Defendants disclosing this necessary financial information. The exact value of the partnership of acquests can only be established after full divulgation of Defendants assets and their eventual evaluation;

(b) Plaintiff has a statutory right to full financial disclosure from Defendants, both to assert her alimentary rights and to value and partition the family patrimony and the partnership of acquests;

23.         Plaintiff clearly has a right to the injunction she is seeking herein, having reason to believe that without this remedy the recovery of her debt will be put in jeopardy. Defendant-Babikian's pattern of conduct shows that he is concealing and removing assets from her reach;

## IRREPARABLE HARM

24.         **Defendant-Babikian is currently selling and/or transferring assets that are part of the family patrimony and of the partnership of acquests. If he is not stopped immediately, Plaintiff will never be able to recover her share of the family patrimony and of the partnership of acquests. She will also never be able to execute any alimentary judgment to be rendered in her favour;**



25.       On August 11 2013, Defendant-Babikian told Plaintiff that he sold the **Range Rover** that the parties co-owned in Los Angeles, California, <u>without her consent</u>, for $ 65,000 (the vehicle had recently been purchased for about $ 115,000 and is still worth approximately $ 100,000). Plaintiff was never consulted with respect to this sale. To the contrary, she indicated to Defendant that she wanted this car to be transferred to her. This did not prevent Defendant-Babikian from disposing of her asset without her permission and without her signature. Defendant gave Plaintiff a sum of $ 32,500 in cash, claiming that this represents the half of the profit from the sale (which Plaintiff does not believe), but expects her to use this capital to support her alimentary needs;

26.       Plaintiff is convinced that Defendant-Babikian must have forged her signature on the car registration transfer papers, as throughout their marriage, she has witnessed him falsifying signatures on official documents. For example, Defendant-Babikian prepared and signed a medical certificate attesting to his good health, along with an envelope that he handwrote, which are produced as **Exhibit P-26** *en liasse*, the whole, in the presence of Plaintiff. This letter and envelope falsely indicate that the sender is Dr. Barrington Iruke M.D. PA. (who is an actual person). Plaintiff also witnessed Defendant-Babikian adding false signatures of notarization on other documents, with false seals, some of which he left in their matrimonial home, as appears from the seal in the name of Francesco Fucelli produced herewith as **Exhibit P-27** – the seal indicates that this person is a "notary public for the province of Quebec," a title that does not even exist in Quebec!

27.       On August 13 2013, Defendant-Babikian also told Plaintiff that he has listed for sale the secondary residence of the parties, located at **642 N. Laurel Ave, Los Angeles, California 90048, USA**, which is worth approximately $ 3,000,000, without her consent. He added that this property will be sold within two to three weeks;

28.       When he came to Canada in June 2013, Defendant-Babikian removed the parties' **wine collection**, which is worth approximately one million dollars, and two **Arturo Di Modica bull statues**, which are worth approximately $ 600,000 from the family residence;

29.       On April 05 2013, Defendant-Babikian sold the former family residence located at **1300 Alain-Grandbois, Apartment 701, Montréal, Québec**. Approximately $ 400,000 from the profits of the sale were deposited "in trust" with Leonnel Iruke, according to allegations contained in Defendant's motion filed in Superior Court of Quebec file number 500-17-076845-133, produced as **Exhibit P-12**;

30.       Defendant was also the owner of another condominium, **1300 Alain-Grandbois, Apartment 702, Montréal, Québec**. This property was transferred to a company, 9248-3247 Québec Inc., owned by his close friends: Alexandre Salameh and Linda Fondacaro. Plaintiff suspects that these friends are acting as nominees for Defendant;

31.       Defendant has also told Plaintiff that he wants to sell the family residence, located at **445 Des Anémones, Laval, Quebec**, where she resides alone;

32.       In fact, Defendant-Babikian is not hiding from Plaintiff his intention to make his assets disappear, as appears from his email dated July 17 2013 produced herewith as **Exhibit P-28**

> «la maison technique n'appartiens ni à toi ni a moi alors je trouve
> dificile a croire que toi ou moi on pourra prendre de largent de cette

maison. Les autos aussi ont des hypotheques. Comme je tai dis je sais pas ce que tu essai de faire, mais sil ya quelque chose que tu veut tu devrais me le dire pour que je te le donne parceque sinon tout va disparaitre.» *(sic)*

33.     Plaintiff responded to Defendant-Babikian's invitation and she identified what she wanted, starting with her keeping the family residence on 445 des Anémones, Laval, and the three cars they were co-owing at the time (the Bentley, the BMW X6 and the Range Rover). It quickly became evident that he had no intention of giving her anything of substantial value;

34.     Defendant-Babikian has even admitted to Plaintiff that he has carefully planned how to dispose of his assets in light of the parties' imminent divorce. His words were: «*Si tu penses que je n'ai pas déjà tout planifié, tu te trompes; j'ai déjà tout planifié!*»;

35.     **Plaintiff is well aware of Defendant-Babikian's ability to hide his assets with complete impunity;**

36.     During the marriage, Defendant-Babikian engaged in extensive efforts to conceal assets and revenues from Plaintiff. To begin with, shortly after the marriage, he stopped holding properties and bank accounts in his personal name He has also shown both a propensity and an ability to shift assets rapidly and through numerous countries, as the whole will be demonstrated herein;

37.     As already explained, Defendant-Babikian has created and controls corporate entities that are his *alter ego* companies in various tax heavens, such as Guatemala, St. Kitts and Nevis, the Seychelles, Panama, British Virgin Islands, the Bahamas, Belize, Hong Kong, Switzerland and Monaco. He uses a Canadian company called Unitrust Capital Corporation to incorporate his offshore alter ego companies. This company, located at 1600 Steeles Avenue West, Suite 228, Concord, Ontario, Canada, publicly holds itself out to be a provider of services for the incorporation of companies in "tax haven" countries, as appears from the relevant pages from the website of Unitrust produced as **Exhibit P-29**. Unitrust statement of account, addressed to Babikian personally, details their services for the following offshore *alter ego* companies: Liner Investments Ltd. (Seychelles), Antica Ventures Ltd. (British Virgin Islands), Arrow Import & Export (British Virgin Islands), Mediasky Holdings Ltd. (Seychelles), Beddington Marketing (Belize), Intelligent Alliance (Seychelles), as appears from **Exhibit P-30;**

38.     As mentioned above, Defendant is also assisted in his endeavours by two men – one of whom he introduced to Plaintiff as a "friend" – but who in fact have acted as his business associates, namely, Leonnel Iruke, who is a member of the Law Societies of Texas and California, and Me Michel Gauthier, who is a member of the Quebec Bar;

39.     Mr. Iruke works exclusively or almost exclusively for Defendant. He is always available for Defendant and jumps on a plane to meet Defendant in Monaco, Montreal or any other cities whenever Defendant requires his presence. He is the one setting up many of the corporate entities, helping Defendant to get different citizenships, and to shelter his assets from recovery by any type of creditors;

40.     Mr. Iruke also operates under the name of Omnisource Legal Group. Mr. Iruke originally practiced law in Houston, and once he started doing business with Defendant, he moved to California, where he does not appear to have an office. He no

longer appears to work at all from his Houston office, where he and his partner practiced law (his partner is currently serving a term in prison for theft);

41.     The Registre des Droits Personnels et Réels Mobiliers of Quebec indicates a "contractual debt" of $ 1,250,000 registered against the four cars that have been registered under Defendant's name. To Plaintiff's knowledge, Mr. Iruke never loaned $ 1,250,000 to Defendant;

42.     Defendant also alleged a "debt" towards Mr. Iruke in order to put his company, 9173-8153 Québec Inc., in bankruptcy, as above-mentioned, which debt is also dubious, to say the least;

43.     In fact, Mr. Iruke earns his living doing business with Defendant, and he is not required to pledge his own funds in support of Defendant's enterprises;

44.     Defendant's money transits through Mr. Iruke's trust account and it is disbursed based on Defendant's instructions. In this fashion, Defendant-Babikian uses Mr. Iruke's trust account as a "conduit" for expenditures of all kinds;

45.     Defendant also uses a lawyer in Quebec, Me Michel Gauthier, both as a nominee («prête-nom»), and as a conduit to channel money through his trust account;

46.     On June 14 2012, Defendant bought **three lots of land in the Domaine des Berges, in Laval, Quebec,** under the name of a company, 9264-5076 Québec Inc., where he intended to build a new family residence with a waterfront. These three lots were purchased for the price of $ **2,744,100,** as appears from **Exhibit P-9;**

47.     The company 9264-5076 Québec Inc. was registered on June 08 2012, and the registry of enterprises [CIDREC] does not disclose who are its shareholders. However the sole director identified is Michel Gauthier, as appears from **Exhibit P-9;**

48.     Me Gauthier is Defendant's attorney *ad litem* in his litigation with the MRQ, as appears from **Exhibit P-12;**

49.     With the assistance of Me Gauthier, Defendant was able to purchase a property worth over 2.7 million dollars without his name showing in any public documents or registry, thereby sheltering this significant asset from his creditors, including, most notably, the MRQ and Plaintiff herself;

50.     Plaintiff is aware that these three lots belong to Defendant because of her extensive involvement in the construction plans for the new residence the parties were contemplating. However, Defendant never advised her that he was buying this land under the name of a company;

51.     Plaintiff participated with Defendant in many meetings with John Garabedian, owner and seller of the complex Domaine Des Berges, Laval, Quebec, and with the architect, from Dubord Design, who did the plans for the new house and with the contractor, Nancy Isabelle from Construction D'Astous, the whole with a view to build one home on the three lots that Defendant bought from John Garabidian, the whole as appears from the plan for the "John Babikian residence" produced herewith as **Exhibit P-31;**

52.     As a further example of Defendant-Babikian's ability to shift assets in fraud of Plaintiff's rights: the family residence located at 642 North Laurel, Los Angeles,

California, was purchased during the marriage, on December 01 2010, in Defendant-Babikian's personal name and, on June 02 2011, unbeknownst to Plaintiff, was transferred to the name of an offshore Bahamanian company controlled by Babikian, by the name of Middlebay Trade Ltd., as appears from **Exhibits P-6 and P-8**;

53.     The address of Middlebay Trade Ltd. is 12914 The Reef Atlantis, Paradise Island, Nassau, Bahamas, which is the other secondary residence used by the parties. It is one of the nine (9) residential condos Defendant-Babikian owns in the Bahamas (two of them are registered in his name including unit 12914, and the seven others are held by his *alter ego* company, John Jack Ventures);

54.     The parties were residing a few months a year in California and they decided to purchase a new home in Los Angeles. Babikian used $ 6,000,000 USD from the HSBC accounts of Arrow Import & Export Corporation and Microtech Ventures Limited to pay for the purchase of the residence the parties bought at 1401 Londonderry Place, Los Angeles, U.S.A., on August 08 2012, which he put in the name of Oriwa Villas Ltd., and the remaining funds with the Escrow Agent were sent to Antica Ventures Ltd., the whole, without Plaintiff's knowledge or consent;

55.     Moreover, Defendant has no scruples and will stop at nothing in order to obtain what he wants;

56.     As appears from paragraph 24 herein, Defendant must have forged Plaintiff's signature in order to sell the Range Rover that they co-owned, unbeknownst to her, and against her will;

57.     Defendant admitted to Plaintiff that in July and August 2013, he had her under surveillance and that he had her Facebook, Gmail, Hotmail and Fido accounts hacked, in order to "make sure that she is a good person", and this without any respect for her right to privacy, and without concern for the anguish that Plaintiff suffered during the whole time she realized she was being followed by detectives;

58.     A couple of years ago, Defendant had several personal and corporate bank accounts at the Bank of Montreal, but they were closed by the Bank, so Defendant sued the Bank of Montreal for closing his accounts without his consent, claiming damages;

59.     The Defence filed in the court record by the Bank of Montreal discloses that the accounts were closed because **Defendant was declaring an income of $ 24,000 but was engaging in bank transactions for hundreds of thousand of dollars, and he was unable to explain the nature of his transactions.** He was also unwilling to explain the nature of his professional activities;

60.     Then, Defendant attempted to open a bank account at the First Caribbean International Bank in Bahamas. He was asked to provide a letter from his Canadian bank attesting that his accounts were in good standing. A letter, allegedly from the Bank of Montreal, was provided to the First Caribbean International Bank, but the Bank of Montreal declared that the signature on this letter was **falsified** and that this letter did not come from them at all! (After the Bank of Montreal filed this defence, Defendant desisted from his lawsuit without further ado;)

61.     **In conclusion, without an order stopping the disposition of Defendant-Babikian's assets whether they are registered in his personal name or in the name of his *alter ego* companies, the Co-Defendants, Plaintiff will be left completely without recourse;**

62.     Plaintiff respectfully requests the issuance of a *Mareva* injunction to enjoin the Defendants not to mortgage pledge, encumber, transfer, dispose, cede, assign, sell, transfer, donate, bestow, remove or alienate in any form, manner or fashion their assets and property wherever situated, in Canada, the United States of America, Monaco, Hong Kong, the Bahamas, St. Kitts and Nevis, Guatemala, Belize, Panama, the Seychelles, Monaco, Switzerland, or elsewhere, whether held directly or indirectly through the intermediary of other persons, whether they be physical, moral or legal persons, including all representatives as well as mandated persons;

63.     Plaintiff respectfully requests that Defendants be ordered to file an affidavit disclosing all their assets whether held directly or indirectly through the intermediary of other persons, whether they be physical, moral or legal persons, including all representatives as well as mandated persons, wherever they may be located in the world, within a delay of seventy-two (72) hours following service of the injunction to be rendered herein;

64.     Defendant has already shredded almost all the physical documents that were in the family residence;

65.     Plaintiff respectfully requests that Defendants be ordered not to remove, destroy or in any way alter any financial, banking, accounting or other records of any business operations, any hypothecation or disposition of capital funds, any proceeds of sale, any transfers of funds, and to conserve all such records for communication to the Court;

66.     Plaintiff undertakes to pay damages in case she fails in her claims or the injunction turns out to be unjustified;

## BALANCE OF CONVENIENCE

67.     There is no inconvenience caused to the corporate Co-Defendants, which are not operating companies in any conventional sense, and which only exist to permit Defendant-Babikian to hide his identity, to be judgment-proof at all times, to deprive Plaintiff of her matrimonial rights, and so on;

68.     As for Defendant-Babikian, the nature of his business dealings is such that he does not in general require access to much capital to conduct his stock deals;

69.     As for Plaintiff, she is prepared to cooperate in the event there are any business dealings of any of the Defendants which may legitimately require the release of some capital sums *pro tem*;

70.     In fact, from the perspective of the judicial system in divorce proceedings, the relief sought by Plaintiff wife is no different from what any ordinary Defendant husband is normally expected to do, *i.e.* provide full financial disclosure and not transact any assets to make himself judgment-proof or to make recovery by Plaintiff impossible;

## URGENCY, NEED TO PROCEED *EX PARTE* AND SEALING ORDER

71.     Defendant has the ability and willingness to dispose rapidly of his unencumbered assets, that are all located outside of Quebec, transferring them into new *alter ego* companies that Plaintiff will not be able to discover, the whole in the context of his having abandoned his Canadian residency and being able to reside wherever he



pleases in the world without having to come back in Canada;

**72.      It is of utmost urgency for Plaintiff to obtain the injunction she is seeking herein, as several assets have already disappeared and other assets, such as the secondary residence at 642 North Laurel, Los Angeles, California, are about to be sold;**

73.      The opportunity for Plaintiff to recover any sums of money she may be awarded depends on her ability to secure these sums;

74.      If the assets are not already secured when Defendants takes cognizance of the present proceedings, they will disappear and Plaintiff will have irrevocably lost her opportunity to recover her share of the family patrimony and of the partnership of acquests, as well as alimony and provision for costs;

75.      Plaintiff must benefit from a delay of ten days from the service on each Defendant of the Provisional Injunction issued by judgment in order to facilitate its enforcement, which will require the cooperation of foreign jurisdictions;

76.      Plaintiff respectfully requests that the file be sealed for a delay of ten days from the issuance of the *Mareva* injunction;

## MANAGEMENT OF THE FILE

77.      Plaintiff respectfully requests that one judge of the Superior Court be seized of the file given the time-consuming nature of the file and the rapidity of intervention it requires;

## WHEREFORE PLAINTIFF PRAYS THIS HONOURABLE COURT:

1.      **GRANT** Plaintiff's motion for *Mareva* Injunction and sealing order;

2.      **ISSUE** an order of provisional injunction to come into force upon service on John Jack Babikian, 9264-5076 Québec Inc., 9224-1249 Québec Inc., Tidal East Global Relief Fund Inc., Vertical International Relief Fund, Middlebay Trade Ltd., John Jack Ventures Ltd., Montblue Commerce, Kenora Overseas, One Berger Circle, Arrow Import & Export Corporation, Antica Ventures Ltd., Mediasky Holdings Ltd., Monolith Ventures Ltd., Aurora Intour Ltd., Intelligent Alliance Corp., Liner Investments Ltd., Normandia Capital Corporation, Nottingham Group, Fellow Trading Ltd., Oriwa Villas Ltd. **(hereinafter collectively referred to as the "Defendants")** and to remain in force for a period of ten (10) days as follows;

3.      **ORDER** the Defendants not to dispose of or encumber (including without limitation by mortgage or pledge), cede, assign, sell, donate, gift, settle or otherwise transfer any of their property or assets of any nature whatsoever, wherever situated in the world, (including without limitation moveable and immoveable property, personal and real property, corporeal or incorporeal property, and interest in trusts and companies wherever they are situated), whether such property or assets are legally or beneficially held, owned or controlled, directly or indirectly, including through any persons or company or trust wherever situated (hereinafter referred to as the "Assets" of Defendants), including without limitation the following Assets:

1. An immoveable situated at **445 des Anémones, Laval, Quebec;**



2. Three lots numbered 4 633 969, 4 633 970, 4 633 971 in the cadastre of Quebec, located in **Domaine des Berges, chemin Bord-de-l'Eau, Laval, Quebec;**

3. An Immoveable situated at **642 N. Laurel Ave, Los Angeles, California 90048;**

4. An immoveable situated at **1401 Londonderry Pl., Los Angeles, California;**

5. Two condominiums, being units **#12914 and #6916 at The Reef Atlantis, in Nassau, Bahamas;**

6. Seven condominiums situated at **The Reef Atlantis, in Nassau, Bahamas,** in the name of John Jack Venture Ltd.;

7. An immoveable situated at Ocean's Edge Frigate Bay, Hillside Unit 1A aux Iles St-Kitts & Nevis;

8. All furniture and moveables garnishing or having garnished any residence where Defendant Babikian has resided since July 31 2010, including wine collections and art work, wherever they are located;

9. All cars registered in the name of Defendants, including the Bugatti Veyron 2008, bearing identification number VF9SA25C18M795175 and Quebec licence plate P78CKV and the Pagani Huayra automobile ordered from Pagani Automobili SPA, San Cesario sul Panaro, Italy, 41018;

10. All gold ingots;

11. All their shares in the following companies:

> **Homemade Harvey** (California)
> **The Fresh Diet / YS Catering** (New York)
> **Copa de Vino Inc.** (Oregon)
> **Ayala Herbal Water** (Pennsylvania)
> **Robofusion/ Puffin Innovations Inc.** (S.Carolina)
> **RGMS Media, Beeyoo** (Florida)
> **Jugular** (California)
> **Shamrock** (Nevada)
> **Energy Telecom** (Florida)
> **Wow Brands** (California)
> **T-Grip** (Oklahoma)
> **Skora** (Oregon)
> **CBS Foods** (Tennessee)
> **Granola Gourmet** (California)          *(unknown value)*

12. All their bank accounts and deposits, including notably:

(a) Checking account number ████ 7287 at the Bank of America, 7900 Melrose Ave, Los Angeles, (routing numbers █ ██0661 and █ ██0358)

(b) Bank Accounts numbered ████ 5-838 and ████ 05-380 at HSBC



in Hong Kong,

(c) Bank accounts ███████ 0001 and ███████ 0002 at Compagnie Monégasque de Banque, 23 avenue de la Costa, Monaco, 98000,

(d) Bank account at CIBC First Caribbean Wealth Management Center, Shirley Street Branch, in Nassau, Bahamas,

(e) Bank account at the Belize Bank International Limited, The Matalon Business Center, 2nd floor, Coney Drive, Belize City, Belize,

(f) Bank account at the Belize Bank, 60 Market Square, Belize City, Belize,

(g) Bank accounts at Bank of Valletta p.l.c. in Valletta, Malta,

(h) Bank account of Me Leonnel Iruke IOLTA account, PLLC Omnisource Legal, in Houston, Texas, Wells Fargo Bank, account number ███ 8486,

(i) Deposits in Me Michel Gauthier's trust account, in Terrebonne, Québec,

(j) Deposit in escrow for the purchase of the property located at 1 Electra Court, Los Angeles,

(k) Deposit at John Scotti Lamborghini Montreal, 4550 boul. Métropolitain East, St-Léonard, H1S 3A8,

(l) Any retainer in the name of Unitrust Capital Corp, a company located at 1600 Steeles Avenue West, Toronto, Ontario,

4.      **REQUEST** the assistance of the Courts of Monaco, Hong Kong, The Bahamas and The United States of America and any other jurisdiction to provide aid and assistance to recognize and enforce all orders rendered pursuant to the present motion;

5.      **GRANT** Plaintiff a delay of 15 days from the date of the judgment issuing the Provisional Injunction (subject to any extension of such delay that may be granted by this Court upon petition of Plaintiff) to serve such judgment on Defendants during which time Plaintiff may seek to have the Provisional Injunction recognized and enforced in Courts in Monaco, Hong Kong, The Bahamas and The United States of America and in any other jurisdiction Plaintiff deems necessary;

6.      **DECLARE** that the Provisional Injunction issued by judgment rendered herein shall expire, in respect of each Defendant, ten (10) days from the date of service such Defendant;

7.      **GIVE ACTE** to the undertaking of Plaintiff to file notice with the Court advising of the service on Defendants of the judgment to be rendered herein issuing the Provisional Injunction, the whole within three (3) juridical days of being advised of such service;

8.      **ORDER** that the Motion in Divorce and the present Motion for Provisional, Interlocutory and Permanent Injunction, the affidavits and exhibits thereto filed in support of the Motion, the judgment issuing the Provisional Injunction to be rendered herein, and all notices of service provided by Plaintiff remain under seal until the Court receives notice that the judgment rendered herein issuing the Provisional Injunction is

served upon all of the Defendants;

9.        **ORDER** each of the Defendants to provide, in writing, to Goldwater, Dubé, to the best of their ability a list of all of their Assets worldwide exceeding $ 5,000 in value, as defined in Conclusion 3 herein, giving the value, location and details of all such assets, the whole within twenty-four (24) hours of the service of the judgment to be rendered herein on such Defendant;

10.        **ORDER** Defendants not to remove, destroy or in any way alter any documents of any kind relating to their Assets, or relating to any transactions involving their Assets, whether they are in paper form of digital form, from January 01 2008 to date, and to **CONSERVE** all such records for communication to the Court;

11.        **ORDER** each of the Defendants to provide to Goldwater, Dubé, within seventy-two (72) hours of the service of the judgment issuing the Provisional Injunction to be rendered herein on such Defendant, an affidavit deposed by each of them (or in the case of all corporate Defendants, by a legally authorized representative), providing the following information concerning such Defendant, accompanied by the supporting documents:

         a. full particulars of all the worldwide Assets, as defined in Conclusion 3 herein, the whole as of September 01 2012 <u>and</u> as of the date of the affidavit;

         b. full particulars of the nature, value and precise location of such Assets (including the name, address and contact person of any institution, corporation, person, partnership, trust or other entity holding such Assets or indebted or obliged in any way to the Defendants), the whole as of September 01 2012 <u>and</u> as of the date of the affidavit; and

         c. full particulars of any mortgages, pledges or other encumbrances on the Assets of the Defendants, and of any dispositions, cessions, assignments, sale donation, gift or other transfers by the Defendants of their Assets, between September 01 2012 and the date of the affidavit, including without limitation the dates of such acts, the names and addresses of the parties involved and the nature and precise location of the Assets involved;

12.        **ORDER** each of the Defendants to provide to Goldwater, Dubé, within (72) hours of the service of the judgment issuing the Provisional Injunction to be rendered herein on such Defendant, the following information:

         (a) The specification and location of all computers, laptops, blackberries and other electronic devices upon which documents or information are stored which are either (1) in his possession, custody or control or (2) to which he has access and which contain documents which are in his possession, custody or control;

         (b) Details of all email accounts held by him or which he controls or to which he has access;

         (c) The addresses or other locations at which the Respondent keeps all documents within his possession, power or control which evidence the nature, location and value of all his Assets ("Asset Documents");

(d) The names, addresses and contact details of all third parties who hold any Asset Documents on behalf of the Respondent or to his order (including any documents to which the Respondent is entitled to copies upon payment of a fee) including without limitation, any solicitors, accountants, financial advisors, banks, investment managers or trustees;

13.      **AUTHORIZE** Defendant Babikian to transfer from outside of Quebec the sum of $ 100,000 to be deposited into a new bank account to be opened by him at a branch of a Canadian bank, in the City and District of Montreal, in the Province of Quebec (hereinafter the "**Account**"), and **ORDER** Defendant-Babikian to identify the Bank and provide the account opening forms to the undersigned attorneys within a delay of twenty-four (24) hours. The sum of $ 100,000 transferred into the Account will be exempt from any injunction (provisional, interlocutory or permanent) issued herein, as necessary for the support of Defendant Babikian, including the payment of his legal fees related to the present proceedings;

14.      **RESERVE** the rights of the Defendant John Jack Babikian to apply to the Court for a modification of these provisions concerning the Account, should his need for funds for his support or legal expenses change in the future;

15.      **ISSUE** a safeguard order to remain in full force until judgment intervenes on the interlocutory injunction, upon the same terms as the provisional injunction described above;

16.      **ISSUE** an order of interlocutory injunction to remain in full force until the final judgment intervenes on the merits of present motion upon the same terms as the provisional injunction described above;

16.      **ISSUE** an order of permanent and final injunction until full satisfaction by Defendants, in capital, interests and costs, of the final and executory judgment to be rendered in the present case, the whole upon the same terms as the interlocutory injunction described above;

18.      **DISPENSE** Plaintiff from providing security in connection with the foregoing injunction;

19.      **ORDER** provisional execution of all judgments to intervene herein, notwithstanding appeal and without security;

20.      **AUTHORIZE** the service of any order and all related proceedings, by electronic mail, facsimile transmission or registered or certified mail, in addition to any other legal means of service, the whole outside of legal hours and on non-juridical days if necessary, and, with respect to the corporate Defendants, **AUTHORIZE** service on such corporate Defendants by service upon Defendant-Babikian, the whole outside of legal hours and on non-juridical days if necessary;

21.      **AUTHORIZE** the service of any order and of all related proceedings which must be served on third parties holding any property belonging to the Defendants by any means, including without limitation, service by a person of the age of majority, electronic mail, facsimile transmission or registered or certified mail, and outside of the legal hours and on non-juridical days if necessary;

22.      **APPOINT** a judge of the Superior Court of Quebec to remain seized of the

file;

23. **RENDER** all such other orders as may be necessary to safeguard Plaintiff's rights;

24. **THE WHOLE**, without costs, but with costs in the event of contestation.

MONTREAL, September 10 2013

Alima Beg, Plaintiff

Goldwater, Dubé
Attorneys for Plaintiff

TRUE COPY / COPIE CONFORME

GOLDWATER, DUBÉ
Attorneys for
Procureurs pour

## A F F I D A V I T

I, the undersigned, Alima Beg, housewife, residing and domiciled at 445 des Anémones, in the city and district of Laval, do solemnly affirm:

1.      I am Plaintiff herein;

2.      I have taken cognizance of the allegations in the foregoing Motion for Mareva Injunction and Sealing of the File;

3.      I have instituted a motion in divorce against the Defendants seeking, *inter alia*, a condemnation against Defendant-Babikian for spousal support in the amount of $ 43,000 per month; interim provision for costs in the amount of $ 500,000; partition of the value of the family patrimony and the matrimonial regime of partnership of acquests, these condemnations sought being in the sum of approximately $ 50,000,000; the whole, as appears from the Court record;

4.      Defendant-Babikian, who is only twenty-six years old, runs a business by which he acquires, directly and indirectly, large stakes in penny stocks, then "promoting" these penny stocks through multiple websites, thereby causing the price of these stocks to run up, so that he can "dump" the stocks with enormous profits;

5.      Defendant-Babikian has been able to accumulate assets of at least one hundred million dollars, which he holds in the names of various *alter ego* corporate entities, which are located in multiple countries, all over the world;

6.      Defendant-Babikian has been able to amass his wealth using only the Internet, without the need for a "bricks and mortar" office, without staff or employees, and without any type of conventional infrastructure. In fact, he runs his business entirely from specially encrypted Blackberry smartphones, which he uses for a few days or weeks before destroying and replacing them. I have witnessed Defendant-Babikian smashing his Blackberry smartphones into small pieces that are later disseminated in different garbage bins so that it is absolutely impossible for anyone to reconstitute the devices and have access to the information they once contained;

7.      Very little information can be found concerning the individuals and the corporate entities behind the website **www.awesomepennystocks.com** and its many sister websites, and Defendant-Babikian's name in particular cannot be linked to these sites through the web;

8.      Defendant-Babikian seeks to conceal his identity at all costs, to avoid paying income taxes on the tens of millions of dollars he has earned through his business of stock promotion on the Internet, and to avoid having to share the assets he has acquired with me, although we are married under the regime of partnership of acquests;

9.      With the astronomical profits that he has been able to generate "promoting" penny stocks, Defendant-Babikian has invested in real estate, in shares of real companies and in stocks, but he has been doing so using *alter ego* corporate entities, of which he is the sole directing mind, often situated in tax haven countries, and his latest strategy is to use companies set up as "charities". Here is the list of *alter ego* corporate entities that I have been able to trace so far:

        (a) I am suing the following corporate entities because they are holding

Defendant-Babikian's assets in fraud of my rights, or they have been created in order to hold his property on his behalf:

     • **Middlebay Trade Ltd.** is incorporated in the Seychelles, and holds for Defendant-Babikian our secondary residence located at 642 N. Laurel Avenue, Los Angeles, as appears from **Exhibit P-8**;

     • **Oriwa Villas Ltd.** holds for Defendant-Babikian his property located at 1401 Londonderry Pl., Los Angeles, California, but its address is at 642 N. Laurel Avenue, Los Angeles as appears from Exhibits P-10A and P10B. Moreover, the funds to purchase the property came from Arrow Import & Export Corporation and Microtech Ventures Limited, as appears from the Buyer's Final Settlement Statement from Granite Escrow Services dated August 08 2012, produced herewith as **Exhibit P-16**;

     • **Arrow Import & Export Corporation** is incorporated in the British Virgin Islands and holds for Defendant-Babikian bank accounts at Hong Kong HSBC. To the best of my knowledge, these are Defendant's principal accounts. The debit and credit cards that Defendant-Babikian would use the most frequently for his day-to-day expenses were the ones from HSBC Hong Kong. Defendant also had a security device from HSBC Hong Kong enabling him to make wire transfers that he also carried with him all the time. Defendant-Babikian is the sole shareholder and director of this company, as appears from the copy of the share transfer certificate and the Consent to act as a Director/Shareholder, all dated February 16 2011, produced herewith as **Exhibit P-17**;

     • **John Jack Ventures Ltd.** is incorporated in the Bahamas and holds for Defendant-Babikian seven condos located at The Reef Atlantis, in Nassau, Bahamas (Defendant-Babikian's names are «John Jack»), as appears from statement of account of the Reef Atlantis, dated June 20 2013, produced herewith as **Exhibit P-18**;

     • **9264-5076 Québec Inc.**, holds three lots located at Le Domaine des Berges, Laval, Quebec, that Defendant-Babikian acquired to build our new family residence, as appears from **Exhibit P-9** and is further explained at paragraphs 46 to 51 herein;

     • **9224-1249 Québec Inc. [Bargainoo Est et Etablissement Bargainoo]**, a company that is related to the domain **www.bargainoo.com**, created and operated by Defendant-Babikian, as appears from the CIDREQ for this company, produced herewith as **Exhibit P-19**;

     • **Vertical International Relief Fund**: Defendant-Babikian flies around the world in a private Gulfstream jet, having an account with NetJets, in the name of this "charitable organization", as appears from NetJets Invoices produced herewith as **Exhibit P-20**;

     • **Tidal East Global Relief Fund** holds shares of Energy Telecom for Defendant-Babikian;

     • **Antica Ventures Ltd.** holds for Defendant-Babikian a bank account at the Belize Bank International Limited, in Belize and shares in the company Wow Brands. I produce herewith an instruction sheet to reload his VISA prepaid Card, indicating that his account is in the name of Antica Ventures, as **Exhibit P-21**;

     • **Kenora Overseas** holds for Defendant-Babikian shares in the company RGMS Media Beeyoo;

• **Monolith Ventures Ltd.** holds for Defendant-Babikian shares in the company YS Catering LLC / The Fresh Diet;

• **Normandia Capital Corp.** holds for Defendant-Babikian shares in the companies CBS Food, T-Grip and Skora and some shares in Energy Telecom;

• **Fellow Trading Ltd.** holds for Defendant-Babikian shares in the company Ayala Herbal Water;

• **Nottingham Group** holds for Defendant-Babikian shares in the companies Robofusion Inc. /Puffin Innovations Inc. et Shamrock;

• **Montblue Commerce** holds for Defendant-Babikian shares in the company Copa Di Vino;

• **One Berger Circle Holdings** was used by Defendant-Babikian to funnel money in order to build the family residence located at 445 des Anémones, Laval, Quebec;

• **Mediasky Holdings Ltd.** is a company recently incorporated in Belize;

• **Liner Investments Ltd.**, is a company recently incorporated in Seychelles Island;

• **Intelligent Alliance Corp.**, is a company recently incorporated in Seychelles Island;

• **Aurora Intour Ltd.**, is a company recently incorporated in Seychelles Island;

(b) Other entities have acted as *alter ego* companies but have been dissolved:

• **Microtech Ventures Limited** held bank accounts for Defendant-Babikian;

• **7238843 Canada Inc.**, a company in which Defendant-Babikian was the principal shareholder and director;

• **9173-8153 Québec Inc., [JB Marketing]**: Defendant was the primary shareholder, director and president of this company, which is now bankrupt;

• **9195-5948 Québec Inc.,**: Defendant was the primary shareholder, director and president of this company, which is now bankrupt;

(c) As far as **9248-3247 Québec Inc.** is concerned, it holds the condominium located at 1300 Alain-Grandbois #702, Montréal, Québec, previously owned by Defendant-Babikian. The principal shareholder is Alexandre Salameh but I suspect that he is acting as a "prête-nom" for Defendant-Babikian since the latter was planning to invest in real estate with Mr. Salameh;

10.     Approximately a year ago, Defendant-Babikian decided to give up Canadian residency and go live in Monaco and he has applied for citizenship in several countries, and in the European Community. He is now a citizen of Canada, Lebanon, Nevis, Guatemala and he is hoping to become a citizen of other countries in the near future. He holds a diplomatic passport from Guatemala, which is produced herewith as appears

**Exhibit P-22**, even though he is not a diplomat. If he is not stopped soon, it will become impossible to control his movements. As it is, he travels on private jets, via NetJets (in an account registered in the name of a "charity"!), where security can be more lax in terms of travel documents;

11.        Defendant-Babikian has companies, or is forming companies, in the Bahamas, the Seychelles, St. Kitts and Nevis, Panama, Hong Kong, British Virgin Islands, Belize, amongst others, and he is in the process of founding a bank in Guatemala, so that he will be able to conduct banking transactions with impunity, and not face expulsion by legitimate banks that do not want to handle his large and unexplained transactions;

12.        Defendant-Babikian told me that the Royal Bank of Canada, HSBC in Switzerland and the Bank of Montreal did not want to keep him as a client. Plaintiff recently discovered the letters the Bank of Montreal wrote to him expelling him, which are produced herewith as **Exhibit P-23**. The undersigned attorneys obtained the Defence filed by the Bank of Montreal telling the rest of the story, as appears from **Exhibit P-13**;

13.        I have witnessed Defendant-Babikian handling cash transactions for very large sums of money. For example, in my presence, in my parents' home, we both counted out three million Canadian dollars in cash, which he then paid to Construction D'Astous, a construction contractor, in Quebec, Canada, to build the family residence;

14.        The Minister of Revenue of Quebec [MRQ] was alerted by the possibility that Defendant-Babikian was under-reporting his income, through its project: «indice de richesse», a lifestyle audit. Defendant declared a total gross income of only $ 504,536 in 2010 but bought in Canada three extremely expensive automobiles during the year: a BMW X6 M, a Bentley Continental 2010 and a Lamborghini Gallardo 560 Spider 2010. In 2010, he also bought in Canada one condominium for $ 370,000 and a piece of land for $ 677,250, the whole without indebting himself for any of these purchases;

15.        During the period that the MRQ was auditing Defendant-Babikian and his four companies in Quebec, he had two of his companies declare bankruptcy, based on debts that appear to be fictitious:

            (a) Defendant-Babikian declared in his bankruptcy documents that 9173-8153 Québec Inc. had debts of $ 550,000 including a debt of $ 300,000 to a law firm located in Texas, Uya Madu Attorneys, where Leonnel Iruke was practising. The other $ 250,000 debt was to a California company, Nick Thomas Ltd. I do not believe for a minute that Defendant's company actually owed these debts as the documents indicate, considering that both Leonnel Iruke and Nick Thomas are personal friends of Defendant-Babikian;

            (b) The bankruptcy documents for 9195-5948 Quebec Inc. show a debt of $ 175,000 to a company located in Florida, First Spectacle Corp. I also do not believe for a minute that Defendant's company actually owed this debt;

16.        On April 19 2013, the MRQ obtained a judgment for $ 4,642,978 against Defendant-Babikian and instituted proceedings to collect this sum, as appears from **Exhibit P-4** and the *Ex parte* motion to obtain authorization to take immediate recovery measures, for permission to execute prior to expiration of delays and other measures, produced herewith as **Exhibit P-24**;

17.        The same day, the MRQ attempted a seizure of the moveable effects located at 445 Des Anémones, Quebec, but the parties were not in the country and nobody was

named as guardian of the goods. This writ of seizure was also never served on Defendant-Babikian;

18.      Shortly thereafter, the MRQ registered legal hypothecs on all the assets registered in Quebec in the name of Defendant-Babikian, which are our principal residence, and three cars: a BMW X6 M, a Bentley Continental 2010 and a Bugatti Veyron which is worth two million dollars, as appears from the extract of the Registry of real and personal rights of moveables produced herewith as **Exhibit P-25**;

19.      At that time, the Bugatti Veyron was physically in Monaco, where Defendant-Babikian had had it shipped a few months before;

20.      However, Defendant-Babikian shipped the Bugatti Veyron back to Montreal for the Grand Prix weekend in June 2013 and sent it back to Monaco once the event was over, without consideration for the fact that he was putting his second most valuable asset known to the MRQ outside of its reach;

21.      I find myself in the following precarious situation:

   • I abandoned my studies, at Defendant-Babikian's request, in order to make a home for the family in the different cities where we have resided: Montreal, Los Angeles, Laval, Monaco and the Bahamas;
   • I have no income of her own;
   • I reside in the family residence that Defendant-Babikian bought under his name only and which is subject to a legal hypotec from the MRQ exceeding the value of the immoveable;
   • I co-own the two cars that are still in Quebec but they are subject to a legal hypothec from the MRQ as well;
   • Defendant-Babikian is indebted towards me for tens of millions of dollars for the partition of the value of the family patrimony and the partnership of acquests but will have completed organizing his worldwide financial empire in such a manner that I will never be able to recover her claim;
   • Defendant-Babikian has relocated to Monaco where he has moved all his personal belongings that used to be kept in the family residence, and he has obtained citizenship from Guatemala and Nevis;
   • Defendant-Babikian has systematically placed the assets he acquires and the revenues he earns in the names of nominees and alter ego companies to defeat my legitimate claims for alimentary support, partnership of acquests and family patrimony;
   • Defendant-Babikian is planning to dispose of his assets that are known from me, or to encumber them with fictitious loans, as he has already done with the cars registered in Quebec;

## PLAINTIFF'S CLEAR RIGHTS

22.      I have a clear right to spousal support, provision for costs and partition of the value of the family patrimony and of the partnership of acquests;

23.      (a) I do not have full knowledge of Defendant-Babikian's assets, nor am I in a position to identify all the acquests, without Defendants disclosing this necessary financial information. The exact value of the partnership of acquests can only be established after full divulgation of Defendants assets and their eventual evaluation;

         (b) I have a statutory right to full financial disclosure from Defendants, both to assert my alimentary rights and to value and partition the family patrimony and the



partnership of acquests;

24.      I clearly have a right to the injunction I am seeking herein, having reason to believe that without this remedy the recovery of my debt will be put in jeopardy. Defendant-Babikian's pattern of conduct shows that he is concealing and removing assets from my reach;

## IRREPARABLE HARM

25.      **Defendant-Babikian is currently selling and/or transferring assets that are part of the family patrimony and of the partnership of acquests. If he is not stopped immediately, I will never be able to recover my share of the family patrimony and of the partnership of acquests. I will also never be able to execute any alimentary judgment to be rendered in my favour;**

26.      On August 11 2013, Defendant-Babikian told me that he sold the **Range Rover** that we co-owned in Los Angeles, California, without my consent, for $ 65,000 (the vehicle had recently been purchased for about $ 115,000 and is still worth approximately $ 100,000). I was never consulted with respect to this sale. To the contrary, I indicated to Defendant that I wanted this car to be transferred to me. This did not prevent Defendant-Babikian from disposing of my asset without my permission and without my signature. Defendant gave me a sum of $ 32,500 in cash, claiming that this represents the half of the profit from the sale (which I do not believe), but expects me to use this capital to support my alimentary needs;

27.      I am convinced that Defendant-Babikian must have forged my signature on the car registration transfer papers, as throughout our marriage, I have witnessed him falsifying signatures on official documents. For example, Defendant-Babikian prepared and signed a medical certificate attesting to his good health, along with an envelope that he handwrote, which are produced as **Exhibit P-26** *en liasse*, the whole, in my presence. This letter and envelope falsely indicate that the sender is Dr. Barrington Iruke M.D. PA. (who is an actual person). I also witnessed Defendant-Babikian adding false signatures of notarization on other documents, with false seals, some of which he left in our matrimonial home, as appears from the seal in the name of Francesco Fucelli produced herewith as **Exhibit P-27** -- the seal indicates that this person is a "notary public for the province of Quebec," a title that does not even exist in Quebec!

28.      On August 13 2013, Defendant-Babikian also told me that he has listed for sale our secondary residence, located at **642 N. Laurel Ave, Los Angeles, California 90048, USA**, which is worth approximately $ 3,000,000, without my consent. He added that this property will be sold within two to three weeks;

29.      When he came to Canada in June 2013, Defendant-Babikian removed our **wine collection**, which is worth approximately one million dollars, and two **Arturo Di Modica bull statues**, which are worth approximately $ 600,000 from the family residence;

30.      On April 05 2013, Defendant-Babikian sold the former family residence located at **1300 Alain-Grandbois, Apartment 701, Montréal, Québec**. Approximately $ 400,000 from the profits of the sale were deposited "in trust" with Leonnel Iruke, according to allegations contained in Defendant's motion filed in Superior Court of Quebec file number 500-17-076845-133, produced as **Exhibit P-12;**

31.      Defendant was also the owner of another condominium, **1300 Alain-**

**Grandbois, Apartment 702, Montréal, Québec**. This property was transferred to a company, 9248-3247 Québec Inc., owned by his close friends: Alexandre Salameh and Linda Fondacaro. I suspect that these friends are acting as nominees for Defendant;

32.      Defendant has also told me that he wants to sell our family residence, located at **445 Des Anémones, Laval, Quebec**, where I reside alone;

33.      In fact, Defendant-Babikian is not hiding from me his intention to make his assets disappear, as appears from his email dated July 17 2013 produced herewith as **Exhibit P-28**:

> «la maison technique n'appartiens ni à toi ni a moi alors je trouve dificile a croire que toi ou moi on pourra prendre de largent de cette maison. Les autos aussi ont des hypotheques. Comme je tai dis je sais pas ce que tu essai de faire, mais sil ya quelque chose que tu veut tu devrais me le dire pour que je te le donne parceque sinon tout va disparaitre.» (sic)

34.      I responded to Defendant-Babikian's invitation and identified what I wanted, starting with me keeping the family residence on 445 des Anémones, Laval, and the three cars we were co-owing at the time (the Bentley, the BMW X6 and the Range Rover). It quickly became evident that he had no intention of giving me anything of substantial value;

35.      Defendant-Babikian has even admitted to me that he has carefully planned how to dispose of his assets in light of our imminent divorce. His words were: «Si tu penses que je n'ai pas déjà tout planifié, tu te trompes; j'ai déjà tout planifié!»;

36.      **I am well aware of Defendant-Babikian's ability to hide his assets with complete impunity;**

37.      During our marriage, Defendant-Babikian engaged in extensive efforts to conceal assets and revenues from me. To begin with, shortly after the marriage, he stopped holding properties and bank accounts in his personal name. He has also shown both a propensity and an ability to shift assets rapidly and through numerous countries, as the whole will be demonstrated herein;

38.      As already explained, Defendant-Babikian has created and controls corporate entities that are his *alter ego* companies in various tax heavens, such as Guatemala, St. Kitts and Nevis, the Seychelles, Panama, British Virgin Islands, the Bahamas, Belize, Hong Kong, Switzerland and Monaco. He uses a Canadian company called Unitrust Capital Corporation to incorporate these offshore alter ego companies. This company, located at 1600 Steeles Avenue West, Suite 228, Concord, Ontario, Canada, publicly holds itself out to be a provider of services for the incorporation of companies in "tax haven" countries, as appears from the relevant pages from the website of Unitrust produced as **Exhibit P-29**. Unitrust statement of account, addressed to Babikian personally, details their services for the following offshore *alter ego* companies: Liner Investments Ltd. (Seychelles), Antica Ventures Ltd. (British Virgin Islands), Arrow Import & Export (British Virgin Islands), Mediasky Holdings Ltd. (Seychelles), Beddington Marketing (Belize), Intelligent Alliance (Seychelles), as appears from **Exhibit P-30**;

39.      As mentioned above, Defendant is also assisted in his endeavours by two men – one of whom he introduced to me as a "friend" – but who in fact have acted as his

business associates, namely, Leonnel Iruke, who is a member of the Law Societies of Texas and California, and Me Michel Gauthier, who is a member of the Quebec Bar;

40.     Mr. Iruke works exclusively or almost exclusively for Defendant. He is always available for Defendant and jumps on a plane to meet Defendant in Monaco, Montreal or any other cities whenever Defendant requires his presence. He is the one setting up many of the corporate entities, helping Defendant to get different citizenships, and to shelter his assets from recovery by any type of creditors;

41.     Mr. Iruke also operates under the name of Omnisource Legal Group. Mr. Iruke originally practiced law in Houston, and once he started doing business with Defendant, he moved to California, where he does not appear to have an office. He no longer appears to work at all from his Houston office, where he and his partner practiced law (his partner is currently serving a term in prison for theft);

42.     The Registre des Droits Personnels et Réels Mobiliers of Quebec indicates a "contractual debt" of $ 1,250,000 registered against the four cars that have been registered under Defendant's name. To my knowledge, Mr. Iruke never loaned $ 1,250,000 to Defendant;

43.     Defendant also alleged a "debt" towards Mr. Iruke in order to put his company, 9173-8153 Québec Inc., in bankruptcy, as above-mentioned, which debt is also dubious, to say the least;

44.     In fact, Mr. Iruke earns his living doing business with Defendant, and he is not required to pledge his own funds in support of Defendant's enterprises;

45.     Defendant's money transits through Mr. Iruke's trust account and it is disbursed based on Defendant's instructions. In this fashion, Defendant-Babikian uses Mr. Iruke's trust account as a "conduit" for expenditures of all kinds;

46.     Defendant also uses a lawyer in Quebec, Me Michel Gauthier, both as a nominee («prête-nom»), and as a conduit to channel money through his trust account;

47.     On June 14 2012, Defendant bought **three lots of land in the Domaine des Berges, in Laval, Quebec**, under the name of a company, 9264-5076 Québec Inc., where we intended to build a new family residence with a waterfront. These three lots were purchased for the price of $ 2,744,100, as appears from **Exhibit P-9**;

48.     The company 9264-5076 Québec Inc. was registered on June 08 2012, and the registry of enterprises [CIDREC] does not disclose who are its shareholders. However the sole director identified is Michel Gauthier, as appears from **Exhibit P-9**;

49.     Me Gauthier is Defendant's attorney *ad litem* in his litigation with the MRQ, as appears from **Exhibit P-12**;

50.     With the assistance of Me Gauthier, Defendant was able to purchase a property worth over 2.7 million dollars without his name showing in any public documents or registry, thereby sheltering this significant asset from his creditors, including, most notably, the MRQ and myself;

51.     I am aware that these three lots belong to Defendant because of my extensive involvement in the construction plans for the new residence we were contemplating. However, Defendant never advised me that he was buying this land under the name of a

company;

52.     I participated with Defendant in many meetings with John Garabedian, owner and seller of the complex Domaine Des Berges, Laval, Quebec, and with the architect, from Dubord Design, who did the plans for the new house and with the contractor, Nancy Isabelle from Construction D'Astous, the whole with a view to build one home on the three lots that Defendant bought from John Garabidian, the whole as appears from the plan for the "John Babikian residence" produced herewith as **Exhibit P-31**;

53.     As a further example of Defendant-Babikian's ability to shift assets in fraud of my rights: the family residence located at 642 North Laurel, Los Angeles, California, was purchased during the marriage, on December 01 2010, in Defendant-Babikian's personal name and, on June 02 2011, unbeknownst to me, was transferred to the name of an offshore Bahamanian company controlled by Babikian, by the name of Middlebay Trade Ltd., as appears from **Exhibits P-6 and P-8**;

54.     The address of Middlebay Trade Ltd. is 12914 The Reef Atlantis, Paradise Island, Nassau, Bahamas, which is the other secondary residence used by us. It is one of the nine (9) residential condos Defendant-Babikian owns in the Bahamas (two of them are registered in his name including unit 12914, and the seven others are held by his *alter ego* company, John Jack Ventures);

55.     We were residing a few months a year in California and we decided to purchase a new home in Los Angeles. Babikian used $ 6,000,000 USD from the HSBC accounts of Arrow Import & Export Corporation and Microtech Ventures Limited to pay for the purchase of the residence we bought at 1401 Londonderry Place, Los Angeles, U.S.A., on August 08 2012, which he put in the name of Oriwa Villas Ltd., and the remaining funds with the Escrow Agent were sent to Antica Ventures Ltd., the whole, without my knowledge or consent;

56.     Moreover, Defendant has no scruples and will stop at nothing in order to obtain what he wants;

57.     As appears from paragraph 24 herein, Defendant must have forged my signature in order to sell the Range Rover that we co-owned, unbeknownst to me, and against my will;

58.     Defendant admitted to me that in July and August 2013, he had me under surveillance and that he had my Facebook, Gmail, Hotmail and Fido accounts hacked, in order to "make sure that I was a good person", and this without any respect for my right to privacy, and without concern for the anguish that I suffered during the whole time I realized I was being followed by detectives;

59.     A couple of years ago, Defendant had several personal and corporate bank accounts at the Bank of Montreal, but they were closed by the Bank, so Defendant sued the Bank of Montreal for closing his accounts without his consent, claiming damages;

60.     The Defence filed in the court record by the Bank of Montreal discloses that the accounts were closed because **Defendant was declaring an income of $ 24,000 but was engaging in bank transactions for hundreds of thousand of dollars, and he was unable to explain the nature of his transactions**. He was also unwilling to explain the nature of his professional activities;

61.     Then, Defendant attempted to open a bank account at the First Caribbean



International Bank in Bahamas. He was asked to provide a letter from his Canadian bank attesting that his accounts were in good standing. A letter, allegedly from the Bank of Montreal, was provided to the First Caribbean International Bank, but the Bank of Montreal declared that the signature on this letter was **falsified** and that this letter did not come from them at all! (After the Bank of Montreal filed this defence, Defendant desisted from his lawsuit without further ado;)

62.     **In conclusion, without an order stopping the disposition of Defendant-Babikian's assets whether they are registered in his personal name or in the name of his *alter ego* companies, the Co-Defendants, I will be left completely without recourse;**

63.     I respectfully request the issuance of a *Mareva* injunction to enjoin the Defendants not to mortgage pledge, encumber, transfer, dispose, cede, assign, sell, transfer, donate, bestow, remove or alienate in any form, manner or fashion oue assets and property wherever situated, in Canada, the United States of America, Monaco, Hong Kong, the Bahamas, St. Kitts and Nevis, Guatemala, Belize, Panama, the Seychelles, Monaco, Switzerland, or elsewhere, whether held directly or indirectly through the intermediary of other persons, whether they be physical, moral or legal persons, including all representatives as well as mandated persons;

64.     I respectfully request that Defendants be ordered to file an affidavit disclosing all our assets whether held directly or indirectly through the intermediary of other persons, whether they be physical, moral or legal persons, including all representatives as well as mandated persons, wherever they may be located in the world, within a delay of seventy-two (72) hours following service of the injunction to be rendered herein;

65.     Defendant has already shredded almost all the physical documents that were in the family residence;

66.     I respectfully request that Defendants be ordered not to remove, destroy or in any way alter any financial, banking, accounting or other records of any business operations, any hypothecation or disposition of capital funds, any proceeds of sale, any transfers of funds, and to conserve all such records for communication to the Court;

67.     I undertake to pay damages in case I fail in my claims or the injunction turns out to be unjustified;

## BALANCE OF CONVENIENCE

68.     There is no inconvenience caused to the corporate Co-Defendants, which are not operating companies in any conventional sense, and which only exist to permit Defendant-Babikian to hide his identity, to be judgment-proof at all times, to deprive me of my matrimonial rights, and so on;

69.     As for Defendant-Babikian, the nature of his business dealings is such that he does not in general require access to much capital to conduct his stock deals;

70.     I am prepared to cooperate in the event there are any business dealings of any of the Defendants which may legitimately require the release of some capital sums *pro tem*;

71.     In fact, from the perspective of the judicial system in divorce proceedings, the relief I seek as a Plaintiff wife is no different from what any ordinary Defendant husband

is normally expected to do, *i.e.* provide full financial disclosure and not transact any assets to make himself judgment-proof or to make recovery by myself impossible;

## URGENCY, NEED TO PROCEED *EX PARTE* AND SEALING ORDER

72.      Defendant has the ability and willingness to dispose rapidly of his unencumbered assets, that are all located outside of Quebec, transferring them into new *alter ego* companies that I will not be able to discover, the whole in the context of his having abandoned his Canadian residency and being able to reside wherever he pleases in the world without having to come back in Canada;

73.      **It is of utmost urgency that I obtain the injunction I am seeking herein, as several assets have already disappeared and other assets, such as the secondary residence at 642 North Laurel, Los Angeles, California, are about to be sold;**

74.      The opportunity for me to recover any sums of money I may be awarded depends on my ability to secure these sums;

75.      If the assets are not already secured when Defendants takes cognizance of the present proceedings, they will disappear and I will have irrevocably lost my opportunity to recover my share of the family patrimony and of the partnership of acquests, as well as alimony and provision for costs;

76.      I must benefit from a delay of ten days from the service on each Defendant of the Provisional Injunction issued by judgment in order to facilitate its enforcement, which will require the cooperation of foreign jurisdictions;

77.      I respectfully request that the file be sealed for a delay of ten days from the issuance of the *Mareva* injunction;

## MANAGEMENT OF THE FILE

78.      I respectfully request that one judge of the Superior Court be seized of the file given the time-consuming nature of the file and the rapidity of intervention it requires;


AND I HAVE SIGNED:


_____
Alima Bég
Plaintiff


Affirmed to before me at Montreal
This 10th day of September 2013

Linda Shore

Commissioner of Oaths for the
Judicial District of Montreal

LINDA SHORE
# 201105

TRUE COPY / COPIE CONFORME

GOLDWATER, DUBÉ
Attorneys for
Procureurs pour