**CONFIDENTIAL**

# NETJETS FRACTIONAL PROGRAM AGREEMENT

## NETJETS SHARE

BY AND AMONG

VERTICAL INTERNATIONAL RELIEF FUND

AND

NETJETS SALES, INC.
NETJETS AVIATION, INC.
NETJETS SERVICES, INC.



# NETJETS FRACTIONAL PROGRAM AGREEMENT

This **NetJets Fractional Program Agreement** ("Agreement") is entered into by and among the Owner and the NetJets entities identified in Item A of the General Schedule set out in Section 1 (collectively the "Parties" and individually each a "Party"). Sales, Manager, and Services are collectively referred to herein as "NetJets." In consideration of the promises and of the mutual covenants, agreements, representations, and warranties herein contained, the Parties agree as follows.

### Section 1 – Intent of the Parties

Owner desires to (i) purchase from Sales an undivided ownership Interest in the Aircraft and Engines (Aircraft and Engines collectively, the "Aircraft") described below, (ii) delegate to Manager the management of the Aircraft, including flight and maintenance services, and (iii) participate in the aircraft exchange program provided by Services. The General Schedule set out below provides details regarding the Owner, Owner's Interest in the Aircraft, and the financial terms of the Agreement.

| GENERAL SCHEDULE | | |
|---|---|---|
| **Party Information** | | |
| A.1 | Owner | Vertical International Relief Fund |
| A.2 | Owner's Principal Contact | John Babikian |
| A.3 | NetJets Sales ("Sales") | NetJets Sales, Inc. |
| A.4 | NetJets Manager ("Manager") | NetJets Aviation, Inc. |
| A.5 | NetJets Services ("Services") | NetJets Services, Inc. |
| **Aircraft and Interest Information** | | |
| B.1 | Aircraft (year, make, model, engines) ("Airframe") | 2013 Bombardier Inc. BD-700-1A11 (Global 5000), together with appurtenances, appliances, parts, instruments, accessions, furnishings and other equipment of whatever nature incorporated in or contained in or attached to the same. |
| B.2 | Aircraft Engines ("Engines") | Two (2) Rolls Royce BR700-710A2-20 engines, which may be removed and replaced by NetJets' at its discretion with alternative engines of the same type |
| B.3 | Anticipated Closing Date | March 28, 2013 |
| B.4 | Closing Date | April 16, 2013 |
| B.5 | Aircraft FAA Registration Number | N101QS |
| B.6 | Aircraft Serial Number | 9483 |
| B.7 | Undivided Interest Size ("Interest") | 6.25% |
| B.8 | Allotted Hours | 50 per Year |
| B.9 | Borrowing Hours | 0 |
| B.10 | Minimum Commitment Date | 36 month anniversary of the Closing Date |
| B.11 | Contract Adjustment Date | 5 year anniversary of the Closing Date |
| **Financial Information** | | |
| C.1 | Purchase Price | $2,796,875.00 |
| C.2 | Brokerage Fee | 4% of the Fair Market Value (Calculated at the Time of Repurchase) |
| C.3 | Operating Fund | $17,429.17 |
| C.4 | Monthly Management Fee | $22,216.00 |
| C.5 | Monthly Management Fee Increase | Not Applicable |
| C.6 | Occupied Hourly Fee | $4,183.00 |
| C.7 | Occupied Hourly Fee Increase 1 | Not Applicable |
| C.8 | Occupied Hourly Fee Increase 2 | To be determined, provided that such increase is not to occur prior to the sixtieth month following delivery of the Aircraft to Sales by the manufacturer |
| C.9 | Occupied Hourly Fee Increase 3 | To be determined, provided that such increase is not to occur prior to the one hundred twentieth month following delivery of the Aircraft to Sales by the manufacturer |
| C.10 | Fuel Variable Rate | $8.33 |
| C.11 | Established Fuel Rate Per Gallon | $1.60 |
| C.12 | Hourly Ferry Fee | $2,934.00 |
| C.13 | Supplemental Rate 1 | $20,764.00 |
| C.14 | Supplemental Rate 2 | $22,651.00 |

Page 1 of 26

CONFIDENTIAL

## Section 2 – Terms and Conditions of Fractional Ownership

**2.1  Purpose.** This Agreement sets forth the general terms and conditions agreed to by the Parties with respect to: (a) Owner's acquisition and use of a fractional interest in the NetJets fractional program Airframe and Engines described in the General Schedule above (collectively, the "Aircraft"), and (b) NetJets' sale and management of the Aircraft for Owner. Included as exhibits and incorporated herein by reference are additional terms and conditions specific to the aircraft sale, management services, and fractional dry-lease exchange. In the event of any conflict between the main text of this Agreement and the exhibits, the language of this main text will govern.

**2.2  Exhibit A - Fractional Interest Purchase Terms & Conditions.** This Agreement and the sale of the Interest in the Aircraft to Owner are subject to the Fractional Interest Purchase Terms & Conditions between Owner and Sales attached as Exhibit A.

**2.3  Exhibit B - Fractional Aircraft Management Services Terms & Conditions.** This Agreement and the fractional program management services delegated by the Owner to Manager are subject to the Fractional Aircraft Management Services Terms & Conditions between Owner and Manager attached as Exhibit B.

**2.4  Exhibit C - Fractional Dry-Lease Aircraft Exchange & Ownership Terms & Conditions.** This Agreement, the dry-lease aircraft exchange program provided by Services, and other conditions of fractional aircraft ownership are subject to the Fractional Dry-Lease Aircraft Exchange and Ownership Terms & Conditions agreed upon by Owner and Services, attached as Exhibit C.

**2.5  Exhibit D – General Terms & Conditions.** This Agreement is subject to the General Terms & Conditions attached as Exhibit D.

## Section 3 – Term and Termination

**3.1  Term.**

a.  *General.* This Agreement shall commence on the Closing Date listed in Item B.4 of the General Schedule and continue in effect until the date the Interest in the Aircraft is repurchased by Sales (or an affiliate of Sales) from Owner in accordance the terms herein, or until this Agreement is amended as provided in Section 3.1.b below.

b.  *Periodic Contract Adjustment.* At least one hundred twenty (120) days prior to the Contract Adjustment Date specified in Item B.11 of the General Schedule, NetJets may send the Owner a proposed Extension Notice detailing certain changes to become effective on the Contract Adjustment Date. A thirty (30) day review period shall then commence for Owner to review the terms of the Extension Notice.

   i.  If Owner notifies NetJets during the review period that it does not accept the terms of the Extension Notice, or if NetJets does not send any Extension Notice, the election will be deemed to be a repurchase request pursuant to Section A.3.2.

   ii. If Owner accepts the terms of the Extension Notice, no further action is necessary and the Extension Notice will automatically go into effect on the Contract Adjustment Date.

**3.2  Termination Rights.**

a.  *Termination for Interference with Crew, Criminal Behavior, or Safety or Security Violations.* NetJets may immediately terminate this Agreement by giving Owner written notice in the event any person designated by Owner to be a passenger on a NetJets aircraft does any of the following: (1) interfere with, threaten, assault, or fail to comply with the safety directions of a NetJets crewmember; or (2) violate the criminal laws or aviation safety or security laws of the United States or any jurisdiction in which NetJets has placed an aircraft at Owner's direction.

b.  *Termination for Nonpayment.* In the event that Owner breaches this Agreement by failing to make any payment within ten (10) days after being given notice that its payment is overdue, NetJets may terminate this Agreement by giving the Owner written notice. NetJets reserves the right to refuse to provide any services under this Agreement during any period that Owner's account is overdue.

c.  *Termination for Insolvency, Bankruptcy, or Receivership.* In the event either Party ceases to do business as a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, is insolvent or the subject of a bankruptcy or receivership proceeding, or in the event any substantial part of the Party's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or governmental agency without being released or satisfied within ten (10) days thereafter, then the other Party may terminate this Agreement by giving the other Party written notice.

d.  *Termination for Uncured Breach.* In the event that either Party is in breach of any material provision of this Agreement (excluding breaches covered by Sections 3.2.a-3.2.c above) and that breach continues uncured for a period of thirty (30) days after written notice thereof, then the non-breaching Party may terminate this Agreement by giving the other Party written notice.

e.  *Termination for Operations Problems.* In the event of any of the following, Owner may terminate this Agreement by giving NetJets written notice: (i) the NetJets Program experiences three (3) or more separate events in any twelve (12) month period that are reportable to the National Transportation Safety Board ("NTSB") as an accident (as that term is defined by the NTSB), and as a result of these events the Federal Aviation Administration ("FAA") revokes or suspends NetJets' management specifications or air carrier certificate and operations specifications; or (ii) Manager is more than two (2) hours late in furnishing the Aircraft to Owner on four (4) or more separate occasions during any twelve (12) month period under circumstances which entitle Owner to free additional flight time pursuant to this Agreement.

f.  *Aircraft Repurchase and Remedies Cumulative.* Any event of early termination shall be handled as specified in Section A.3 of Exhibit A. The non-breaching Party shall be

entitled to pursue all remedies available to it in law or in equity.

### Section 4 – Miscellaneous Provisions

**4.1 Disclaimer of Warranties.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR THE EXHIBITS, THERE ARE NO WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, CONCERNING THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, OR THE AIRCRAFT, ITS CONDITION, ITS FITNESS FOR A PARTICULAR PURPOSE, ITS AIRWORTHINESS, ITS DESIGN, ITS OPERATION, ITS MERCHANTABILITY OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.

**4.2 Governing Law and Court Jurisdiction.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, without regard to that state's or any other state's choice of law provisions. Any action or other legal proceeding of any kind, legal or equitable, based upon or in any way related to the subject matter of this Agreement, including the sale, operation, maintenance, management, inspection, servicing or occupancy of the Aircraft, shall be brought exclusively in an appropriate court of competent jurisdiction located in Franklin County, Ohio (if the action is brought in state court) or in the United States District Court for the Southern District of Ohio (if the action is brought in federal court). The Parties further agree that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**4.3 LIMITATION OF LIABILITY.** THE PARTIES AGREE THAT UNDER NO CIRCUMSTANCES SHALL ANY PARTY BE LIABLE TO THE OTHERS FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE) INCLUDING LOSS OF REVENUE, LOSS OF USE, OR ANTICIPATED PROFITS.

**4.4 JURY WAIVER.** THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVE THEIR RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT OR PROCEEDING RELATING TO, ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER DOCUMENT, AGREEMENT OR INSTRUMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties hereto, each acting under due and proper authority, have executed this NetJets Fractional Program Agreement effective as of the Closing Date specified in the General Schedule.

NetJets Aviation, Inc. ("Manager")
NetJets Sales, Inc. ("Sales")
NetJets Services, Inc. ("Services")
("NetJets")

By: _____
     Christopher W. Belcher
Name: _____

Title:  Assistant Corporate Secretary

With Notices Addressed to NetJets:
Attn: NetJets Legal Department
Owner Contract Administration
4111 Bridgeway Ave., Columbus, Ohio 43219
Phone: 614.239.5500 / Fax: 614.239.2119
E-mail: ContractNotices@netjets.com

VERTICAL INTERNATIONAL RELIEF FUND
A CORPORATION FORMED UNDER THE LAWS OF WYOMING

By: _____

Name:  John Babikian

Title:  Chief Asset Manager

With Notices Addressed to Owner:
Attn: Mr. John Babikian
Vertical International Relief Fund
11601 Wilshire Blvd.
Los Angeles, California 90025
Phone: 310.488.6388 / Fax:
E-mail: applemanjack@gmail.com

# # #

CONFIDENTIAL

# EXHIBIT A – FRACTIONAL INTEREST PURCHASE TERMS & CONDITIONS

These Fractional Interest Purchase Terms & Conditions ("Purchase T&Cs") between Sales and Owner are incorporated by reference into the Agreement. In the event of any conflict between this Exhibit A and the main text of the Agreement, the language of the main text of the Agreement will govern.

### Section A.1 – Sale of Interest in the Aircraft

**A.1.1  Transfer of Ownership.** Sales will convey good and marketable title to the Interest in the Aircraft free and clear of any and all liens or encumbrances to the Owner on the Closing Date. The Aircraft shall consist of the airframe together with all parts, instruments, furnishings, engines and other equipment of whatever nature contained or attached to the same (and all aircraft logbooks and records, if any, relating to the airframe, and, to the extent assignable, all rights of Sales to service and warranty rights with respect to the airframe).

a.  Sales represents that on the Closing Date the Aircraft will be in good working order and repair, and have a valid Certificate of Airworthiness issued by the FAA.

b.  Sales represents that the Aircraft (i) either has been newly delivered from its manufacturer or has been maintained and inspected during the preceding twelve (12) months in accordance with the applicable provisions of 14 CFR Part 91, Subparts E or K, or Part 135; and (ii) is in compliance with the applicable requirements of 14 CFR Part 91, Subparts E or K, or Part 135.

**A.1.2  Sale of Additional Interests.** Sales shall have the right to sell or lease additional undivided interests in the Aircraft for the remaining unsold portion of the Aircraft to such persons as Sales, in its sole discretion, deems acceptable and Owner shall have no right to object to any such sale or lease by Sales. Upon any such sale or lease by Sales to other interest owners a tenancy-in-common shall arise among Owner and such other interest owners.

**A.1.3  Ownership Rights.**

a.  Tax Benefits. Owner shall be entitled to its pro-rata share of the depreciation, gain, loss, deduction, credit or any tax benefits with respect to the Aircraft.

b.  Permitted Encumbrances. Owner shall be permitted to allow only the following encumbrances on the Interest in the Aircraft (i) a lien (the "Bank Lien") in favor of a licensed financial institution or lender (collectively, the "Bank") in form and substance acceptable to NetJets, and (ii) leases between Owner and related persons or entity that are acceptable to NetJets and in compliance with applicable law of the Federal Aviation Administration. Bank Liens constituting acceptable encumbrances shall: (a) be limited to the Owner's Interest size; (b) be limited to airframe only; (c) recognize the rights of the other owners of interests in the Aircraft; (d) recognize and give senior priority to the rights of NetJets under this Agreement; (e) contain the agreement of the Bank to allow the Aircraft to continue to be operated under this Agreement and within the NetJets Program notwithstanding the occurrence of an event of default under the Bank Lien or a lease back arrangement with a Bank (the "Bank Lease"); and (f) contain the agreement of the Bank to file all appropriate releases with the Federal Aviation Administration and to register all appropriate discharges with the International Registry promptly upon receipt of payment for the indebtedness secured by the Bank Lien. If Owner causes or permits an encumbrance that is not permitted under this Agreement, Owner shall at its own cost take all necessary steps to achieve the removal of the encumbrance.

### Section A.2 – Closing

**A.2.1  General.** Upon the delivery of the executed Agreement by Owner, any other documents required by the Federal Aviation Administration or reasonably required by NetJets, and the balance of the Purchase Price, Sales will cause the Aircraft to be positioned in the mutually agreed upon location set forth below in Section A.2.2. Following the positioning of the Aircraft, Sales will file the FAA Bill of Sale and Aircraft Registration Application to record the conveyance of the Interest in the Aircraft from Sales to Owner. The date of closing of the sale of the Interest in the Aircraft to Owner shall be defined as the Closing Date and listed in item B.4 of the General Schedule. Owner appoints Sales as its agent to accept delivery of the Aircraft on the Closing Date.

**A.2.2  Closing Location.** The closing shall occur in a mutually acceptable closing location, which (subject to the possible change of tax laws) shall include the following states: Connecticut, Delaware, Florida, Maine, Massachusetts, Montana, New Hampshire, North Carolina, Ohio, Oregon, Rhode Island, and South Carolina. Upon the request of Sales, Owner will provide a sales tax exemption certificate.

**A.2.3  Taxes.**

a.  The Aircraft shall be registered with the state of Ohio by Sales at its expense.

b.  Owner agrees that it shall be responsible for any sales, use, excise, luxury or similar tax, including any related penalties and interest, assessed or imposed on the purchase or use of the Interest in the Aircraft. In the event any sales, use, excise, luxury or similar tax is assessed on Sales with respect to the purchase of the Interest in the Aircraft, then Owner covenants and agrees to pay an amount equal to the assessed tax, and any related penalties and interest, to Sales within ten (10) days of receiving notice from Sales, and Sales shall apply such amount to payment of the tax. Owner may protest such taxes, provided it fully indemnifies Sales for such tax. Owner agrees to indemnify Sales for any sales, use, excise, luxury or similar tax, including any related penalties and interest, assessed, or imposed on the purchase or use of the Interest in the Aircraft.

**A.2.4  Precondition to Closing.** If Owner is a corporation, it shall be required to provide NetJets with a corporate resolution and power of attorney in a form reasonably acceptable to NetJets. If Owner is a limited liability company, or is entering into this Agreement in its capacity as trustee of a trust, it shall be required to provide NetJets

any information or forms required by the FAA for registration of the Interest. In all cases, Owner shall be required to provide NetJets with a power of attorney in a form acceptable to NetJets. Receipt of the documents required by this section is a precondition to closing on the Aircraft.

### Section A.3 - Repurchase of the Interest

**A.3.1 General.** This Section A.3 sets forth the options for Sales' repurchase of the Interest in the Aircraft from Owner. Upon repurchase, Owner shall transfer to Sales good and marketable title to the Interest in the Aircraft free and clear of any and all liens or encumbrances relating to or caused by Owner or by any lender or lessor to Owner other than NetJets. Further, as a condition to closing on the repurchase, Owner must submit to Sales a duly executed bill of sale in proper form for filing with the FAA, conveying title to the Interest in the Aircraft from Owner to Sales. Sales reserves the right to require the Aircraft to be positioned to a location of its choice for the title transfer. The Repurchase Date shall be the date that title transfers from Owner to Sales.

**A.3.2 Repurchase at Owner's Request.** Owner, upon at least ninety (90) days written notice to Sales, shall have the right to cause Sales to repurchase the Interest in the Aircraft at any time after the Minimum Commitment Date specified in item B.10 of the General Schedule for the then Fair Market Value less (i) the Brokerage Fee and (ii) any and all unpaid sums due NetJets from Owner as of the Repurchase Date ("Unpaid Sums"). In the event the Fair Market Value is insufficient to deduct the Brokerage Fee and Unpaid Sums, then Owner shall remain liable to Sales, or the applicable NetJets entity, to the extent of such deficiency.

**A.3.3 Repurchase upon Termination by NetJets.** Upon termination by NetJets under Section 3.2(a-d) of the Agreement, Sales shall have the right, in addition to any other remedies at law or in equity to which Sales may be entitled, to repurchase the Interest in the Aircraft for the Fair Market Value minus the Brokerage Fee and any Unpaid Sums. In the event this repurchase occurs prior to the Minimum Commitment Date specified in item B.10 of the General Schedule, then Owner must pay to Sales the greater of: (i) twelve (12) months Monthly Management Fees or (ii) the remaining Monthly Management Fees due through such Minimum Commitment Date.

**A.3.4 Repurchase upon Other Termination by Owner.** Upon termination by Owner under Section 3.2(d-e) of the Agreement (and provided no material default by Owner has occurred and is continuing uncured under this Agreement), Owner shall have the right and option to cause Sales to repurchase Owner's Interest in the Aircraft for the Fair Market Value minus any Unpaid Sums.

**A.3.5 Fair Market Value.**

a. Fair Market Value means the value of the Aircraft as determined by mutual agreement of Owner and Sales, or as determined by Section A.3.5.b, multiplied by the percentage equivalent of the interest size being repurchased. In all cases, the value will be determined using the assumptions that: (i) the Aircraft is in the condition required to be maintained under the Fractional Management Services Terms & Conditions, (ii) the interior and paint are of normal wear and tear based on the age of the Aircraft, (iii) mid-life (pre Hot Section inspections), (iv) the Aircraft has the average number of hours based on all Aircraft of similar make and vintage in the NetJets fleet; (v) the airframe is half-way to the time required for any heavy maintenance checks, and (vi) there is no regard to or consideration of any maintenance reserves established by NetJets.

b. If Owner and Sales cannot mutually agree on the Fair Market Value, then the Fair Market Value shall be determined by the following appraisal process: Owner and Sales shall each hire at their own cost and expense an Appraiser to perform a desk top appraisal of the Aircraft. Thereafter, Owner and Sales will attempt to mutually agree on the Fair Market Value. If Owner and Sales are still unable to mutually agree on the Fair Market Value, then the originally chosen Appraisers shall select a third Appraiser to conduct an appraisal of the Aircraft, with such third appraisal being paid for equally by Owner and Sales. Thereafter, the Fair Market Value shall be the value determined by two of the three Appraisers agreeing upon the Fair Market Value. The Appraisers must use the assumptions given in the Fair Market Value definition and comply with the current Uniform Standards of Professional Appraisal Practice (USPAP).

### Section A.4 – Transferability, Substitutions, and Trade-Ins

**A.4.1 Transferability.** Owner may transfer its interest to a third party ("New Owner") only with the written consent of Sales. Such consent shall not be unreasonably withheld, provided that the New Owner (i) satisfies Sales' creditworthiness criteria and (ii) assumes the rights and obligations and makes the necessary representations under the Fractional Ownership Documents. Notwithstanding the foregoing, Sales shall have a ten (10) day right of first refusal to purchase the Interest in the Aircraft on the same terms and conditions as offered to such proposed New Owner. Sales will handle the necessary documents and filings required for such transfer (and Owner shall be responsible for fees associated with registration with the International Registry). For all assignments to a New Owner, a fee of $10,000 shall be charged and all unused hours (pro-rata up to that date) shall be forfeited. For all assignments to a New Owner that is an individual family relative of Owner, a business entity affiliated with Owner, or an owner, manager, director, or officer of Owner, only a fee of $5,000 shall be charged and any underflown hours accrued during the previous term of ownership may be retained by such subsequent transferee.

**A.4.2 Aircraft Substitution.** Owner acknowledges that Sales may deem it desirable to substitute the Interest in the Aircraft for an interest in another aircraft of equal or greater value. If Sales requests Owner to substitute its Interest in the Aircraft, then Owner will complete all necessary paperwork required for the substitution (including making any requested International Registry registrations) within ten (10) business days after receiving notice from Sales.

**A.4.3 Trade-In Option.** If Owner trades the Interest in the Aircraft for an interest in another aircraft from NetJets that is both: (i) equal to or larger in interest size and (ii) equal to or more valuable than the Interest in the Aircraft, then the trade value provided for the Interest in the Aircraft shall be the Fair Market Value and the

Page 5 of 26

Brokerage Fee shall not apply. Upon trade-in, Owner shall transfer to Sales good and marketable title to the Interest in the Aircraft free and clear of any and all liens or encumbrances relating to or caused by Owner or by any lender or lessor to Owner other than NetJets.

### Section A.5 – International Registration of the Aircraft

**A.5.1   International Registry.** International Registry shall mean the registry established by the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment. The following sets forth the Parties' understanding with respect to registrations at that International Registry regarding the Interest in the Aircraft. Each Party shall bear its own costs and fees and shall act with all reasonable diligence to complete any such permitted registrations.

**A.5.2   Purchase by Owner.** Owner may register the sale of the Interest in the Airframe (but not Engines) on the International Registry pursuant to this Section. Upon receiving notice from the International Registry that Owner has initiated a proper registration of a sale of the Interest in the Airframe, Sales will promptly consent to such registration. The registration with the International Registry of any interest relating to the Engines, or any portion thereof, is not permitted.

**A.5.3   Repurchase or Trade-In.** As a condition to the (i) closing of the repurchase contemplated by Section A.3 or a trade-in as provided in Section A.4.3, or any other arrangement whereby Owner conveys or has agreed to convey all or a portion of the Interest in the airframe to Sales, and (ii) payment of any funds or other consideration from Sales to Owner, Owner and Sales shall complete the registration at the International Registry of a sale of the Interest (or any portion thereof) in the airframe to be conveyed to Sales, at Owner's expense.

**A.5.4   Service Provider.** Prior to the registration of any sale of the Interest, or any portion thereof, in the airframe on the International Registry in accordance with this Section, Owner shall enter into an International Registry Services Agreement with DeBee Gilchrist CTC, Inc., or such other service provider as requested by Sales, unless Owner has already established an account with International Registry as a registry user, in which case DeBee Gilchrist CTC, Inc., or one of its employees or agents acceptable to Sales, shall be appointed as a professional user for any transactions related to the Interest in the airframe.

**A.5.5   Permitted Registrations and Discharges.** Owner shall only initiate, consent to, or otherwise permit registrations on the International Registry that pertain to the Interest in the airframe and are permitted under this Section. For avoidance of doubt, prospective contract of sale, prospective international interest or any other prospective registration on the International Registry are not permitted. If in the sole determination of Sales, Owner has created or permitted (directly or indirectly) any registration at the International Registry with regard to the Aircraft other than as allowed by this Section, Owner shall be obligated, at its own cost and expense, to take all actions which in the reasonable opinion of Sales are necessary to discharge or remove such registration from the International Registry.

# # #

*ATTACHMENT A.1 – CLOSING STATEMENT*

Issued: February 25, 2013

Vertical International Relief Fund
11601 Wilshire Blvd.
Los Angeles, California 90025

**PURCHASE OF AN UNDIVIDED 6.25% INTEREST IN GLOBAL 5000 S/N 9483, FAA REGISTRATION NUMBER N101QS**

| | |
|---|---|
| Purchase Price | $ 2,796,875.00 |
| Payment received for Purchase Price | ($ 2,796,875.00) |
| **Total amount due on Closing Date** | $ 0.00* |

*In addition to this amount, any applicable sales tax will appear on the first invoice.