```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #14cv1740
  SECURITIES AND EXCHANGE            :
  COMMISSION,
                                     :
                  Plaintiff,
                                     :
    - against -
                                     :
  JOHN BABIKIAN,                          New York, New York
                                     :    April 8, 2014
                      Defendant.
------------------------------------:


                    PROCEEDINGS BEFORE
              THE HONORABLE JUDGE PAUL A. CROTTY,
              UNITED STATES DISTRICT COURT JUDGE
```

APPEARANCES:

```
For Plaintiff:          SECURITIES AND EXCHANGE COMMISSION
                        BY:  MATTHEW COHEN, ESQ.
                             MICHAEL ROESSNER, ESQ.
                             ANDREW McFALL, ESQ.
                        100 F Street N.E.
                        Washington, D.C.  20549
                        (202) 551-7276


For Defendant Babikian: CORRIGAN & MORRIS LLP
                        BY:  STANLEY MORRIS, ESQ.
                        201 Santa Monica Boulevard
                        Suite 475
                        Los Angeles, California 90012
                        (310) 394-2828
```

```
Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:    (212) 420-6007
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES CONTINUED:

For NetJets:                    CONNELLY FOLEY
                                BY:  PETER PIZZI, ESQ.
                                888 Seventh Avenue, Ninth Floor
                                New York, New York 10106
                                (212) 307-3700

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| NONE | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| NONE | | | | |

4

1            THE CLERK:    Counsel in the matter of SEC v.

2  Babikian, please step forward.   Plaintiff, front table;

3  defendant, back table.

4            (pause)

5            THE CLERK:    Your Honor, this is the matter of SEC

6  v. John Babikian, et al., docket number 14cv1740.   Counsel

7  for the SEC, please state your appearances for the record.

8            MR. MATTHEW COHEN:    Good afternoon, Your Honor,

9  Matthew Cohen for the SEC.   With me at counsel table is

10 Michael Roessner and Andrew McFall.

11           THE COURT:    Okay, Mr. McFall, Mr. Roessner.

12           THE CLERK:    For the defendants.

13           MR. STANLEY MORRIS:    Good afternoon, Your Honor,

14 Stanley Morris of Corrigan & Morris on behalf of defendant

15 John Babikian.

16           THE COURT:    Okay, Mr. Cohen, you want to go

17 first?

18           MR. COHEN:    Very well, Your Honor.   We are here

19 on the court's order to show cause why a preliminary

20 injunction should not be issued in this case.   I spoke to

21 Mr. Morris out in the hallway, and he submitted a response

22 to the Court's order as required on last Monday --

23           THE COURT:    Yes.

24           MR. COHEN:    -- and the Government followed a

25 reply.   I'm sure the Court has.   I mean in the interest of

1  tailoring the issues for the Court, I could perhaps get

2  ahead of myself and broadcast were I think Mr. Morris is

3  heading.  I guess I'd defer to counsel if he --

4          THE COURT:   Why don't you go ahead?

5          MR. COHEN:   Yeah.  So very well.  So Mr. Morris

6  has raised a couple of issues on behalf of Mr. Babikian in

7  response to the order to show cause.  The first argument is

8  that the order was issued on the basis of inadmissible

9  evidence, that is, that the evidence was not admissible at

10  a trial.  The Government relied on hearsay.  And for that

11  reason, without really identifying a specific sharpened

12  factual dispute, the order was inadequate.  Preliminary

13  injunction should not issue.

14          We cited a number of authorities in our filing as

15  to why that's not the law.  This is a summary proceeding.

16  The rules of evidence do not apply.  The issue before the

17  Court is whether or not the evidence is reliable.  The

18  Court has a declaration from Andrew McFall as well as a

19  number of supporting exhibits, many of them business

20  records.  One issue that Mr. Babikian took issue with is

21  the lack of business record declarations in support of our

22  exhibits.  We've actually gathered a number of them in

23  anticipation of today.  I've provided those to Mr. Morris,

24  and we're prepared to tender them to the Court if need be.

25          But the records that we're relying on are business

1   records.  They're records from brokerage accounts, from

2   internet service providers, the main registration companies

3   and so forth.  And what they do, as the Court is aware, is

4   they tie Mr. Babikian to the websites and to the email

5   blasts that send out the recommendation to investors that

6   they purchase this stock, America West Resources.

7          There are records from the transfer agent for

8   America West, and they records from, ultimately from a

9   number of different financial institutions including Brown

10  Brothers Harriman, which was the institution that

11  ultimately held the shares of Mr. Babikian in  a custodial

12  account for the Swiss bank where they were, that show the

13  amount of stock that Mr. Babikian had and the sale of that

14  stock during the pump and dump at issue.

15         I mean as a preliminary matter or --

16         THE COURT:  To put a not too fine a point on it,

17  Mr. Fall's declaration, with all of its evidentiary flaws,

18  is more than sufficient to support the action of the Court.

19         MR. COHEN:  It's more than sufficient.  It's more

20  than sufficient.  It's – and Mr. McFall, of course, is here

21  and would certainly be willing to answer any questions of

22  the Court --

23         THE COURT:  No, I read his submission, and I read

24  Mr. Morris' rebuttal.

25         MR. COHEN:  And the other point that I make on

1  that issue is that the Court's order required an accounting

2  of Mr. Babikian --

3            THE COURT:    Yeah, there's been none of that.

4            MR. COHEN:    There's been none of that.

5            THE COURT:    No compliance with the Court's order.

6  What are the other arguments?

7            MR. COHEN:    So moving on then.  The other two

8  points that I believe we're here on are, first, that in

9  addition to our asset freeze, the Government sought and the

10 Court granted writs of attachment under the Federal Debt

11 Collection Procedure Act, attaching to a liquid asset, the

12 money from NetJets, about $2 ½ million, as well as three

13 pieces of real property.

14           The argument, as I understand it, is two-fold.

15 First, that that's just an improper use of the Federal Debt

16 Collection Procedure Act, and it doesn't apply on these

17 facts.  And, number two, even if it does, this is an

18 overreach by the Commission, that we're oversecured.

19           Two responses.  With respect to the applicability

20 of the Federal Debt Collection Procedures Act in the first

21 instance, I'm afraid that the SEC and Mr. Babikian just

22 disagree.  We've cited a number of cases as well as the

23 statute itself --

24           THE COURT:    The statute is 28 U.S.C. 3000?

25           MR. COHEN:    Yes, sir.

1          THE COURT:   Yeah.   I'll give the Court a moment.

2   And I think I could fairly succinctly walk Your Honor

3   through precisely why the statutory language completely

4   supports the application and these facts in an effort, in a

5   prejudgment posture to secure assets.

6          THE COURT:   All right, go ahead.

7          MR. COHEN:   All right?  So what we do is we start

8   with Section 3001, applicability of the chapter.

9   3001(a)(2), laying out the scope of this statute, which was

10  passed in 1990, says that "This chapter provides the

11  exclusive civil procedures for the United States to obtain

12  before judgment on a claim for a debt a remedy in

13  connection with such claim."

14          So then you go to the prejudgment subchapter,

15  which is 3100, you go to 3101, prejudgment remedies, and

16  that sets forth the requirements for an application.

17          THE COURT:   Yes.

18          MR. COHEN:   3101(a)(1), "The United States may in

19  a proceeding in conjunction with the complaint or at any

20  time after the filing of a civil action on a claim or a

21  debt make application under oath to a court to issue any

22  prejudgment remedy."

23          So, Your Honor, first, the statute specifically

24  anticipates seeking prejudgment relief in connection with a

25  filing of a civil action by the United States, precisely

9

1   what we have done here.  The key, of course, is whether

2   this is a civil action on a claim for a debt, on a claim

3   for a debt.  Debt is a defined term in the statute.

4           THE COURT:   It's 302.

5           MR. COHEN:   It's 302 exactly.  302(3) --

6           THE COURT:   (a) and (b).

7           MR. COHEN:   -- as we set forth in our filing, it

8   includes a penalty.  All right?  Claim is not a defined

9   term in the prejudgment remedy subchapter of the FDCPA,

10  unhelpfully.

11          So we would submit two things to the Court --

12          THE COURT:   Well, what about Mr. Morris' point

13  that at its maximum there's $1.9 million that was - was it

14  Air Western?

15          MR. COHEN:   NetJets.

16          MR. MORRIS:   America West Resources.

17          MR. COHEN:   America West.

18          MR. MORRIS:   America West Resources, Inc.

19          THE COURT:   America West Resources, the pump and

20  dump, the maximum of the ill-gotten gains was $1.9 million.

21  And even if you doubled it, you have far more security than

22  $3.8 million.

23          MR. COHEN:   And so as we set forth in our reply,

24  there's a couple of problems with that.  Number one is we

25  don't have discovery yet to actually know the full extent

1   of our claim.  What we (indiscernible) a conservative

2   estimate as to our entitlement to disgorgement of 1.9

3   million and prejudgment interest and then doubling the

4   disgorgement out, we, of course, get the penalty.  That's

5   based on the facts that we presently know, cutting Mr.

6   Babikian every possible benefit of the doubt.

7          And what I mean by that is we can show that Mr.

8   Babikian had close to 1.5 million shares of America West,

9   and we can show that that number of shares and more was

10  actually showed.  But because we only show 1.466 million

11  shares of Mr. Babikian's going into the account and we see

12  shares left in the account after 1.6 million were sold out

13  of the account, we're conservatively alleging at this

14  point, without the benefit of discovery and without his

15  responses to the discovery, that --

16          THE COURT:   There must be other shares.

17          MR. COHEN:   That there must be other shares.

18  That there must be other shares.  And this is only for the

19  account that we're aware of.  We think through discovery

20  we'd find out about more.  That's point number one.

21          But point number two, with respect to the

22  oversecuritization argument, is this.  We can't say right

23  now that we are oversecured.  What we know is that we've

24  got tied up $2 ½ million of cash, and that's the money from

25  NetJets.  The other three assets that we presently are

1  aware of of Mr. Babikian's are, number one, a home on

2  Laurel Avenue in Los Angeles.   And when we came into court

3  two weeks ago, we let the Court know that that house was

4  listed for sale and that it had, based on the internet and

5  public source research that we had at our disposal, an

6  estimated value of about $2.5, $2.6 million.  And that's

7  the number that's used now in the defendant's response.

8          As I've indicated in our reply brief, when we're

9  talking about real estate, it's the appraised value and the

10  equity that really matters for assessing whether or not

11  we're secured.  And so what we have is an asset that we

12  thought --

13          MR. COHEN:   Do you know whether Mr. Babikian owns

14  the residential property?

15          MR. COHEN:   Yeah, that's exactly where I'm going.

16  The residential property is owned by - he doesn't own

17  anything that we've got in front of Your Honor in his own

18  name.  It's all in the name of these alter ego companies.

19  The residential property on Laurel Avenue is titled under

20  the company Middle Bay trade.  Three weeks ago we

21  understood Middle Bay Trade had the deed to that property.

22  We have since learned that, short time before coming to

23  Court, Mr. Babikian deeded half of his interest to his ex-

24  wife we believe in some sort of divorce settlement.

25          And so a property that we thought he owned

1   entirely he now only owns half of, and we've attached to

2   our filing settlement statement for that sale.  And you can

3   see, once commissions and other things are taken out and

4   then the proceeds that are anticipated to flow from the

5   sale of the property are almost $1.9 million, his interest

6   is only half, his equity in that is only half.  So that

7   puts us at about $900,000.

8           THE COURT:   That takes care of the Los Angeles

9   property.  What about the Oregon property?

10          MR. COHEN:   The Oregon --

11          MR. McFALL:   There's one other Los Angeles

12  property.

13          MR. COHEN:   There's one other Los Angeles

14  property that I'll get to in a moment.  The Oregon property

15  we believe has a value of less than 500,000, and I'll also

16  tell the Court we heard late last week from someone

17  claiming that it's been attached improperly, that a

18  residential parcel on some farmland owned by Mr. Babikian

19  was actually deeded by Mr. Babikian to someone else, and

20  we're sorting through that.  That individual hasn't

21  intervened yet in court.

22          It would appear to us that might be a relief

23  defendant from whom we can still seek relief, but at this

24  point, the value that we're aware of, $500,000, we don't

25  know what kind of equity, if it is Mr. Babikian's, he has

1    in it.  We haven't gotten, of course, his accounting or

2    responses to our discovery.  So we're still not completely

3    secured on what I would conservatively submit is a $.1 and

4    $4.2 million total claim.

5         The third property, the third property is 1401

6    Londonderry Place in Los Angeles.  Now, this is a property

7    we put forth in Mr. McFall's declaration that it appears

8    Mr. Babikian, through another front company, purchased for

9    $6 million in cash a couple of months after the pump-and-

10   dump scheme.

11        We have – we are quite eager, of course, to get

12   information from Mr. Babikian, first, to confirm that he is

13   the owner, it's titled in the name of a company called

14   Oriwa, O-R-I-W-A.  Oriwa lists as its place of business the

15   first Los Angeles property that I was referring to.  The

16   deed transferring ownership of this real estate to Oriwa

17   notes on it to send a copy to John Babikian.  We're very

18   confident it's his.  We don't know how much equity he has

19   in it or its current value because we don't have an

20   accounting from him, but, make no mistake, we think it's

21   substantial.

22        We've just gotten a title report.  The title

23   report is through March 14.  The title report though still

24   leaves us in the dark over the last week or several days

25   about whether anything has come in since we've come to

1  court.

2          THE COURT:   So you want to make three points.

3  Your first point is that the submission made by Mr. McFall

4  is more than adequate.   The second point is that you're not

5  overcollateralized.   What's your third point?

6          MR. COHEN:   The third point is that the FDCPA

7  applies on these facts, that the commission is entitled to

8  use it to secure a civil penalty.

9          THE COURT:   All right.   Mr. Morris.

10         MR. MORRIS:    Thank you, Your Honor.

11         THE COURT:   Yes, sir.

12         MR. MORRIS:   We're not here just because there's

13 an equity freeze and that they're going after an equity

14 freeze.  We're here mostly because for the first time since

15 the FDCPA has been created 24 years ago, since its

16 inception, the SEC is asking this Court to do something

17 that's never been done before, handed a new nuclear weapon,

18 if you will.  And the amount of the so-called --

19         THE COURT:   Why is it a nuclear weapon?  I was

20 thinking this is very much – in New York, for example, we

21 have articles of attachment when you have a lawsuit for a

22 fraud.  Before your lawsuit is established, you know, you

23 can go in and attach assets.  I don't see this any

24 different than a fairly common, straightforward civil

25 remedy.  It's a drastic remedy but a provisional remedy,

1 but it's available to all people who claim that they've

2 been defrauded here in New York.

3       MR. MORRIS:   Right, and as I said --

4       THE COURT:   So I don't see this as a nuclear

5 weapon.   It's a colorful phrase but --

6       MR. MORRIS:   In the 24 years this statute's been

7 around, no judge has ever granted the SEC this kind of

8 relief before in this situation.   What we have here is we

9 have the SEC's filed a complaint, and in that complaint

10 they make a claim for a penalty, but that penalty is

11 completely uncalculable.   It's illiquid, it's disputed,

12 it's contingent.   The only way they can get that penalty is

13 if a jury - and this is U.S. v. Tall, 481 U.S. 412, the

14 Supreme Court has said the only way they get that penalty

15 is if a jury finds liability.   And once a jury's found

16 liability, then a penalty can be imposed.

17       But right now they have no right to any penalty.

18 There is no debt owing the United States.   And so in order

19 to look at whether or not this FDCPA can be applied, we got

20 to look at - we start with Grupo Mexicano.   In Grupo

21 Mexicano the Supreme Court said that any prejudgment

22 release [sic] statute has to be strictly construed and that

23 the courts have to be very careful and mandates the courts

24 not to expand prejudgment relief because of the drastic

25 consequences.

1           In looking at the FDCPA, one of the most helpful

2     cases I found was written by Louis Kaplan of this court,

3     and the SEC cites it, <u>SEC v. ICP Asset Management</u>, 2012

4     case.  Judge Kaplan very carefully goes through this

5     foreign – I'm sorry – this Federal Debt Collection

6     Procedures Act and he says in subchapter (a) is where the

7     definitions can be found for the entire statute.

8     Subchapter (b) is prejudgment remedies.  Subchapter (c) is

9     post-judgment remedies.  And subchapter (d) is fraudulent

10    conveyances, and basically subchapter (d) doesn't apply.

11    It tracks the Federal Bankruptcy Code for the fraudulent

12    conveyance.

13          So what we're looking at is subchapter (b) here,

14    prejudgment remedies, and subchapter (a), which is the

15    definitions for (a) through (c), by the way.  (d) has its

16    own definitions because it applies to fraudulent

17    conveyances.

18          So under subchapter (a) it says, "A debt means an

19    amount that is owing to the United States," present tense,

20    "an amount that is owing."  That's the statutory language.

21    And, again, <u>Grupo Mexicano</u> requires we read that literally.

22    Here, there is no amount owing.

23          And how does the SEC then do this gymnastics of

24    coming out with an amount owing?  Well, they cite only to

25    four cases.  None of them are similar to this, and we'll go

1    through each of the four cases.

2           The first case that they cite is a Second Circuit

3    case, the Board of Governors v. Ferron.  Mr. Ferron was

4    involved in the Bank of BCCI, and Mr. Ferron had a penalty

5    assessed against him by the Board of Governors of the

6    Federal Banking Reserve System.  They have the power to

7    assess a penalty.  The SEC does not have statutory

8    authority to assess any penalties.  So there was already a

9    penalty assessed.  Then there was an administrative hearing

10   to confirm the penalty.  Then the Federal Debt Collection

11   Practices Act comes into play.  Why?  Because there's a

12   debt owing.

13          Also, along the definition of a debt owing, they

14   give some examples back to subchapter (a), if I can back up

15   for a minute, and they say that those are overpayments,

16   assessments, penalties, costs, and incurred.

17          So the next case the SEC cites is, well, the SEC

18   v. ISP Asset Management.  I would urge the Court to read

19   that.  It's a very wonderful description by Judge Kaplan on

20   this statute.  And in that – that's a fraudulent conveyance

21   case, and he very clearly talks about that the narrow

22   reading of what is a debt owing isn't applicable in that

23   case because the fraudulent conveyance case and subchapter

24   (c) has its own definitions.  So you have to look at the

25   (a) definition.

1          It's a fraudulent conveyance case.  In that case

2    the SEC had a claim against, had a judgment I think against

3    an individual who – or, no, I'm sorry, they were

4    investigating an individual who then transferred property

5    to a trust.  They sued the trustee.  The trustee brought an

6    action to have the case dismissed, and said the Federal

7    Debt Collection Practice Act doesn't apply.  The judge

8    refused to dismiss the case and said it does because it's a

9    fraudulent conveyance under this subchapter (c).  It's just

10   completely inapposite to our case other than it does a

11   great job of describing the statute.

12          Under the next case they cite, U.S. v. Teever,

13   there's an overpayment by the U.S. Government to a school,

14   and they've overpaid millions of dollars, and the

15   government wants it back.  There's a debt owing.  They paid

16   money, it's calculable, it's something that can be easily

17   ascertained.

18          Then the SEC really starts reaching.  They can't

19   come up with any case like this where they just filed an

20   action in court with a complaint.  All they have is a claim

21   for this penalty.  The next case they go to is U.S. v.

22   Lighthouse Disaster Relief.  It's a Middle District of

23   Louisiana.  And in that case the Government said that by

24   mistake they had overpaid $5 million to an entity that was

25   involved in the Katrina disaster relief fund.  Again,

1    there's an amount that's ascertainable, that's calculable,

2    and it's an amount owing.  Here, there's no ascertainable

3    amount of what this penalty is.  All there is under the

4    statute, if you read Section 20 of the 33 Act, Section 21

5    of the 34 Act, what you're going to see is it just says

6    there's a maximum penalty of $150,000 against an individual

7    or the amount of the ill-gotten gain, whatever the gain

8    was.  That's the maximum amount.

9         And if the SEC's theory was correct that you

10   always can apply this in this case, they get that 10

11   percent, they get a 10 percent surcharge, they've actually

12   exceeded the maximum allowed under the securities laws.

13        THE COURT:  Well, let me ask you a question, Mr.

14   Morris.  Assume that the allegations of the complaint in

15   the McFall affidavit, even though you don't like its

16   evidentiary basis, is accurate and that Mr. Babikian

17   engaged in pump and dump scheme.

18        MR. MORRIS:  Correct.

19        THE COURT:  Are you suggesting that the SEC is

20   without remedy with regard to Mr. Babikian's and this

21   hypothetical?

22        MR. MORRIS:  Well, there's two --

23        THE COURT:  That he's engaged in pump and dump,

24   he bilks the shareholders, and he's beyond remedial efforts

25   of the SEC until such time as they prove it?

1          MR. MORRIS:   No, I'm not, Your Honor, I'm not

2   suggesting that at all.  This court has broad equitable

3   power, and under the equitable power of this court, it can

4   impose an asset freeze, and it can impose that asset freeze

5   up to the amount of the wrongful gain.  An asset freeze is

6   not punitive; it is simply that you don't get to keep what

7   you got.  And so --

8          THE COURT:   Well, I don't even know – that's

9   right, it's just preserving a pool of assets until such

10  time as a determination is made as to the disposition of

11  those assets.

12         MR. MORRIS:   Right, up to the disgorgement

13  amount.  The asset freeze, there's case law on this, the

14  asset freeze cannot include the penalty amount.  It can

15  include the disgorgement amount.  So this court has

16  equitable power to get the disgorgement amount frozen.

17  That's how much this court can freeze with its equitable

18  power, pretty well established --

19         THE COURT:   And in your view what is the

20  disgorgement amount?

21         MR. MORRIS:   The disgorgement amount here is in

22  dispute, but the SEC argues $1.9 million. We argue

23  $500,000.

24         THE COURT:   Because you deduct the cost of the

25  shares.

1          MR. MORRIS:   Correct.  Because, again, you have

2    to give up what you got, not what you already had. The case

3    law again is Second Circuit case.  I can cite you to --

4          THE COURT:   Incidentally, that's not how we

5    calculate loss under the sentencing guidelines.

6          MR. MORRIS:   Well, SEC v. Cavanaugh says that,

7    it's a Second Circuit case, 155 F.3d 129 at 132.  But,

8    nonetheless, it would be 1.9 million at most that could be

9    frozen.  Under the court's equitable power, the court can

10   consider hearsay evidence, it has to weigh it, but it can

11   consider hearsay evidence in connection with this equitable

12   remedy.  But what the court cannot do is use this Federal

13   Debt Collection Practice Act, then go and attach and

14   garnish and grab people's wages without some statutory

15   authority.  There is no statutory authority for that

16   because there is no debt owing.  There is only the SEC

17   making a claim that if they show liability somewhere down

18   the road, then they'll have a debt owing, and then, of

19   course, they could then use these procedures.

20          But at this point, there is no debt owing.  They

21   don't cite you one case that provides any authority for

22   that.  I practiced at the SEC on the enforcement staff for

23   four and a half years, I practiced in the SEC enforcement

24   world for the last twenty years; I've never seen this ever

25   done under the Federal Debt Collection Practice Act, and

1  they haven't either because they haven't cited you a case

2  where it's been in this very same situation.

3          THE COURT:   Do you know where Mr. Babikian is

4  now?

5          MR. MORRIS:   What's that?

6          THE COURT:   Do you know where Mr. Babikian is

7  now?

8          MR. MORRIS:   Not at this moment, no.

9          THE COURT:   Do you know why he hasn't responded

10 to the directions of the TRO, that he submit to --

11         MR. MORRIS:   The affirmative belief, well, partly

12 because we're here challenging it.  We believe that with

13 the asset freeze and the two and a half million dollars,

14 there is more than sufficient - again, the court has

15 brought equitable power to freeze the likely disgorge, if

16 the SEC shows that it's likely to succeed, then it has

17 broad equitable power to freeze 1.9 million under the SEC's

18 allegations of wrongful gain, ill-gotten gain.  That's what

19 can be frozen under the court's equitable power.

20         The SEC's already attached $2 ½ million of

21 NetJets, so they wouldn't need any further discovery to

22 find out how much money they can go get because they

23 already have more than they can possibly freeze under the

24 law.  And this is not even a close call here.

25         It's just simply impermissible to abuse the

 1  Federal Debt Collection Practice Act this way.  It's a case

 2  of first impression.  There is no debt owing the United

 3  States, and there has to be a debt owing.  Grupo Mexicano

 4  instructs this court not to expand these prejudgment

 5  remedies because they are so drastic.  And there's never

 6  been a case.  Every case that the SEC cites is about a case

 7  where the debt is owing, there's been an overpayment, the

 8  Federal Reserve has already assessed a penalty.

 9        The SEC can't any assess any penalties here.  They

10  have no right to assess a penalty.  They can claim one, and

11  if they ultimately prove liability, then they have a right

12  to get up to a maximum, but nobody knows what that amount

13  is.  It's incalculable because it's left to the discretion

14  of the court up to a maximum amount.

15        THE COURT:  So in your view, Mr. Morris, I don't

16  want to put words in your mouth, but you believe the SEC

17  has no rights under the Fair Debt Collection Act?

18        MR. MORRIS:  Not at this time.  Not until they

19  have a debt owing.  There is no debt owing at this point.

20        THE COURT:  But in the meantime the court has

21  general equitable powers to --

22        MR. MORRIS:  To institute an asset freeze,

23  absolutely, and up to the amount of disgorgement.  It

24  cannot freeze the penalty amount, but it can freeze the

25  disgorgement amount, the wrongful gain.  That is what the

1  court has authority to do at this point.

2           THE COURT:   And why is it 1.9 and not, say, for

3  example, 3.8?

4           MR. MORRIS:   Because the SEC alleges that he sold

5  1.9; that's the gross proceeds of all the stock.

6           THE COURT:   Yeah, correct.

7           MR. MORRIS:   It couldn't possibly be more than

8  that.  That would be the absolute gross proceeds.

9           THE COURT:   Anything else?

10          MR. MORRIS:   And they've already got 2.5 million

11 in cash.  So there's more than sufficient assets to cover

12 that.  And so the Federal Debt Collection Practice Act just

13 doesn't apply.  This Court should decline the invitation to

14 expand this to something that it's never, ever been

15 utilized with before, and why doesn't it apply?  The

16 definition is there has to be – it's a present tense.

17 There is a debt owing.  There is no debt owing.  There is a

18 claim for damages if liability is shown, but that claim, we

19 don't even know what the amount would be.  You know,

20 there's only maximum amounts given in the statute, and the

21 statute, you know, and the assessment is 10 percent would

22 exceed even the securities laws maximum amount.

23          If you'd like, I can give you the specific cites

24 to the penalty --

25          THE COURT:   Why don't you give me the cites

1  please?

2          MR. MORRIS:   Yes.  The SEC statutes are Section

3  20(d) of the Securities Act, 15 U.S.C. --

4          THE COURT:   I've got those.

5          MR. MORRIS:   Oh, okay.  I'm sorry, I'm not sure

6  what statute you're looking for.

7          THE COURT:   Well, I thought you were going to

8  cite me specific provisions of the Federal Debt Collection

9  Act.

10          MR. MORRIS:   Okay.

11          THE COURT:   But I mean I have Mr. Cohen's.   I

12  mean if there's any others that you want to call to my

13  attention.

14          MR. MORRIS:   Right, Section A, the definition

15  section, where debt is defined.

16          THE COURT:   Yeah, okay.

17          MR. MORRIS:   And it's defined as --

18          THE COURT:   An amount that is owing --

19          MR. MORRIS:   -- an amount owing.

20          THE COURT:   Correct.  You emphasize that's in the

21  present tense.

22          MR. MORRIS:   I would also like to cite you to the

23  Supreme Court that says that "a penalty cannot be imposed

24  in an SEC action until after liability has been assessed."

25  And the defendant has a jury trial right to liability, and

1 then once liability has been found, there can be a penalty

2 assessed.

3         In terms of the – and that goes to the Federal

4 Debt Collection Practices Act.  They're asking you to do

5 something unprecedented.  It's never been done before.

6 None of the cases that they've cited support their action,

7 and if you allow this, then every time the SEC files an

8 action, they're entitled to go out, attach and garnish

9 assets, and get a 10 percent penalty beyond what the

10 securities statutes itself allow.  Every single case, they

11 can just go get an attachment because they've alleged a

12 punitive damage.  And even though the securities laws say

13 your maximum punitive damage is the disgorgement amount,

14 they get a 10 percent bump on that, so they've now somehow

15 circumvented or overridden the securities laws themselves.

16         THE COURT:   All right, I think I have your point,

17 Mr. Morris.

18         MR. MORRIS:   Okay.  Let's go on to the TRO.  The

19 TRO shouldn't – the preliminary injunctive relief also –

20 oh, and, by the way, under the Federal Debt Collection

21 Practice Act, the SEC is also required to have admissible

22 evidence.  While the Court is permitted to rely on hearsay

23 with the injunctive relief, the equitable relief is not for

24 the legal relief.  The legal relief requires admissible

25 evidence.

1          If the Court's inclined to rule in their favor on

2    this Federal Debt Collection Practice Act, we would insist

3    that the Court also rule on our evidentiary objections that

4    we've made.

5          Moving on to the preliminary injunctive relief,

6    there's only three claims at stake here in the SEC's

7    complaint.  They're found at paragraphs 27, 28 - there are

8    only minimal facts here, I'm sorry, paragraphs 27, 28, and

9    29 of the SEC's complaint.  And I can - essentially it says

10   these email subject lines read "Brand new pick coming the

11   1st," and their body which contains the newsletter bore the

12   prominent headline, "Today's pick, AWSR," which is the

13   stock symbol for the --

14          THE COURT:   America West, yeah.

15          MR. MORRIS:   -- America West Resources, which has

16   ticker symbol for America West.  The (indiscernible)

17   disclaimer.  Then they go on to say that the disclaimer

18   says that the website's operators, owners, employees, and

19   affiliates may have interest positions in the equities,

20   securities in the companies profiled on this website, in

21   some or all (indiscernible) acquired prior to the

22   dissemination of this report, and it may increase or

23   decrease these holdings at any time.  That's the extent of

24   the so-called pump here that he has said this is his pick,

25   and he owns some stock, he may have bought it before, he

1   may not, he may sell it, he may not.

2           And then they go on to say, well, that was

3   inadequate disclosure.  Those disclaimers weren't adequate.

4   That he should have said exactly how much stock he owned

5   and that he intended to sell it, and that's what they say,

6   it wasn't adequate.  Those are not egregious facts.  Right

7   or wrong, those are very technical sort of allegations that

8   are being made here, and these are not facts that are

9   egregious.

10          And the SEC, in order to prove, to obtain the

11  preliminary injunctive relief under SEC v. Cavanaugh again,

12  they've got to show that there's both, substantial showing

13  of likelihood of success as to both the current violations

14  and the risk of repetition.  We're talking about something

15  that happened two years ago.  This happened in February

16  2012.  We're sitting here now in April of 2014.  This is

17  more than two years ago.  Were the statements he made

18  material enough to cause the stock to go flying up --

19          THE COURT:   I just tried a case involving a pump

20  and dump, United States v. Levy, and these very similar

21  allegations were made, and they served as a basis for

22  conviction.  So I mean --

23          MR. MORRIS:   Well, I'm just telling you that

24  these are the allegations, that he didn't fully disclose

25  the --

1          THE COURT:   -- so your point is - I mean that was

2   the point the jury was charged at, the failure to make

3   these disclosures was enough to case Mrs. Levy into

4   liability.  Criminal liability.

5          MR. MORRIS:   Just yesterday, I learned that FINRA

6   has launched a similar lawsuit against a broker-dealer on

7   the very same, for manipulating a stock on the very same

8   day on the very same stock and accusing this broker-dealer,

9   who's also been sued.  So the materiality goes to that as

10  well.  But the scienter --

11         THE COURT:   Well, I'm afraid I lost your point

12  here, Mr. Morris.  You direct me to 27, 28, and 29.

13         MR. MORRIS:   Right, that his - that the egregious

14  allegation here is that he said he picks this stock and

15  that he didn't fully disclose his intentions with regard to

16  that stock.  The scienter is --

17         THE COURT:   You say that's not egregious?

18         MR. MORRIS:   I would say that's not egregious

19  because of the disclaimer that was associated with that.

20         I would also say that the SEC hasn't shown a

21  likelihood of future violations.  They have to show in

22  order to obtain the injunctive relief that there's a

23  likelihood of future violations.  This is something that

24  occurred two years ago in isolation, they haven't alleged

25  it's recurring.  They've only alleged that this happened

1   once two years ago, and, therefore, the preliminary

2   injunctive relief is questionable.  The Federal Debt

3   Collection Practice Act is off the reservation.  They're

4   not even close.  They don't have a case to support it, they

5   don't have a debt that's owed; they're not even close on

6   that one.

7            On the preliminary injunction relief I'll concede

8   it's close, Your Honor.  I think the problem they have is

9   the likelihood of future success.

10           In regard to the asset freeze --

11           THE COURT:   The likelihood of future success or

12  the likelihood of repetition?

13           MR. MORRIS:   I'm sorry, excuse me, yeah, the

14  likelihood of future violations is what I meant to say,

15  yeah.  I think that they have an issue showing that since

16  it happened two years ago, and they only argue one isolated

17  incident.

18           But the next level, the next issue we have to

19  address here today is the asset freeze, and the law is

20  pretty clear here that the court has to tailor the asset

21  freeze narrowly to limit it to the disgorgement that may

22  ultimately be obtained.  And it's a fundamental policy that

23  it's not to be punitive.  It is only tailored to the actual

24  wrongful gain that the individual got.

25           Now, we might disagree on what the wrongful gain

1   is, but this is articulated in <u>SEC v. AbsoluteFuture.com</u>, a

2   Second Circuit case, 393 F.3d 94 and 96.  It's well settled

3   the amount of disgorgement is determined by the amount of

4   profit realized.  How much profit was realized?  The SEC's

5   own records show that Mr. Babikian paid $1.4 million for

6   the, approximately $1.4 million for the approximately 1.4

7   million shares that are at issue.  He paid those in an

8   arm's length transaction with the issuer in the

9   marketplace.  He then sold the 1.4 million shares for $1.9

10  million.  We would argue the gain he has to give up is not

11  what he already had, the $1.4 million, but he has to give

12  up the $500,000 gain that he obtained from this.

13          In conclusion, the SEC's worst case, or our worst

14  case I guess I should say, best case is that it was 1.9

15  million is the proper disgorgement number.  Your Honor,

16  what we need today and what we're looking for is a number.

17  If it's $1.9 million that should be frozen here, Mr.

18  Babikian's prepared to cooperate to have that transferred

19  to the court registry.  He'll place $1.9 million here which

20  is all the SEC's entitled to as its prejudgment relief,

21  which is in the court's full equitable power, the very

22  maximum number.  I guess you could add some prejudgment

23  interest on that, so $2 million.  That's the very maximum

24  relief that the court is entitled to grant the SEC at this

25  prejudgment stage.

1          Post-judgment, you know, things are different.

2 Once they prove that they're entitled to a penalty, there's

3 an amount owing, yes, then you can use the Federal Debt

4 Collection Practices Act.  But they're not even close to

5 having an amount owing to the Government.  It is owing,

6 it's very clear, they haven't given you one piece of

7 authority for that.  The statutory language itself --

8          THE COURT:  Well, you haven't given me one bit of

9 compliance with the court order, I mean I assume that your

10 offer here is not made to me because I don't like to

11 bargain.  I mean it's really to Mr. Cohen, and the SEC.

12          MR. MORRIS:  Right, I'll make that offer in open

13 court.

14          THE COURT:  If you want to compose your

15 differences, that'll be fine with me.

16          MR. MORRIS:  Yeah, right, my offer's to Mr.

17 Cohen, that's fine, and in terms of complying with the

18 discovery orders, Your Honor, I'm a small firm.  I'm trying

19 to do what I can.  I had to focus on this.  I don't believe

20 the discovery's going to make any difference in this case

21 one way or the other, and certainly not at the preliminary

22 injunctive relief stage because --

23          THE COURT:  Still in all it is a court order,

24 right, and there are alternatives too, if you can't comply

25 with the court order, you say, Your Honor, I'm a solo

1   practitioner, I want to provide this and this, give me more

2   time, and you didn't do that.  I mean so we have complete

3   breaches of the court's directions without explanation.

4           MR. MORRIS:   I would for some additional time to

5   comply.  We intend to comply.  The lack of compliance,

6   although not acceptable, is not, should not affect the

7   Court's decision today.  What we're asking for today is a

8   number.  We need a number right now.  You've frozen all of

9   his assets worldwide.  You've attached $11 million worth of

10  property --

11          THE COURT:   I don't know if we've attached all of

12  his assets worldwide.

13          MR. MORRIS:   Well --

14          THE COURT:   We've attached three real estate --

15          MR. MORRIS:    -- three assets worth $11 million,

16  right.  The asset freeze is in place.  What we're looking

17  for is some relief from that.  What we're looking for today

18  is a number.  What number should be frozen here that is

19  justified under the law and that is reasonably calculable?

20          THE COURT:   All right, let me --

21          MR. MORRIS:   It can't include a penalty that

22  nobody can calculate, that's illiquid.

23          THE COURT:   All right, I understand.

24          MR. PETER PIZZI:   I'm sorry, before you hear from

25  the SEC, I'd like to just address the Court briefly.  I

1  represent NetJets, the garnishee.

2          THE COURT:   Oh, yes, okay.

3          MR. PIZZI:   So I'm Peter Pizzi, P-I-Z-Z-I is the

4  last name.  We ask for the opportunity to deposit the $2.5

5  million into court so that we don't have to pay attention

6  to this case, and there could be no question that we have

7  divested ourselves of all of the funds (indiscernible)

8  share transfer, aircraft share transfer.

9          So that's what we ask before the Court today, if

10  possible.  We had tried to get that by stipulation, but

11  barring that we ask the Court to note that on the order so

12  --

13          THE COURT:   I think it's a good idea, but I

14  prefer you do it by stipulation.  Has anybody heard of this

15  request from Mr. Pizzi?

16          MR. COHEN:   We've been in touch with Mr. Pizzi,

17  and we actually had prepared – give him the credit – he

18  prepared a proposed stipulation that he signed, we're

19  prepared to sign, and I've provided a copy of it to Mr.

20  Morris.  I believe the desire was to litigate the claims,

21  the arguments about the scope of the FDCPA if we're

22  stipulating to transfer everything to the registry.

23          But I'm prepared to and will sign the proposed

24  stipulation.

25          MR. MORRIS:   And I'm prepared to sign the

1  stipulation if the Court will agree that that's the max,

2  the $2.5 million is the maximum amount --

3        THE COURT:   No, you see, I'm hearing bargaining.

4  I'm hearing bargaining, and I'm not going to bargain with

5  you.  You want to sign the stipulation, fine.  You don't

6  want to sign the stipulation, well, that's fine too.

7        MR. PIZZI:   Thank you, Your Honor.

8        THE COURT:   Thank you, Mr. Pizzi.  Okay.  Want to

9  hear from the SEC?

10        MR. COHEN:   Yes, sir, thank you.  To respond to

11  the points made by counsel.

12        THE COURT:   Yes.

13        MR. COHEN:   Grupo Mexicano is completely

14  distinguishable.  This is a case involving --

15        THE COURT:   Here's the key point.  Do you have a

16  case out of the Federal Debt Collection Practice Act which

17  in the past the SEC has done what it's doing here?  Other

18  than the case in the Middle District of Louisiana.

19        MR. COHEN:   No.  The answer to your question's

20  no. We don't have a case where the SEC has used the FDCPA

21  on a (indiscernible).  There's not a ton of case law, as

22  the court is probably aware, on the FDCPA.

23        THE COURT:   Yeah.

24        MR. COHEN:   We cited three cases though that we

25  think are as close to being on point as you can under the

1  circumstances.

2          THE COURT:   Is Mr. Morris right?  I mean there's

3  always a first time for everything, but this'll be the

4  first time for this.

5          MR. COHEN:   This would be the first time for

6  this, and I think, if I may, all the authority's there for

7  Your Honor to do it.  You've got the <u>Ferron</u> case out of the

8  Second Circuit.   The Second Circuit.  And that is a case

9  that did not involve an overpayment where the Government

10  was initiating a claim to try to claw back an overpayment,

11  or even seek a penalty on top of an overpayment.  That was

12  the case where there was a penalty – they called it an

13  assessment which is another one of the catch phrases under

14  the FDCPA – but it was a penalty sought for the Federal

15  Reserve Board of Governors for a violation of the Bank

16  Holding Act, a regulatory infraction that was litigated

17  much like the commission is doing here, and the <u>Ferron</u> case

18  under the Second Circuit.

19          And you've also got two cases, not just the Middle

20  District of Louisiana, but also <u>DeGregorio</u>, which we've

21  cited, which I believe is a case out of Florida, and it's

22  in our brief.  The citation to it is, Middle District of

23  Florida, 510 F. Supp. 2d 877.  That was a false claims act

24  case involving a defendant who was defrauding Medicare.

25  The important thing there though is that the FDCPA was not

1    just used for the overpayment on the Medicare fraud but

2    also for the damages, for the penalty that followed from

3    it, and the court made that very clear, and also cited the

4    case out of Louisiana.

5           So there are three cases, three cases that we

6    think provide all the foundation that one needs to apply it

7    on these facts, but we recognize that this would be the

8    first time that it's been applied in an SEC enforcement

9    action.

10          THE COURT:   All right.

11          MR. COHEN:   All right.  You know, I'm happy to

12   address other points as well raised by Mr. Morris with

13   respect to whether or not this is an egregious violation

14   that would ultimately, at the end of the day, upon final

15   judgment substantiate a penalty claim commensurate to a

16   disgorgement amount that is as high as we anticipate it

17   being.  I think the answer is, based on the facts the Court

18   has before it, yes.  Yes.

19          And I can tender, we just prepared a couple, just

20   one page demonstratives just to give a visual of what this

21   case is about and what the evidence at trial would be.

22   I've marked them for today's hearing as 104 and 105.  I'll

23   give – just give a copy to Mr. Morris as well.  These just

24   summarize the McFall declaration and the exhibits thereto.

25   If I may pass them up, Your Honor?

1          THE COURT:   Yes.

2          (pause in proceeding)

3          MR. COHEN:   And if I may, I'll start with exhibit

4    104.   And this goes to the point that this is not an

5    egregious violation of the securities laws.   This is a

6    technical violation, that there was a disclaimer, it was

7    more than sufficient.

8          This is a case involving a very thinly traded

9    stock that in the week before the fraudulent conduct had a

10   total trading volume of about 7,000 shares.   In the year

11   leading up to the fraud --

12         THE COURT:   Then all of a sudden, you know, after

13   certain touts, there was a spike, unexplained by any news

14   in the newspaper other than the tout.   And you have a

15   rocket-like rise, and then before the rise is completely

16   achieved, you have a rapid disposition by the person in the

17   know.   That's - is that what this chart's telling me?

18         MR. COHEN:   That's exactly right.

19         THE COURT:   Yeah.

20         MR. COHEN:   That's exactly right.   I think spike

21   - and I think spike's an understatement.   You went from

22   7,000 shares in a week, to 7.8 million shares in 90

23   minutes.   You effectuated a change in the share price from

24   29 cents per share the day before the closing price, the

25   day before, to a high of $1.80.   So this was a massive

1   fraud perpetrated in just a 90-minute window.  And so

2   that's what exhibit 104 shows.  And that also I think is a

3   really good exhibit to explain why our disgorgement theory

4   is a righteous one.

5          Disgorgement calls for the wrongdoer to give up

6   what can be reasonably approximated of his profits.  There

7   is no way that Mr. Babikian, who possessed 1.466 million

8   shares of American West, could have sold those shares on

9   February 23.  There's just no way.  At most, he could have

10  sold a couple of thousand.  Of course, at this stage in the

11  proceeding, it would be his burden to establish otherwise

12  the challenge, and he hasn't.  But as we said in the brief,

13  what he accomplished was a truly unnatural feat of

14  unloading that many shares in such a short period of time

15  at such a high price.

16         So with respect to the second exhibit, this

17  summarizes the methodical kind of scheme that this case is,

18  and that's going to be exhibit 105 that I passed up.  It's

19  a timeline.  And what the timeline shows is the steps to

20  acquire shares in America West, move them to a – first to

21  acquire the shares, then have the restricted legend removed

22  from them so they could be traded on the market.  Then have

23  them moved to a --

24         THE COURT:   Well, okay, I understand your point,

25  but Mr. Babikian's counsel points out that, you know, this

1    occurred two years ago, and there's no likelihood of

2    repetition.  I mean this is two years old.  This may be

3    wonderful evidence, but it's evidence of an older act.  So

4    Mr. Morris says there's no likelihood of repetition here.

5            MR. COHEN:   So I have a couple of responses to

6    that.  The first is I think the degree of planning that

7    went into this act, from that I think the Court can infer

8    that there is a risk of repetition.  This wasn't a one-off.

9    This is something that was well thought out over the course

10   of several, several months, and it was effectuated by

11   somebody with the means to do it again.

12           The second point, and this is just something

13   that's kind of just bleeds throughout the paperwork that

14   we've submitted, Mr. McFall's declaration, this is a very

15   sophisticated individual.  Dealing with his affairs,

16   understanding his affairs is like, it's not an exaggeration

17   I think to say it's like being in a hall of mirrors.

18   Everything is an alter ego front company housed somewhere

19   offshore, and trying to peel things back and understand

20   what's Mr. Babikian's, where property's being transferred

21   to, I think someone that is able and who has demonstrated

22   an ability to conduct his affairs in that manner, who is as

23   internet savvy as he evidently is based on the allegations,

24   the facts set forth in the McFall declaration, I think

25   there's also a risk of repetition there.

1          THE COURT:    Let me interrupt you just for a

2   second.   The TRO that I issued expires at 5 p.m. today.

3   The parties consent to an extension of the TRO so that I

4   can write a decision on this application for preliminary

5   injunction?

6          MR. COHEN:    No objection from the Commission.

7          THE COURT:   Mr. Morris.

8          MR. MORRIS:   Your Honor, we ask today that the

9   Court limit the asset freeze.   The TRO I have no objection

10  to extending, the preliminary injunction.   I have no

11  objection even to an asset freeze, Your Honor.   What we

12  have an objection to is the pervasiveness of it, that

13  everything, he can't feed his child, he can't put gas in

14  his car.   The asset freezes every dime he has.

15         The law is very clear that the asset freeze cannot

16  go beyond the disgorgement.   There's $2.5 million right

17  here which more than exceeds even the SEC's disgorgement

18  figure. That's what we would like to have the Court do is

19  limit the asset freeze, continue the preliminary

20  injunction, vacate these writs of attachment and

21  garnishments because they're not --

22         THE COURT:   I may very well do that.   I mean the

23  argument is very intriguing.   But in the meantime my TRO

24  expires, which puts you in the position where you could do

25  whatever you wanted to do.

1          MR. MORRIS:   Well, okay, Your Honor --

2          THE COURT:   And all I'm asking you is to continue

3   with the TRO until such time as I'd make my decision --

4          MR. MORRIS:   I consent to that --

5          THE COURT:   -- and I understand that I have to --

6          MR. MORRIS:   -- Your Honor, yes, I'm sorry, I

7   misunderstood.  I consent.

8          THE COURT:   Okay.  All right.

9          MR. MORRIS:   My mistake, I apologize.

10         MR. COHEN:   And so one more – two more points

11  just on the likelihood of continued conduct.  Paragraph 34

12  of our complaint alleges that the APS website touted stocks

13  beyond America West on three separate occasions.  In the

14  fall of 2013, the Commission issued orders suspending

15  trading in stocks that were the subject of APS touting.

16  That's also penny stocks.  APS touting campaigns.  And, of

17  course, we're a little hamstrung completely responding to

18  that because we don't have discovery from Mr. Babikian.  We

19  would, among other things, marshalled proof from discovery

20  put to him about other touts.

21         So I think – and then I guess the last point is

22  the scope of the conduct injunctive relief that we're

23  seeking here is actually quite limited.

24         THE COURT:   Well, what about Mr. Morris' point,

25  you know, that take $2 million, freeze that, you know, you

1  have more than enough to, given the allegations in the

2  complaint.  You're not entitled to more.  Take the limited

3  exercise of the court's equity power, freeze the assets,

4  and sufficient to address the claim, and let it go at that.

5        MR. COHEN:   I understand why the argument is

6  made, because --

7        THE COURT:   I do too.

8        MR. COHEN:   Right, because the money that's

9  already tied up from NetJets.  But the Commissions got a

10  claim here for far more than $2 million.  I'm using "claim"

11  in the more colloquial sense, not the FDCPA sense.  We have

12  a total allegation here that when proven in court, and it

13  will be, would entitle us to at least 1.9 million in

14  disgorgement, prejudgment interest, a civil penalty

15  commensurate to the amount of disgorgement, and then up to

16  10 percent in fees under the FDCPA.  That gets us right now

17  to $4.2 million.  And as I stand before you, I am confident

18  that the number will only go up with discovery.

19        THE COURT:   All right, I think I've heard enough.

20  I'll take – is it Mr. Prizzi?

21        MR. PIZZI:   Pizzi, yes, Your Honor.

22        THE COURT:   Pizzi, I'll take your order.

23        MR. PIZZI:   Thank you.

24        THE COURT:   Hand it up.

25        MR. MORRIS:   Your Honor, if I could just add one

44

1  point.

2          THE COURT:   Yes.

3          MR. MORRIS:   The Second Circuit case that's been

4  cited, it's very, and I would urge the Court to read it

5  carefully as well as the <u>SEC v. ISP</u>, that management case.

6  The Second Circuit says at page 6 here, "The assessment

7  against Ferron became an amount owing to the United States,

8  but the Board issued notice of assessment." The Federal

9  Reserve Board has the capability to assess a penalty

10  evidently from my reading of this case. And the SEC does

11  not have an ability to assess a penalty. They can't assess

12  any penalty, so there is no amount owing. That's not

13  within something the SEC has statutory authority to do.

14          The SEC can file a complaint, they can seek

15  punitive damages, but that isn't an amount owing. That

16  amount is not even, nobody can calculate it. It's

17  disputed. It's contingent. It's – there's no readily

18  calculable way to even come up with what the punitive

19  amount would be. All the SEC statute says is they can seek

20  a punitive penalty, and then it gives the maximum amount of

21  what that penalty can be, but it doesn't provide for any

22  specific penalty. In fact, that's left to the discretion

23  of the court. And the court can only issue that penalty

24  under the Supreme Court law once there's been a finding of

25  liability. So there can be no debt owing in the penalty.

1    And with regard to the disgorgement amount, the

2  court is limited under its equitable power to freezing the

3  amount that's subject to disgorgement, however that's

4  calculated.  In this case, as I said, the maximum amount

5  anybody could calculate would be $1.9 million.

6    THE COURT:  Okay, I mean I've got that point.

7    MR. MORRIS:  I don't want to belabor it.  And if

8  I could make just one last point.  The tout that the SEC

9  says is so egregious is "today's pick is."  That's the only

10  allegation in the complaint is that he issued an email that

11  said "today's pick," that's not, he's not misrepresenting

12  the facts about that pick.  I don't even know what that

13  means, but it isn't, you know, this stock is worth a

14  billion dollars or whatever.  I mean it just says "today's

15  pick is."

16    THE COURT:  Well, you ought to read the United

17  States v. Levy.  I've got a couple of opinions on it.  You

18  may come to the contrary conclusion.

19    Now, do you object to the stipulation in order to

20  deposit funds into the registry of the court, Mr. Morris?

21    MR. MORRIS:  Your Honor, I have a slight issue

22  with that.  This stipulation I haven't read but I assume is

23  asking me to stipulate on behalf of Vertical Relief Fund,

24  Inc., not Mr. Babikian.  I don't have authority to Vertical

25  International Relief Fund, Inc., so I don't think I can

1  sign the stipulation as counsel to Vertical Relief Internet

2  [sic] Fund, Inc.  So that's – I have I guess – I might be

3  able to get authority but I don't have this at this point,

4  so that's I guess why I am not able to sign.

5          THE COURT:   Mr. Pizzi, what do you want to do?

6  Do you want to wait for authority or do you want me to just

7  --

8          MR. MORRIS:   I don't have any objection.  On

9  behalf of Mr. Babikian I don't have any objection with

10 doing that.  In fact, it seems to be a logical thing since

11 NetJet is advised that they're going assess some sort of

12 fees against the $2 ½ million for I think maintenance or

13 something, I'm not sure but whatever those fees are.  I

14 don't have any objection on behalf of Mr. Babikian.

15         And with that 2 ½ million I would argue that the

16 Court has equitable power to freeze that.

17         THE COURT:   I'm over – yeah, you're going to say

18 I'm overcollateralized.

19         MR. MORRIS:   I would say that the SEC is

20 sufficiently collateralized --

21         THE COURT:   At 1.9 or 2 --

22         MR. MORRIS:   At, well, $2 million.  Under its

23 best case scenario.

24         THE COURT:   Now, therefore, it is hereby

25 stipulated and agreed between the parties and by garnishee

1  NetJets (1) NetJets shall deposit by check the sum of $2.5

2  million.  Upon deposit of such amount in the registry of

3  this court, NetJets shall be dismissed as a garnishee in

4  this proceeding.  And as soon as the business of the

5  clerk's office allows, the clerk shall deposit the sum of

6  2.5 into the Court Registry Investment System, the CRIS

7  system.  In all other respects, the repurchase agreement,

8  including all interest thereon, up to and including the

9  date of withdrawal, shall be held according to further

10  order of the court.  That's what it says.  I don't think it

11  refers to the party – what is the party that you refer to,

12  Mr. Morris?

13        MR. MORRIS:   I see here in the whereas clause it

14  says, "All proceeds from NetJet fractional share in the

15  name of Vertical International Relief Fund" --

16        THE COURT:   Oh, yeah, that's true.  Right.  Well,

17  what do you want to do, Mr. Pizzi, in light of the

18  inability of Mr. Morris to stipulate on behalf of Vertical

19  International Relief Fund?

20        MR. PIZZI:   Well, I believe that NetJets took

21  direction from Mr. Babikian as to this transaction, his

22  lawyers consenting on behalf of the executive of Vertical

23  Relief.  So I think that's a reasonable solution.

24        MR. MORRIS:   I'd agree.  As I said, Your Honor,

25  on behalf of Mr. Babikian I have no objection.

1          THE COURT:   I didn't hear what you said, Mr.

2  Morris.

3          MR. MORRIS:   Oh, I have a bad habit of talking

4  too fast.  On behalf of Mr. Babikian, I don't have any

5  objection to this money being transferred to the court

6  registry.

7          MR. PIZZI:   I think it's satisfactory, Your

8  Honor.  The alternative would be to reduce stipulation with

9  a signature for Vertical Relief, but it's not a party

10  technically to this case.  But I'm happy to do that as

11  well.

12          THE COURT:   I think to be safe, that's what you

13  ought to do.  Or I could modify this, directed to all

14  proceeds from NetJets fractional share in the name of –

15  well, I don't know if you want to do that.  Mr. Morris, do

16  you want to suggest any language that modifies Vertical

17  International Relief?

18          MR. MORRIS:   Can we – let me take a quick look

19  here, sorry.

20          (pause in proceeding)

21          THE COURT:   An entity under the control of Mr.

22  Babikian?

23          MR. MORRIS:   Yeah, I think you're right.

24          THE COURT:   Subject to his direction and control.

25          MR. MORRIS:   Yeah.  I don't think I have, you

1  know, I think what I can - I just don't want to get myself

2  into a bind I guess.  I can say that I represent my client.

3  On behalf of Mr. Babikian, he has no objection.  I think he

4  signed document with NetJet as the asset manager, so I can

5  say Mr. Babikian as asset manager of NetJets has no

6  objection to this transfer.  That may be sufficient, if I

7  can just say essentially that as an asset, on behalf of Mr.

8  Babikian as asset manager.

9             THE COURT:   Okay.

10             MR. PIZZI:   He's asset manager of Vertical

11  International Relief Fund?

12             MR. MORRIS:   That's what he signed the original

13  contract for with Vertical International, on behalf of

14  Vertical International Relief Fund.

15             THE COURT:   The SEC object?

16             MR. COHEN:   No, Your Honor, I mean - no, Your

17  Honor.  I think exhibit 46, for example, to the McFall

18  declaration has Mr. Babikian signing for Vertical

19  International Relief Fund as the asset manager for that

20  entity in a NetJets documents.  And it's our understanding

21  as well the negotiations between NetJets and Mr. Babikian

22  that resulted in the transaction that left NetJets with a

23  $2.5 million in proceeds were all conducted with Mr.

24  Babikian.

25             MR. MORRIS:   Your Honor --

1          THE COURT:   Mr. Morris.

2          MR. MORRIS:   -- if I may.  I just - I'd sign this

3   and just note it at the bottom, on behalf of John Babikian,

4   asset manager of Vertical International Relief Fund.

5          THE COURT:   All right.  Have the others signed it

6   as well?

7          MR. PIZZI:   The SEC --

8          MR. COHEN:   We've signed it, Your Honor.

9          THE COURT:   All right.  If you hand it up, Mr.

10  Pizzi, I'll be happy to sign it.

11         MR. PIZZI:   Thank you.

12         (pause in proceeding)

13         THE COURT:   All right, I've so ordered it and

14  signed and dated it today.  The TRO is continued until such

15  time as I reach my decision.  I promise I'll have a

16  decision for you shortly.

17         MR. COHEN:   Thank you, Your Honor.  If I may, I

18  have one more order of business that I'd just like to

19  raise.

20         THE COURT:   Yeah.

21         MR. COHEN:   And that is another one of the

22  properties is the Laurel Avenue property.

23         THE COURT:   Yes.

24         MR. COHEN:   And that is the one that's pending

25  sale.  From the Commission's perspective, I think it's

1  certainly in the Commission's interest and we believe it's

2  in Mr. Babikian's interest to allow that sale to go

3  through.  They have what appears to be an arm's length

4  buyer and a purchase price of the property.  But for the

5  sale to go to closing because it's subject to the court's

6  orders, it needs to be released.

7            So we prepared and I've provided a draft of this

8  to Mr. Morris an order that would allow that to happy, and

9  I'd like to just tender it up for the Court's

10  consideration.

11            THE COURT:   Okay.  When is the closing supposed

12  to occur?

13            MR. COHEN:   I think they were looking to do it

14  right before we came to court or right after we came to

15  court.  It's now I think been postponed indefinitely, but

16  they're looking to do it soon.  Weeks, a couple of weeks.

17            THE COURT:   Well, if you can work it out with Mr.

18  Morris, that's fine with me.  If not, I'm going to have a

19  decision within a week's time.

20            MR. COHEN:   Okay.  I'll talk to counsel.

21            THE COURT:   All right.  Okay, anything else?

22  Thank you very much for the argument.  I appreciate it.

23            MR. COHEN:   Thank you, Your Honor.

24            MR. MORRIS:   Thank you, Your Honor.

25            THE COURT:   You know, we didn't have a court

1  reporter.  We didn't have a court reporter, but all this

2  was taken down.  And so it's orally recorded.  So you can

3  order a transcript.  It would be helpful, since everybody

4  was citing cases, if somebody orders a transcript, to get

5  the benefit of your citations.  Thank you very much.

6           MR. COHEN:    Thank you.

7           (Whereupon, the matter is adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3          I, Carole Ludwig, certify that the foregoing

4   transcript of proceedings in the United States District

5   Court, Southern District of New York, Securities and

6   Exchange Commission versus Babikian, Docket #14cv1740, was

7   prepared using digital transcription software and is a true

8   and accurate record of the proceedings.

9

10

11

12

13  Signature_____

14                      CAROLE LUDWIG

15  Date:   April 11, 2014

16

17

18

19

20

21

22

23

24

25